**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Formatted Table

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,<br>108 Metropolitan Courthouse, Nashville, TN 37219-6300<br><br>HARRIS COUNTY, TEXAS,<br>1001 Preston Street, Houston, TX 77002<br><br>CITY OF COLUMBUS, OHIO,<br>90 West Broad Street, Columbus, OH 43215<br><br>~~and~~<br><br>EL PASO COUNTY, TEXAS,<br>500 E. San Antonio Avenue, El Paso, TX 79901<br><br>TRAVIS COUNTY, TEXAS<br>700 Lavaca Street, 5th Floor<br>Austin, TX 78701<br><br>and<br><br>DALLAS COUNTY, TEXAS,<br>500 Elm Street, 7th Floor Dallas, TX 75202<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as the Secretary of Homeland Security; FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in his official capacity as the FEMA Administrator.<br><br>*Defendants*. | Case No. 1:26-cv-02886 (AHA) |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Congress created the Homeland Security Grant Program (HSGP) to help state and local governments prevent, protect against, and respond to terrorism. To that end, Congress directed the Federal Emergency Management Agency (FEMA) to allocate those grants by a statutory formula keyed to each jurisdiction's vulnerability to terrorist attacks.

2. Congress did not create the HSGP to empower the federal government to control state and local election procedures. Yet the Administration has now hijacked the program to do just that. For Fiscal Year 2026 HSGP funding, FEMA has conditioned these critical national security funds on states and counties adopting a series of five mandatory changes to their election procedures. The conditions touch on nearly every aspect of the election process: voting equipment and the means by which voters cast their ballots, post-election audits, ballot reconciliation, voter-roll citizenship checks, and election worker citizenship checks.

3. FEMA will now hold 20 percent of every state's HSGP award hostage—more than $200 million nationwide—unless states agree to these and other election conditions. FEMA has even suggested that unless a state complies with these conditions, FEMA may cancel the *entire* HSGP award for the state, the vast majority of which is earmarked for counties and municipalities like Plaintiffs here. FEMA's changes will fundamentally alter how states and local jurisdictions administer elections.

4. FEMA has no authority to impose those conditions—not under its governing statute and not under the Constitution. Congress authorized FEMA to help jurisdictions protect critical infrastructure from terrorist and cyberattacks. It did not authorize FEMA to decide who may vote, how ballots must be counted, or how states maintain their voter rolls. Never before has FEMA purported to regulate how states and counties run elections. Such a transformative

assertion of federal authority in an area of traditional state control requires clear congressional authorization that FEMA does not have. The power to administer elections belongs to the states, subject only to conditions imposed by Congress—not the President, not the Secretary of Homeland Security, and not FEMA.

5. FEMA's new election-related conditions on HSGP funding ("Election Administration Conditions") are also arbitrary and capricious. FEMA has offered no reasoned explanation for how overhauling state election administration serves HSGP's counterterrorism mission, and it has ignored the legal, financial, and logistical chaos these conditions will inflict on state and local governments that are suddenly told—only months before an election—that they must transform how their elections are run. Nor has FEMA reckoned with the separate harm inflicted by the 20 percent holdback itself: by denying states and localities funds for border security, cybersecurity, and counterterrorism programs, FEMA leaves those communities less safe—under the guise of enforcing Election Administration Conditions it has no authority to impose.

6. Plaintiffs therefore ask this Court to set aside FEMA's Election Administration Conditions and prevent Defendants from withholding, suspending, terminating, or otherwise reducing HSGP funds on the basis of those conditions.

**PARTIES**

7. Plaintiff Metropolitan Government of Nashville and Davidson County (Nashville) is a combined municipal corporation and county government organized and existing under Tennessee law.

8. Plaintiff Harris County, Texas, is a county government organized under Texas law.

9. Plaintiff the City of Columbus, Ohio, is a municipal corporation organized under Ohio law.

10. Plaintiff El Paso County, Texas, is a county government established under Texas law.

11. Plaintiff Travis County, Texas, is a county government established under Texas law.

12. Plaintiff Dallas County, Texas, is a county government established under Texas law.

~~11.~~13. Defendant U.S. Department of Homeland Security (DHS) is a cabinet-level department of the Executive Branch of the federal government. DHS is responsible for administering the Homeland Security Grant Program through its component agency, the Federal Emergency Management Agency.

~~12.~~14. Defendant Markwayne Mullin is the Secretary of Homeland Security. He is sued in his official capacity.

~~13.~~15. Defendant Federal Emergency Management Agency ("FEMA") is a component agency of DHS.

~~14.~~16. Defendant Cameron Hamilton is the FEMA Administrator. He is sued in his official capacity.

**JURISDICTION AND VENUE**

~~15.~~17. This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

~~16.~~18. This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 702, 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

~~17.~~19. Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. § 1391(e).

## FACTUAL AND LEGAL BACKGROUND

***A. The Homeland Security Grant Program***

~~18.~~20. Following the September 11, 2001 terrorist attacks, Congress created the Department of Homeland Security ("DHS") to reduce the vulnerability of the United States to terrorism and assist in recovery from terrorist attacks that occur within the United States. Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135. Over the years, Congress has established various grant programs through which DHS supports state, local, tribal, and territorial efforts to prepare for and prevent future acts of terrorism, major disasters, and other hazards.

~~19.~~21. One such program is the Homeland Security Grant Program ("HSGP"), 6 U.S.C. §§ 603–609, which DHS administers through its subagency, the Federal Emergency Management Agency ("FEMA"). Under the HSGP, FEMA distributes funding to State Administrative Agencies, or "SAAs," which manage and distribute HSGP funds and issue subawards to local and tribal governments and other eligible organizations. Since 2002, Congress has appropriated approximately $1 billion to $2 billion annually for the HSGP.

~~20.~~22. The HSGP has three components: the Urban Area Security Initiative ("UASI"), the State Homeland Security Program ("SHSP"), and Operation Stonegarden ("OPSG"). *Homeland Security Grant Program*, FEMA, https://www.fema.gov/grants/preparedness/

homeland-security (last visited Aug. 17, 2026). Each fiscal year, FEMA issues a single consolidated Notice of Funding Opportunity ("NOFO") for all three components.

~~21.~~23. The UASI program, the largest of the three components, provides funding to designated "high-risk urban areas" to build capacity to prevent, prepare for, protect against, and respond to terrorism. *See* 6 U.S.C. § 604. Each year, federal law directs FEMA to designate eligible high-risk urban areas and allocate UASI funding to them according to an assessment of "the relative threat, vulnerability, and consequences from acts of terrorism faced by each eligible metropolitan area," 6 U.S.C. § 604, based on factors including the area's population density, history of threats, and "consequences related to critical infrastructure," *id.* § 608(a).

~~22.~~24. FEMA distributes UASI grants to the state or states in which the eligible high-risk urban area is located. The state must then distribute to its designated UASI areas not less than 80 percent of the grant funds awarded; a state may retain the remainder for items, services, or activities that benefit its high-risk urban areas. 6 U.S.C. §§ 604(c), 609(a). Applicable uses of UASI funds include developing and enhancing homeland security or emergency management, designing, conducting, and evaluating training and exercises, purchasing, upgrading, storing, or maintaining equipment, or paying salaries and benefits to personnel to serve as intelligence analysts. *Id.* § 609(a).

~~23.~~25. Similar to UASI, the SHSP program provides funding to states to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism. 6 U.S.C. § 605(a). And like UASI, SHSP grants are formula grants based on a statutory risk formula, not competitive grants. Specifically, Congress requires FEMA to allocate SHSP funds based on a statutory risk assessment that considers the "relative threat, vulnerability, and consequences" to each state from acts of terrorism, based upon factors such as population

density, history of threats, and "its degree of threat, vulnerability, and consequences related to critical infrastructure." 6 U.S.C. § 608(a).

~~24.~~26. Based upon the statutory formula for SHSP grants, each state is entitled to a minimum, specific allocation of SHSP funds whenever a notice of funding opportunity arises. FEMA distributes SHSP funds to each state, which must then pass down at least 80 percent of the grant funds or services, items, or activities equal to at least 80 percent of the grant funds to tribes or local jurisdictions. 6 U.S.C. § 605(c). Applicable uses of SHSP funds include developing and enhancing homeland security, designing and conducting training exercises, purchasing and upgrading equipment, or paying salaries and benefits. *Id.* § 609(a).

~~25.~~27. The OPSG program provides funding to support joint efforts by Customs and Border Protection and state, local, tribal, and territorial law-enforcement agencies to strengthen border security. DHS, *Notice of Funding Opportunity (NOFO): Fiscal Year 2026 Homeland Security Grant Program* (July 9, 2026) ("2026 NOFO"), at 22–23 https://www.fema.gov/sites/default/files/documents/fema_gpd_hsgp-nofo-fy2026_0.pdf. OPSG funding is distributed to eligible law enforcement agencies located along the nation's international borders based on risk to the security of the border and the anticipated effectiveness of the proposed projects in mitigating that risk. *Id.* at 73. FEMA considers factors including the nature and level of the threat, vulnerability, miles of border, and border-specific law-enforcement intelligence. *Id.* at 43, 73.

~~26.~~28. Since fiscal year 2020, FEMA has also identified National Priority Areas (NPA) within HSGP to promote coordinated investment in specified preparedness risks and goals. FEMA may require recipients to devote a stated percentage of their HSGP awards to projects

addressing those priorities. FEMA has treated election security as either a component of a NPA or a standalone NPA in every year it has identified NPAs except fiscal year 2021.

~~27.~~29. Beginning in fiscal year 2023, FEMA has included election security as a standalone NPA and required recipients to devote at least 3 percent of their HSGP awards to it. During this time, FEMA has required each state and local recipient to submit an Investment Justification ("IJ") that explains how the recipient plans to meet the Election Security NPA and other NPAs with minimum spend requirements. FEMA has warned that failure to do so could lead to the agency placing funding on hold in an amount up to the minimum spend requirement (3 percent for election security) until the state submits an IJ that includes proposed projects that "sufficiently align" to the NPA. *See, e.g.*, DHS, *Notice of Funding Opportunity (NOFO): Fiscal Year 2024 Homeland Security Grant Program* 7 (Apr. 16, 2024) ("2024 NOFO"), https://www.fema.gov/sites/default/files/documents/fema_fy2024_hsgp_nofo.pdf.

~~28.~~30. In fiscal years 2023 and 2024, FEMA gave state and local recipients broad flexibility to determine which election security projects would meet the 3 percent expenditure minimum in a way that best satisfied their jurisdictions' needs while furthering broader anti-terrorism goals. Example project types included physical security measures for election offices and voting locations (locks, alarms, access controls, etc.), cybersecurity assessments and mitigations, and online presence services to protect election workers from threats and harassment. FEMA stated that it would not approve expenditures that were "used to suppress voter registration or turnout." 2024 NOFO at 34. But prior to 2025, FEMA never required or encouraged state and local recipients to alter rules and procedures for registering voters, counting ballots, or otherwise conducting elections.

~~29.~~31. In fiscal year 2025, FEMA imposed additional requirements for the Election Security NPA and stated that it would withhold 3 percent of the total HSGP award (the amount corresponding to the election-security minimum-spend requirement) until FEMA confirmed the state or locality's compliance with these requirements. Among other things, FEMA required state and local recipients to prioritize compliance with the latest federal voluntary voting system guidelines, complete voting system testing through a federally-accredited laboratory, and use the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") system to verify the citizenship of election workers. U.S. Dep't of Homeland Sec., *Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program* 17–18 (July 28, 2025), https://www.fema.gov/sites/default/files/documents/fema_gpd_homeland-security-grant-program-nofo_fy2025.pdf ("2025 NOFO").

~~30.~~32. On June 8, 2026, DHS released "updated compliance requirements" for the FY2025 Election Security NPA. The directive incorporated requirements associated with Executive Order 14248, which is described below, and stated that to comply, states and counties must both meet the 3 percent election-security minimum-spend requirement and three new "certifiable compliance conditions," including using the SAVE database for both voter list maintenance and election worker eligibility. *See* Memorandum from FEMA, Re: Homeland Security Grant Program Border Security and Election Security National Priority Area Requirements 3–4 (June 8, 2026), https://www.fema.gov/sites/default/files/documents/fema_rsl_gpd_ib-569-border-security-election-security_06082026.pdf.

~~31.~~33. Several weeks later, on June 24, 2026, and then as amended on July 9, 2026, FEMA released its notice of funding opportunity for the FY2026 HSGP, which included new conditions to be imposed for FY2026 HSGP funds. 2026 NOFO. As described in greater detail below, these conditions went much further in seeking to leverage HSGP funding to control election procedures nationwide.

***B. Plaintiffs' HSGP Grants***

~~32.~~34. Plaintiffs in this case are counties and cities that have all consistently received HSGP funding and are expected to receive FY2026 HSGP funding if and when the funds are released to states.

*Nashville*

~~33.~~35. Plaintiff Nashville is a rapidly growing metropolitan area with more than 700,000 residents that also draws a large number of tourists. It hosts high-profile visitors, including the President and Vice President, and stages large-scale public events, including CMA Fest, professional and collegiate sporting events, and events tied to the Grand Ole Opry's 100th Anniversary. Nashville has weathered both natural and human-caused disasters, including a 2020 Christmas Day bombing that devastated a downtown city block. Protecting Nashville requires coordination and assistance among multiple local agencies, including the Nashville Fire Department, Metro Nashville Police Department, and Office of Emergency Management, all of which depend on federal grant funding to keep pace with evolving technology and to train personnel adequately to ensure the safety of both residents and tourists.

~~34.~~36. Nashville routinely applies for and receives pass-through grants from the Tennessee Emergency Management Agency ("TEMA") under the UASI and SHSP programs.

~~35.~~37. For fiscal years 2023 and 2024, Nashville received $740,450 and $591,643, respectively, in UASI funding. Nashville used these funds to acquire critical equipment, including a SPOT robot capable of entering dangerous areas to detect hazardous materials and explosives, and handheld spectrometers and atmospheric monitors to guard against chemical and biological threats, and to fund crucial training, including for structural collapse response.

~~36.~~38. For FY2025, Nashville expects to receive $1,425,776 in UASI funding, which it plans to spend on equipment such as a VipIR detector for chemical threat detection and shoring equipment for urban search and rescue, as well as for additional training on structural collapse.

~~37.~~39. Nashville is seeking UASI funding again for FY2026.

~~38.~~40. Under the FY2026 UASI funding allocation that FEMA has released, the Nashville-Davidson-Murfreesboro-Franklin, TN designated urban area is slated to receive $3,785,734. 2026 NOFO at 73.

~~39.~~41. With FY2026 UASI funds, Nashville intends to purchase, among other things, an armored vehicle and ballistic vests for its SWAT team; protective gear and bomb-sniffing dogs for its bomb squad; detectors for chemical/biological weapons; infrared technology for heat signatures to help search for people; an advanced cradle for helicopter rescues; and various other gear. Nashville also hopes to use the funds for staff training, including for a special medical team that teaches high-level emergency skills (e.g., amputations).

~~40.~~42. For FY2023 and FY2024, Nashville received $288,441 and $43,470.99, respectively, in pass-through funding through the SHSP Program. Nashville used that funding to acquire an emergency shelter system, generator, and portable lighting for rapid disaster response and to fund crucial training to prepare for such situations.

~~41.~~43. For FY2025, Nashville expects to receive $92,820 in SHSP funding, which it plans to spend on ballistic helmets for active aggressor response as well as water-rescue training.

~~42.~~44. Nashville is seeking SHSP funds again in FY2026.

~~43.~~45. Nashville hopes to use FY2026 SHSP funds for four major purchases: X-Ray equipment and a PAN (Percussion Actuated Non-electric) disrupter for the bomb squad, equipment to allow tactical members to rappel from a helicopter, and jet skis to allow the marine team to quickly reach areas of the Cumberland River without having to use a larger boat. Nashville also hopes to use the funds to buy dive equipment and to replace gear that has expired.

~~44.~~46. The State of Tennessee is encouraging its subrecipients, including Nashville, to have a contingency plan in place and to consider how projects and priorities could be adjusted if the full FY2026 HSGP allocation is not made available.

*Harris County*

~~45.~~47. Harris County is the nation's third-largest county by population, with over 4.8 million residents as of the last census, or over one in every six residents of the State of Texas. If Harris County were a state, it would be the 25th largest state in the country. As of July 29, 2026, the County has 2,748,714 registered voters. It is home to the most diverse population and electorate in Texas. More than 145 languages are spoken in Harris County. It has 1,224 voting precincts.

~~46.~~48. In Texas, HSGP funds are awarded initially to the Office of the Governor, which acts as the State Administrative Agency for HSGP. The Office of the Governor then distributes HSGP funds to various local, regional, and state sub-recipients to enhance security and terrorism preparedness. Harris County has received HSGP funds for many years.

~~47.~~49. In recent years, Harris County has received HSGP funding through both the SHSP and UASI programs. The county receives SHSP funds through the Houston-Galveston Area Council, which administers the SHSP grant program for the region, and it receives UASI funds through the Houston Urban Area Working Group, which oversees the UASI grant program in the Houston area.

~~48.~~50. In FY2024, Harris County received at least $6.6 million in UASI funds and $292,000 in SHSP funds. In FY2023, Harris County received at least $6.8 million in UASI funds and $325,000 in SHSP funds. In FY2022, Harris County received at least $5.9 million in UASI funds and $47,000 in SHSP funds.

~~49.~~51. Harris County has received or expects to receive UASI funds for fiscal years 2024, 2025, and 2026.

~~50.~~52. For FY2024, FEMA allocated $21,748,776 in UASI funding to the Houston-The Woodlands-Sugar Land, TX urban area. FY2024 NOFO at 16.

~~51.~~53. For FY2025, FEMA allocated $26,233,082 in UASI funding to the Houston-The Woodlands-Sugar Land, TX urban area. FY2025 NOFO at 56.

~~52.~~54. Under the FY2026 UASI funding allocation that FEMA has released, the Houston-The Woodlands-Sugar Land, TX urban area is slated to receive $23,347,667. 2026 NOFO at 73.

~~53.~~55. Of those FY2026 UASI funds, Harris County expects to receive and use some of that funding for projects such as: ensuring the integrity of radio networks used by first responders; training special response teams and investing in equipment capable of detecting hazardous chemical, biological, radiological, nuclear, and explosive materials; training and equipping special response teams tasked with protecting the public from violent extremists,

bombs, and other explosive devices; and maintaining an emergency alert system to disseminate information to the public during a terrorist attack.

~~54.~~56. In the past, Harris County has received and invested HSGP funds to protect public safety. For example, it has used grant funds to invest in cameras, screening equipment, lighting, access controls, fencing, and operational overtime to enhance the physical security of transportation centers, parks, restaurants, shopping centers, special event venues, and similar locations. Grant funds have also been used to fund projects that support first responder training and equipment needs, including the purchase of PPE and other resources needed to effectively respond to terrorist attacks and active shooter events.

*City of Columbus*

~~55.~~57. In Ohio, HSGP funds are awarded initially to the Ohio Emergency Management Agency (EMA), which acts as the State Administrative Agency for HSGP. Ohio EMA then distributes HSGP funds to various local, regional, and state sub-recipients to enhance security and terrorism preparedness.

~~56.~~58. Plaintiff City of Columbus has received HSGP funds over many years—sometimes from the state as a sub-awardee and sometimes through Franklin County Emergency Management & Homeland Security, which serves as the central coordinating body for the UASI grant program within the Columbus, Ohio urban area.

~~57.~~59. In recent years, the City of Columbus has received HSGP funding through both the SHSP and UASI programs.

~~58.~~60. The city received SHSP program funds for FY2022 ($185,000), FY2023 ($280,026), and FY2024 ($91,842).

~~59.~~61. The city has received or expects to receive UASI funds for fiscal years 2024, 2025, and 2026. For FY2026, Defendants have allocated $3,662,688 in UASI funds to the Columbus urban area. 2026 NOFO at 72. For FY2025, Defendants allocated $4,062,892 in UASI funds to the Columbus urban area. 2025 NOFO at 56. For FY2024, they allocated $1,346,340. 2024 NOFO at 16.

~~60.~~62. Of those funds, the City of Columbus expects to receive and use some of that funding for anti-drone equipment. That anti-drone equipment will protect a number of the city's transportation and athletic facilities, including the city's airport, football stadium for Ohio State University (OSU), hockey arena for the National Hockey League team Columbus Blue Jackets, ballpark for the AAA minor league baseball team Columbus Clippers, and soccer stadium for the Major League Soccer team Columbus Crew. The city also plans to use FY2026 funds to support public safety preparation in connection with Columbus's role as a host city for the soccer competition portion of the 2028 Olympic and Paralympic Games. The city also has additional investments in mind for UASI funds, such as installing a radio tower near the City's main source of drinking water to support first responder communication in the event of a law enforcement emergency.

~~61.~~63. In the past, Columbus has similarly received and invested HSGP funds to protect public safety. For example, thanks to ~~roughly $1.5 million~~$477,318 in FY2024 UASI funds, the City of Columbus was able to purchase a bomb robot—a remotely controlled mobile device used by Columbus law enforcement and first responders to safely inspect, analyze, and disable explosive devices from a distance. The city has also used prior HSGP funds to supplement overtime expenses for extra officers at large public events such as OSU football games; to upgrade police helicopters; to provide fire extinguisher training with a propane-fed system; to

update hazmat suits, masks, and air tanks for its SWAT teams; and to invest in chemical detection systems that provide real-time detection of gas/vapor, liquid, and solids, as well as identification of unknown solid and liquid chemicals.

*El Paso County*

~~62.~~64. El Paso County is a multicultural and geographically distinct county. It is home to more than 800,000 residents, more than 82 percent of whom are Hispanic and more than 68 percent of whom speak a language other than English at home. It is the westernmost county of Texas and part of the largest border community on the Rio Grande.

~~63.~~65. El Paso County routinely applies for and receives pass-through grants from the Office of the Governor under the SHSP and OPSG programs.

~~64.~~66. In Texas, the Office of the Governor publishes notifications of funding opportunities for SHSP funds at the beginning of December. El Paso County's grants division subsequently notifies county departments and begins to coordinate with them on applications.

~~65.~~67. Completed applications must be approved by the El Paso County Commissioners Court, after which they are submitted to the state through the Office of the Governor's eGrants system. Applications are typically due at the beginning of February.

~~66.~~68. In Texas, local SHSP applicants must also coordinate with their regional Council of Governments, which prioritizes the grant applications. El Paso County belongs to the Rio Grande Council of Governments.

~~67.~~69. In April, SHSP applicants present to the Council's First Responders Preparedness Planning Group, which then rates applications. In May, SHSP applicants receive notice of the Council's priority list with the applicants and amounts that will be recommended to the state for funding.

~~68.~~70. Between September and November, applicants receive notification of an award from the Office of the Governor.

~~69.~~71. Since ~~FY2018~~FY2017, the County has received a total of $1,297,291.68 in SHSP Regular funding. Additionally, since FY2016 it has received $586,452.23 in Law Enforcement Terrorism Prevention Activities (LETPA) funding through SHSP.

~~70.~~72. Recent SHSP Regular and LETPA funds help pay for much-needed equipment for the county sheriff's office's special teams, including items such as radios, protective gear, generators, and defibrillators.

~~71.~~73. For the County's current fiscal year, El Paso County plans to use SHSP FY2025 funds to reimburse the purchase of night vision kits, microphones and earpieces, generators, trailers, ATVs, and rescue harnesses.

~~72.~~74. For the County's next fiscal year, El Paso County expects to receive $100,431 in SHSP Regular funding and $73,641.06 in SHSP LETPA funding.

~~73.~~75. For OPSG funds, between February and March of each year, U.S. Border Patrol holds a meeting with El Paso County law enforcement agencies to discuss the following year's funding request. Each county agency prepares its own requested budget.

~~74.~~76. U.S. Border Patrol compiles the full El Paso County request for approval. Once approved by U.S. Border Patrol, the request, or Operation Order, is sent to FEMA.

~~75.~~77. Once FEMA approves a request, it sends a notification to U.S. Border Patrol and the Office of the Governor. The Office of the Governor then enters the information into the state eGrants system as an application and notifies county law enforcement agencies.

~~76.~~78. In February, El Paso County generally receives notification from the Office of the Governor that applications are ready in eGrants. The County's Grants Division coordinates with the El Paso County Sheriff's office on applications.

~~77.~~79. Completed applications must be approved by the El Paso County Commissioners' Court, after which they are submitted to the state through the Office of the Governor's eGrants system. Completed applications are usually submitted at the end of February.

~~78.~~80. Between April and July, county departments receive notifications of OPSG awards. Those awards must be approved by the El Paso County Commissioners Court before the County Grants Division accepts them in eGrants.

~~79.~~81. Since ~~FY2017~~FY2016, the County has received $11,290,356.91 in OPSG funding. El Paso County uses these funds for the purpose of enhancing border security. OPSG funds support overtime, equipment, and mileage reimbursement.

~~80.~~82. For the County's current fiscal year, El Paso County plans to use OPSG FY2025 funds to fund overtime, vehicles, license plate readers, and fuel.

~~81.~~83. For the County's next fiscal year, El Paso County expects to receive an estimated $1,759,802 in OPSG funds.

*Travis County*

84. Travis County, Texas, serves approximately 1.36 million residents and contains substantial critical infrastructure, including hospitals, airports, academic institutions, utilities, communications infrastructure, and emergency-response facilities, as well as major events that bring hundreds of thousands of visitors to the region each year.

85. Travis County participates in the HSGP through the UASI program, and HSGP funds have directly supported both election security and law-enforcement capabilities.

86. For FY2026, Travis County has been allocated $260,975 in UASI funding.

87. Among other things, prior HSGP awards have funded mobile panic buttons for polling sites, law-enforcement equipment, and security training that prepares election staff to respond to active threats at polling locations.

*Dallas County*

88. Dallas County is a multicultural and geographically distinct county. It is the second most populous county in the State and home to more than 2.66 million residents. Per the United States Census Bureau, more than 41 percent of Dallas County's residents are Hispanic, and more than 43 percent speak a language other than English at home.

89. Dallas County routinely applies for and receives pass-through grants from the Office of the Governor under the HSGP program.

90. In Texas, the Office of the Governor publishes notifications of funding opportunities for SHSP funds at the beginning of December. Dallas County's grants division subsequently notifies county departments and begins to coordinate with them on applications.

91. Completed applications must be approved by the Dallas County Commissioners Court, after which they are submitted to the state through the Office of the Governor's eGrants system. Applications are typically due at the beginning of February.

92. In Texas, local HSGP applicants must also coordinate with their regional Council of Governments, which prioritizes the grant applications. Dallas County belongs to the North Central Texas Council of Governments.

93. The Dallas County Office of Homeland Security and Emergency Management (DCHSEM) Department, is a division of Dallas County. The DCHSEM Department is created

pursuant to Chapter 418 of the Texas Government Code (the Texas Disaster Act of 1975), which mandates local emergency management program.

94. DCHSEM has applied for several grants through the Homeland Security Grant Program between 2022 and 2026.

95. Dallas County was awarded UASI Homeland Security Grant Funding from 2022 to 2024 totaling $716,592.51. In FY2025 Dallas County was allocated $170,761.97 in UASI funding. And in FY2026 Dallas County was allocated $169,000.00 in UASI funding. As of this date, Dallas County has not actually received the UASI funds allocated to it for FY2025 and FY2026.

96. Presently, the FY2025 Dallas County Election Security grant funds of $169,000 is subject to Line Items Holds placed on them by Texas. Dallas County's application for the FY2026 Election Security Overtime grant of $175,000 has been submitted and is pending.

97. Dallas County has used UASI funds for a range of tHSGP purposes, including hazardous materials planning, cybersecurity, and domestic violence extremism workshops, and election security..

***C. The Administration's Efforts to Unlawfully Control State Election Procedures***

~~82.~~98. Since 2025, the Trump Administration has repeatedly attempted to control election administration and make rules for federal elections. Many of these efforts have exceeded the Executive Branch's authority. Various federal courts have declared them unlawful and blocked their implementation.

~~83.~~99. First, on March 25, 2025, President Trump issued Executive Order No. ~~14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("2025 Order"). Among other things, the President directed~~14248, directing the Election Assistance Commission ("EAC") to revise voting machine

guidelines and rescind certifications based on prior standards. He also mandated that DHS and the so-called Department of Government Efficiency ("DOGE") review state voter registration files.

~~84.~~100. Three federal courts enjoined implementation of multiple provisions of the 2025 Order. These courts uniformly ruled that only Congress and states may regulate elections, and the President has no role in creating election policy. *See California v. Trump*, No. 25-cv-10810-DJC, 2026 WL 1826535, at *3 (D. Mass. June 24, 2026) (The Constitution "does not grant the President any specific powers over elections."); *League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC*"), 808 F. Supp. 3d 29, 79 (D.D.C. 2025) ("Because our Constitution assigns responsibility over election regulation to Congress and the States, not the President, that command exceeds the President's authority."); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1187 (W.D. Wash. 2026) ("[T]he Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." (cleaned up)).

~~85.~~101. With respect to voting systems, Section 4(b) of the 2025 Order directed the EAC to issue amended voting system guidelines that would (1) prohibit ballots using a barcode or quick-response code in the vote counting process, except to accommodate voters with disabilities; (2) provide a voter-verifiable paper record; and (3) rescind certifications based on prior standards. 2025 Order § 4(b).

~~86.~~102. A federal court in Washington State found Section 4(b) unlawful because "the Constitution assigns no authority to the President over federal election administration," and because HAVA and the NVRA "assign no role to the President in overseeing the certification of voting systems." *Washington*, 814 F. Supp. 3d at 1219–20.

~~87.~~103. In 2025, DHS and DOGE launched a dramatic overhaul of the SAVE program. DHS's U.S. Citizenship and Immigration Service ("USCIS") operates the SAVE program primarily to give state governments an additional method to verify the citizenship and immigration status of people applying for government benefits, such as food stamps and Medicaid. DHS also permits states to use it to help determine eligibility to vote in elections. The 2025 overhaul enabled access to Social Security Administration data via the SAVE program, allowed jurisdictions to conduct bulk searches through the program, and made access to the program free, among other changes.

~~88.~~104. The modified SAVE program does not reliably reflect whether a person is a United States citizen. DHS has estimated a 5 to 10 percent error rate in SAVE. U.S. Dep't of Homeland Sec. and Cal. Dep't of Healthcare Servs., *Computer Matching Agreement Between DHS-USCIS and CA-DHCS* 11, https://perma.cc/E5WW-7YQH (last visited Aug. 17, 2026). The underlying datasets available through the SAVE program are themselves unreliable and no dataset feeding into the SAVE program is likely to contain the most up-to-date information on naturalized citizens, because an individual's citizenship status is recorded at a particular moment in time. Plaintiff Dallas County does not join the allegations in this paragraph.

~~89.~~105. In an apparent effort to carry out the 2025 Order's mandate that DHS review complete state voter files, *see* 2025 Order § 2(b)(iii), the Department of Justice requested complete voter registration lists from at least 48 states and Washington, DC. DOJ then sued 30 states and Washington, DC for refusing to turn them over. DOJ conceded that it plans to share these voter files with DHS so they can be compared to SAVE program data. Jude Joffe-Block, *The Justice Department plans to share sensitive voter data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs. All

22 courts that have issued decisions in these cases (as of this filing) have dismissed the federal government's complaints, concluding that DOJ is not entitled to obtain the states' complete voter files under federal law. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

~~90.~~106. On June 22, 2026, a Washington, DC federal court set aside and vacated the 2025 overhaul of the SAVE program, the result of DHS "haphazardly combin[ing] and repurpos[ing] the private information of millions of Americans, including citizenship data that they knew to be unreliable." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026). The court concluded that the expansions violate the Social Security Act and the Privacy Act. *Id.* at *2*; but see Florida v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-00509, 2026 WL 1968339, at *4 (N.D. Fla. July 7, 2026) (ordering that four states be permitted to access the overhauled SAVE program).

~~91.~~107. Three months before the DC district court ruled, on March 31, 2026, the President issued a second executive order pertaining to elections, Executive Order 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("2026 Order"). Section 2(a) of the order directed DHS to create a list of U.S. citizens over the age of 18 in each state, derived from SSA records, data available through the SAVE program, and other federal databases.

~~92.~~108. On June 25, 2026, a Massachusetts federal court ruled that Section 2(a) of the 2026 Order is unlawful, because "neither in HAVA nor any other federal statute does Congress authorize the federal government to create their own voting database. Instead, Congress, consistent with the Constitution, has left that authority to the States alone." *California*

*v. Trump*, No. 26-cv-11581, 2026 WL 1826490, at *14 (D. Mass. June 25, 2026). The court therefore enjoined DOJ, DHS, and USCIS, among others, from "taking any steps to create a new federal program to superintend and control Plaintiff States' maintenance of their voter rolls." *Id.* at *17.

~~93.~~109. In short, a series of federal courts have rejected the Trump Administration's intrusion on congressional and state authority over elections, enjoining some of the very policies that this NOFO requires states and local jurisdictions to comply with in order to receive full HSGP funding.

***D. The FY2026 HSGP Notice of Funding Opportunity***

~~94.~~110. In June 2026, the Administration unveiled its newest gambit to seize control of election procedures—this time by leveraging funding under the Homeland Security Grant Program.

~~95.~~111. The Administration unveiled this plan through FEMA's release of the 2026 NOFO for the HSGP. A NOFO is a required publication through which a federal agency "announce[s] specific funding opportunities for Federal financial assistance that will be openly competed." 2 C.F.R. § 200.204 (2024). Through the NOFO, FEMA once again included election security as an NPA with a 3 percent minimum spend requirement.

~~96.~~112. For the first time, however, FEMA also announced that it would additionally withhold 20 percent of recipients' total HSGP awards unless and until recipients comply with five election administration policy conditions stated in the NOFO (the "Election Administration Conditions"). Specifically, the 2026 NOFO provides that "for each state and UASI, FEMA will withhold from drawdown an amount equal to 20 percent of the recipient's total HSGP award (SHSP, UASI, and OPSG) until the recipient submits proof of compliance

with the FY2026 Election Security NPA requirements, and such proof is verified/confirmed by the Department." 2026 NOFO at 8.

~~97.~~113. According to the NOFO, the five election administration policy conditions with which "each state and high-risk urban area election jurisdiction must" comply to receive their full allocated HSGP award are:

(1) "Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots;"

(2) "Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes;"

(3) "Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary;"

(4) "Voter roll citizenship verification: Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance HSGP counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database;" and

(5) "Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under HSGP."

2026 NOFO at 15–16.

~~98.~~114. On August 10, 2026, DHS released additional guidance, doubling down on the Election Administration Conditions described in the original directive and partially clarifying the standards and methodology for conducting the post-election 5 percent manual audits and voter/ballot reconciliation. FEMA, Grant Programs Directorate Info. Bull. No. 580, *Fiscal Year 2026 Election Security Guidance* (Aug. 10, 2026), https://www.fema.gov/sites/default/files/documents/fema_gpd-ib-template_fy26_election-security-guidance.pdf ("August 10 Guidance").

~~99.~~115. First, for the new condition regarding transition toward hand-marked paper ballots, the August 10 Guidance provides specific requirements that must be included in each State's transition plan where that jurisdiction is currently using barcode or QR code based tabulation. Those jurisdictions are required to:

- "Identify which counties or local jurisdictions use systems that count votes from barcodes or QR codes and provide the approximate number of precincts using such systems.

- Describe the equipment, replacement voting system or configuration that will tabulate directly from voter-verifiable, human readable, hand-marked paper ballots. Explain which components of the jurisdiction(s) systems will need to be updated or replaced.
- Ensure that Americans with Disabilities Act (ADA) compliant ballot marking devices are still available for disabled voters.
- Present a schedule for phasing out barcode or QR code based tabulation, including key milestones such as procurement and deployment, if necessary. Indicate the target election by which all affected jurisdictions will be using handmarked paper ballots.
- Provide an estimate of the total cost of the plan for all applicable jurisdictions within the state, covering equipment, software, training, testing, deployment, storage."

*Id.* at 2–3.

~~100.~~116. The August 10 Guidance sets the following requirements for the 5 percent post-election manual audit condition:

- "All ballots from each randomly selected precinct and from each randomly selected batch must be manually counted.
- The random selection must include ballots from all methods of voting, including Election Day in-person, early in-person, vote by mail or absentee, and provisional ballots.
- At a minimum, the audit must include at least two races with at least one race for federal office.
- Each jurisdiction must ensure that the electronic voting system accurately counted votes and that the audit is completed in time for results to inform certification decisions, when consistent with applicable law."

*Id.* at 3.

~~101.~~117. The guidance further states that "[u]nless state law mandates post-certification audits, jurisdictions should conduct the audit after completion of the unofficial canvass, including late-arriving, vote by mail, and provisional ballots." *Id.* at 4.

~~102.~~118. For the new "reconciliation" condition, the guidance requires each election jurisdiction to "reconcile the number of voters who voted in each federal election with the number of ballots cast" by creating "a static list of each voter who participated in the election" that includes "the name, unique voter ID number, and the method of voting for each voter who participated in the election." *Id.*

~~103.~~119. To accomplish voter roll citizenship verification, the guidance requires states to use SAVE to "verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award." *Id.* at 5. Alternatively, a state may provide "a list of registered voters with unknown citizenship status to be reviewed by USCIS before the election." *Id.*

~~104.~~120. The guidance also directs that "Where the functionality of SAVE is impacted by the June 22, 2026, order in *League of Women Voters v. DHS*, Civ. Action No. 25-3501," the following should be treated as controlling while that case is on appeal: "For any person registered to vote for whom the state does not have records of citizenship, the state may resolve this uncertainty by submitting relevant information to USCIS for an immigration records search consistent with 8 U.S.C. § 1373." *Id.* at 2 n.1.

~~105.~~121. As the August 10 Guidance confirms, meeting the 3 percent election security spending allocation does not, by itself, release the 20 percent holdback, and the holdback applies to all of a recipient's HSGP funds, not just the 3 percent set-aside. *Id.* at 2.

~~106.~~122. According to the NOFO, states were required to submit HSGP applications by July 24, 2026. 2026 NOFO at 4. Grant awards will be made no later than September 30, 2026, with a projected period of performance from September 1, 2026 to August 31, 2029. *Id.*

***E. The New NOFO Conditions Harm Plaintiffs***

~~107.~~123. The withholding of 20 percent of all HSGP funds until a "recipient submits proof of compliance" with the NOFO's election policy requirements "and the Department verifies/confirms that proof," 2026 NOFO at 16, harms local jurisdictions, including Plaintiffs, in several ways. Indeed, for jurisdictions like Plaintiffs, no matter whether their state certifies compliance with the Election Administration Conditions, these jurisdictions will suffer economic and other injuries one way or another. First, unless and until Plaintiffs' states certify compliance with the Election Administration Conditions, Plaintiffs will suffer an immediate 20 percent withholding of HSGP FY2026 grant funds that they would otherwise receive. Plaintiffs would use these funds to, in DHS's words, "strengthen[] the nation's capacity to prevent, prepare for, protect against, and respond to acts of terrorism and other catastrophic events." 2026 NOFO at 4. The loss of this funding is an economic injury: it deprives Plaintiffs of money and requires them to divert human and budgetary resources to prepare for and adapt to the immediate withholding. It also undermines Plaintiffs' capacity to safeguard their residents from terrorism or other catastrophic events by withholding the 20 percent of HSGP funds otherwise made available for that purpose. These economic injuries and associated harms are immediate and will persist unless and until DHS "verifies/confirms" a recipient's compliance with the NOFO's otherwise unrelated election administration requirements.

~~108.~~124. In fact, the loss of funding may be far greater than 20 percent. In guidance issued on July 9, 2026, DHS stated that "[s]ustained noncompliance" with the Election Administration Conditions may result in remedies under 2 C.F.R. § 200.339, Ex. D to Complaint, *Illinois v. FEMA*, 26-cv-00485 (D.R.I. July 23, 2026), ECF No. 1-4, which includes that a federal agency may "[s]uspend or terminate the Federal award in part or in its entirety."

~~109.~~125. Second, if Plaintiffs' states do accept the Election Administration Conditions and compel local jurisdictions to comply, Plaintiffs that administer elections (Harris County and El Paso County) or fund the entities that do (Nashville) will have to implement significant changes to election procedures. Implementing these onerous changes will require Plaintiffs to expend staff time and budgetary resources, and doing so in the hurried manner that the federal government seeks will undermine the sound administration of elections.

*Nashville*

~~110.~~126. A 20 percent holdback of FY2026 UASI and SHSP funds would limit Nashville's ability to acquire the equipment and fund the training it has planned to protect its residents and visitors.

~~111.~~127. Further, Nashville funds the Davidson County Election Commission, which administers elections in the County and pays for poll workers, ballots, and most other election-related expenses. Complying with the Election Administration Conditions would impose substantial costs on the Election Commission that would be borne by Nashville.

~~112.~~128. The Davidson County Election Commission currently uses ~~a combination of~~ ballot marking devices that ~~encode votes~~record voting selections that are then printed in ~~a barcode~~both barcodes and human-readable text on a ballot card. Voters feed their ballot cards into scanners~~.~~ that read the barcodes and tabulate voting selections. The ~~entire~~ fleet would need

to be reconfigured to accommodate a change to the full-face hand-marked ballots as contemplated by the transition plan the Election Administration Conditions require. As one example, each precinct has one or two scanners~~, and a~~. A change to hand-marked ballots would ~~require~~lead to longer user sessions given the potential for voter error in marking the ballots. To maintain the level of service currently provided, the Election Commission would likely need to purchase ~~of~~ additional scanners ~~because hand-marked ballots take longer to scan than machine-marked ballots~~. Such equipment costs would be borne, in substantial part at least, by Nashville.

~~113.~~129. The Election Administration Conditions' contemplated transition to hand-marked ballots would also necessitate reeducating the voting population, which has been using touch screens since 2006. The reeducation costs would be borne by Nashville.

~~114.~~130. The Election Commission currently conducts audits in compliance with the ~~scheme~~system identified at Tenn. Code Ann. § 2-20-103. These audits, which require a significant amount of time and resources, are conducted by Election Commission employees. During the most recent audit, on August 13, 2026, five randomly selected ballot boxes were reconciled with their Election Day totals, showing zero errors. To conduct the additional 5 percent manual audit required by the Election Administration Conditions, as fleshed out by the August 10 Guidance, the Election Commission would likely incur increased employee and staff costs that would be borne by Nashville.

~~115.~~131. The Election Commission currently has no process or dedicated staff to run voter rolls through SAVE as required by the Election Administration Conditions. Allocating Election Commission staff time to implement the SAVE requirement would likely incur a financial cost, borne by Nashville~~, and would also risk disenfranchising Nashville voters, given the reported frequency of errors in the SAVE system~~.

~~116.~~132. Further, pursuant to state law, all poll workers who are eighteen years of age or older must be registered voters, and, therefore, citizens. Tenn. Code Ann. § 2-4-103. Accordingly, the Election Commission has no existing process for running poll workers through the SAVE system as doing so would be largely duplicative and unnecessary. Allocating Election Commission staff time to do so would likely incur a financial cost, borne by Nashville.

*Harris County*

~~117.~~133. Compliance with the new conditions would require significant changes to Harris County's election administration, which would be both costly and time-consuming.

~~118.~~134. For example, Harris County currently utilizes the Hart Verity voting system. Voters make their selections using Verity voting devices, which produce a voter-verifiable paper vote record reflecting the voter's selections. After reviewing the printed vote record, the voter deposits it into a Verity scanner for tabulation. Harris County anticipates that transitioning to an exclusively hand-marked paper ballot system would cost millions of dollars and require the acquisition of additional equipment, increased election staffing, and significant changes to existing election procedures and training. Creating a plan to transition to such a system would impose significant costs on Harris County, requiring the county to divert significant amounts of money and the valuable time and efforts of county personnel.

~~119.~~135. Moreover, Texas law requires that counties finish counting regular ballots within twenty-four hours of the polls closing on Election Day. Texas Election Code Annotated § 66.053. Harris County—the most populous county in Texas—would not be able to meet this statutory deadline using exclusively hand-marked paper ballots that cannot be tabulated using current systems.

~~120.~~136. Similarly, Harris County complies with Texas's existing post-election hand count audit requirements. Texas law requires a post-election hand count audit of certain ballots that were electronically tabulated, with stipulations governing which and how many polling locations, precincts, and contests are included. Texas Election Code Annotated § 127.201. It also requires Harris County to complete this audit by a statutorily prescribed deadline that typically falls either twenty-one or thirty days after Election Day, depending on the election type. Under Texas law, Harris County may only add additional polling locations to this audit "in accordance with procedures prescribed by" the Texas Secretary of State. *Id.* In turn, the Texas Secretary of State has placed limits on the number of polling locations that a county may add to the audit, absent a discrepancy, and imposed requirements on the manner in which those locations may be added. *Id.*; Election Advisory No. 2025-21, Texas Secretary of State, https://www.sos.state.tx.us/elections/laws/advisory2025-21.shtml. Requiring Harris County to instead conduct a manual post-election audit of the paper ballots in at least 5 percent of the precincts in the county, and at least 5 percent of all of the centrally tabulated "batches," would significantly expand the scope of the county's existing post-election audit obligations and would require substantial additional personnel, time, and other resources, potentially interfering with Harris County's ability to fulfill its audit obligations under state law. Harris County anticipates that conducting a manual audit of that magnitude would take approximately three to four months.

~~121.~~137. The reconciliation requirement would similarly require the addition of significant resources to identify and understand the cause of any discrepancies. There are several valid reasons why the number of ballots used may differ from the number of voters, such as spoiled or damaged ballots. The County Clerk's office would need to hire additional personnel dedicated to doing this each day during voting. Further, Harris County already complies with

reconciliation requirements imposed by Texas law. *See* Texas Election Code Annotated § 127.131.

~~122.~~138. With respect to the use of the SAVE database to verify the citizenship of registered voters, Harris County does not have access to SAVE and would need to coordinate with the Texas Secretary of State's Office, which would likewise cause delays and costs. Harris County understands that, in the past, there have been significant inaccuracies identified in the SAVE database and, as a result, Harris County would have to dedicate significant time and resources to checking the accuracy of the SAVE results to ensure that Harris County's voters are not disenfranchised.

~~123.~~139. Verifying the citizenship of "any person who works at a polling place; or who operates any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems," August 10 Guidance at 5–6, would impose still more burdens on Harris County. There is no existing process for running poll workers through the SAVE system, and doing so would be duplicative, as poll workers are already required to be registered voters under state law. Furthermore, Texas law requires that each election precinct's presiding election judge "appoint the election clerks to assist the judge in the conduct of an election at the polling place served by the judge." Tex. Elec. Code Ann. § 32.031. The presiding judge must select election clerks from lists submitted by the county chairs of the two major political parties in each county. *Id.* § 32.034. Election clerks must be qualified voters, but the Texas Election Code does not provide for direct county oversight of the lists submitted by the political parties or of a presiding judge's selection of election clerks from those lists. Texas law would need to be changed to provide the county with that authority, and exercising that authority

prior to each election would impose significant costs on the county in terms of money and manpower.

~~124.~~140. The citizenship verification requirement extends beyond poll workers to include temporary agency workers and vendors who "work on or with election systems." This would require the county to incur significant costs in order to create and implement an entirely new system of ensuring that temporary agencies and third-party vendors employ only U.S. citizens, not just individuals who are authorized to work in the United States.

*City of Columbus*

~~125.~~141. The City of Columbus's budget is tight, and the city hopes it can receive its full allotment in FY2026 HSGP funds. A 20 percent or greater withholding of FY2026 UASI funds would deprive the city of critical antiterrorism funding allocated to the Columbus area and negatively impact the services and public safety measures that Columbus could fund.

*El Paso County*

~~126.~~142. Complying with the Election Administration Conditions would be costly and time-consuming for El Paso County while also creating additional hurdles for the County's voters.

~~127.~~143. For example, El Paso County currently uses the Election Systems & Software Express Vote voting system, which consists of ballot marking devices that encode votes in a barcode for tabulation. According to an estimated price quote from Election Systems & Software, transitioning to an exclusively hand-marked paper ballot system would cost $3 million just to obtain the necessary printers.

~~128.~~144. Printing those ballots would also take approximately 30 seconds to 1 minute per ballot—a tenfold increase from the amount of time it currently takes. Accordingly,

the County would likely need additional workers and equipment to avoid significant delays for voters.

~~129.~~145. Further, hand-marked paper ballots can lead to ambiguities (mis-marked ballots, circled choices, stray marks, etc.) that prevent optical scanners from counting the ballot in a way that matches the voter's intent, resulting in additional staff work to review ambiguous ballots and potential uncounted votes. And when hand-marked ballots are double-sided or longer, there is a significantly higher risk of jamming when individuals attempt to submit their ballots, which can lead to long delays at polling places.

~~130.~~146. El Paso County complies with Texas's existing post-election hand count audit requirement. Requiring the County to instead—or in addition—conduct a 5 percent manual audit would significantly expand the scope of the County's post-election audit obligations and would require substantial additional personnel, time, and other resources.

~~131.~~147. Likewise, El Paso County already complies with ballot reconciliation requirements imposed by Texas law. Imposing additional procedures and recordkeeping requirements will necessitate more of election workers' time and could cause delay in finalizing vote counts.

~~132.~~148. Without additional funding to make up for the cost of implementing the Election Administration Conditions, El Paso County would have to reduce the number of voting locations to obtain the requisite cost savings. This, in turn, runs the risk of overrunning remaining voting locations and creating significant delays due to longer lines. Further, changing allowable voting locations runs the related risk of confusing and discouraging voters from turning out.

~~133.~~149. Due to the complexity and burdensome nature of the Election Administration Conditions, the County anticipates losing poll workers who find learning entirely new systems and processes daunting; in practice, many election workers report that they will continue their work unless and until a significant change in process takes place.

~~134.~~150. To make up for the cost of implementing the Election Administration Conditions, the County would also likely need to cut its voter outreach programs (such as naturalization ceremonies and voter deputy registrar services) to save on costs.

*Travis County*

151. Travis County administers elections through its elected County Clerk.

152. Travis County employs extensive election-security practices, including restricted access to election systems, pre-election verification of voting equipment and software, logic-and-accuracy testing, tamper-evident security measures, chain-of-custody documentation, law-enforcement oversight of central counting, and post-election audits.

153. Several of FEMA's Election Administration Conditions would require Travis County to make substantial and costly changes to those existing election procedures.

154. Travis County currently uses an Election Systems & Software voting system in which voters make their selections on ballot-marking devices that produce a voter-verifiable paper record containing both a text record of the voter's choices and barcodes used for tabulation. The County acquired those ballot-marking devices in 2018, the equipment is expected to have a useful life of at least ten years and potentially much longer, and the County has no current plans to replace it.

155. Transitioning to exclusively hand-marked paper ballots would cost millions of dollars and require additional equipment and election workers, redesigned ballots, testing and

certification, changes to agreements with political parties and other jurisdictions, new training, and extensive public education.

156. FEMA's manual-audit and reconciliation requirements would impose additional burdens on Travis County. Texas law already requires a post-election hand-count audits under procedures established by state law.

157. FEMA's separate requirement to manually audit at least 5% of precincts and centrally tabulated batches would significantly expand that obligation, requiring substantial additional personnel, time, and resources and potentially interfering with the County's ability to fulfill its existing state-law audit obligations.

158. Likewise, although Travis County already conducts ballot reconciliation as required by Texas law, FEMA's reconciliation methodology would require the County to devote additional personnel to identifying and investigating discrepancies, including routine discrepancies caused by spoiled or damaged ballots.

159. Finally, Texas law already requires election workers to be U.S. citizens. The County Clerk's Office does not access the SAVE system to verify the citizenship of registered voters, nor does it submit information to USCIS for an immigration records search. Poll workers are already required to be registered voters under state law and there is no existing process for running poll workers through the SAVE system.

*Dallas County*

160. A 20 percent holdback of FY2026 UASI and SHSP funds would limit Dallas County's ability to acquire the equipment and fund the training it has planned to protect its residents and visitors.

161. Dallas County participates in the County-wide polling location program, which under the Texas Election Code allows any voter in Dallas County to vote at any location during early voting or election day regardless of their assigned election precinct.

162. To implement the County-wide polling location program, Dallas County's current electronic voting system utilizes ballot marking devices that are pre-programmed with different ballot styles to accommodate the multiple local governmental entities that conduct elections within Dallas County. This system allows any voter to present themselves at any polling location and to be assigned a blank ballot that is programmed to present the applicable races and propositions for their jurisdiction on the ballot marking device for selection. The electronic voting system utilizes a bar code for the ballot marking device to read the ballot style as well as to print the results on the ballot that can be read and counted by the electronic voting system tabulators.

163. To support a hand marked paper ballot system within the County-wide polling location program, Dallas County would have to procure hundreds of ballot-on-demand printers. The ballot-on-demand printers are necessary to print individualized ballots that can then be hand-marked by the voter. In addition, the Dallas County Elections Department would have to procure and deliver ample physical ballot stock to each polling location to accommodate printing of ballots on site.

164. The ballot stock needed to accommodate a ballot-on-demand system would require more paper in terms of size and weight to be delivered to each polling location. Thus, the Department would incur additional costs for the procurement of the ballot on demand paper stock but also for the additional personnel time to deliver the ballot stock to each location. If a

location runs out of paper stock for ballots, under Texas Election Code Section 51.008(e) the Department must promptly supplement ballots upon request of a polling location.

165. Dallas County received a quote for the potential procurement of 1,450 ballot-on-demand printers, at a cost of $7.25 million.

166. Such a transition would also require Dallas County to train staff to use the printers, and prepare training materials and classroom instruction for several thousand election judges, clerks, and other officials.

167. Section 127.201(a) of the Texas Election Code requires a one percent (1%) post-election manual recount in accordance for every election. In order to implement the five percent (5%) manual post-election audit of ballots required by the NOFO to receive a fully allocated HSGP award, the Department would have to double its current staff assigned to conduct post-election audits. Meeting that staffing would double the Department's current personnel costs which are approximately $10,000.00.

168. Currently the Department has no access to the U.S. Citizenship and Immigration (USCIS) Systematic Alien Verification for Entitlements (SAVE) system. The Texas Secretary of State (SOS) has not provided any recent guidance that would likely require the Dallas County Election Administrator, who acts as the voter registrar, to check the citizenship of all Dallas County registered voters in the SAVE system. The SOS also has not provided the Department with access to the SAVE system.

169. Dallas County currently verifies the United States citizenship of most election poll workers by verifying that the election poll worker is a registered voter in Dallas County. In the State of Texas, registered voters must be a United States citizen and must acknowledge their United States citizenship on their voter registration application. The only exception would be

applicable to the Department's student poll workers who are 16 and 17 years of age, and thus not eligible to register to vote. However, Texas Election Code Section 32.0511(b)(2)(B) requires that student poll workers be United States citizens.

170. The Department has no access to the SAVE system, and has not received any guidance from the SOS directing the Department to verify the United States citizenship status of the Department's election poll workers other that the methods stated above in accordance with the Texas Election Code.

171. If the Department was given access to the SAVE system and directed by the SOS to review the citizenship status of both registered voters and election poll workers, such a task would create operational constraints on the Department's current staff. Without the ability to hire additional temporary staff, it would be difficult for the Department to complete the citizenship checks required by the NOFO within the 120-day deadline.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act: Exceeds Statutory Authority

~~135.~~172. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~136.~~173. The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

~~137.~~174. An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined,

or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

~~138.~~175. Defendants have made a final decision to impose the Election Administration Conditions on the FY2026 HSGP grants, as specified in the 2026 NOFO. Plaintiffs expect that FY2026 HSGP grant award letters will incorporate the terms of the NOFO into awards, as FEMA has done in prior years. The decision is final agency action reviewable under 5 U.S.C. § 704, as it determines recipients' and subrecipients' rights and obligations and produces legal consequences, including the withholding of funds from recipients that do not certify compliance and the imposition of burdensome changes to election practices in states that accept the Election Administration Conditions.

~~139.~~176. An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That principle holds special force with respect to the administration of federal grant programs, because Congress exclusively holds the constitutional power of the purse. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (The Constitution "exclusively grants the power of the purse to Congress, not the President."). Because Congress dictates the terms of federal spending, agencies may only add conditions to federal grant programs that Congress has authorized by statute; no law or provision of the Constitution authorizes the Executive Branch to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds.

~~140.~~177. Congress established HSGP by statute to assist state, local, and tribal governments in preventing, preparing for, protecting against, and responding to acts of terrorism

and other threats and hazards. Congress specified the purposes for which HSGP funds may be used and the factors DHS must consider in allocating those funds.

~~141.~~178. Congress has not authorized DHS or FEMA to condition the award of HSGP funding on a recipient's adoption of the agencies' preferred election administration policies, including the Election Administration Conditions. Nor do the Election Administration Conditions implement any statutory requirement governing HSGP.

~~142.~~179. Indeed, no provision of the Homeland Security Act, the appropriations bills funding the HSGP, or any other statute could be interpreted to authorize the Election Administration Conditions given the vast political consequences and federal implications of the conditions. If Congress intended to authorize DHS or FEMA to set substantive requirements concerning voter registration, ballot counting, voting equipment, and other matters of election administration, it would have done so clearly. Neither DHS nor FEMA can point to "clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

~~143.~~180. Because Congress has not authorized Defendants to impose the Election Administration Conditions on HSGP grants, the Election Administration Conditions must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations."

**COUNT II**
**Violation of the Separation of Powers: Power of the Purse**

~~144.~~181. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~145.~~182. This Court has inherent equitable power to enjoin executive conduct that violates the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). "[W]henever a separation-of-powers violation

occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

~~146.~~183. Under the Constitution, the Executive's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "And when it comes to spending, the President has none of his own constitutional powers to rely upon." *San Francisco*, 897 F.3d at 1233–34 (cleaned up).

~~147.~~184. In contrast, Congress's powers to set national policies are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *San Francisco*, 897 F.3d at 1238. The Spending Clause provides "The Congress" with the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. And the Appropriations Clause means that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quotation omitted); U.S. Const. art. I, § 9, cl. 7.

~~148.~~185. The Executive cannot usurp Congress's spending powers in pursuit of its own policy agenda. Yet that is what Defendants have done here. Congress did not condition the receipt of HSGP funds on states agreeing to the Election Administration Conditions or any other conditions remotely similar. Defendants have no constitutional authority to create these conditions from whole cloth and hold back HSGP funds unless states agree to them.

~~149.~~186. By conditioning receipt of congressionally appropriated HSGP funds on compliance with the Election Administration Conditions, Defendants have violated the separation of powers in usurping Congress's exclusive control over federal spending, and Defendants must be enjoined from implementing or enforcing the conditions.

**COUNT III**
**Violation of Federalism and the Spending Clause: Conditions on Funding to States**

~~150.~~187. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~151.~~188. This Court has inherent equitable power to enjoin conduct by the Executive Branch that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491 n.2.

~~152.~~189. The Election Administration Conditions violate the Spending Clause with respect to the conditioning of federal funds provided to states specifically.

~~153.~~190. Where Congress enacts legislation pursuant to the Spending Clause to provide federal funds to states, the Supreme Court requires that any conditions on those funds meet certain requirements. One such requirement is that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). In addition, any conditions imposed on federal funding to states must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992). The Election Administration Conditions violate both of these requirements.

~~154.~~191. Congress has not "unambiguously" prescribed the Election Administration Conditions for the HSGP program in the Homeland Security Act or any other statute. The Spending Clause requires that Congress, not a later Executive Branch notice, provide states with clear notice of imposed conditions. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 298 (2006). Congress did not provide states and local governments clear notice that when they elected to participate in HSGP their funding would depend on adoption of the Executive Branch's preferred election policies. Nothing in the HSGP statutes informs recipients that eligibility for terrorism prevention and preparedness funding depends on changing voter

registration procedures, ballot counting rules, citizenship verification, or other aspects of election administration preferred by the President.

~~155.~~192. The Election Administration Conditions are further unlawful because they are unrelated to the federal interest in HSGP, a program Congress created to enhance homeland security preparedness and prevent, protect against, respond to, and recover from terrorism and other threats and hazards. *See Illinois v. FEMA*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025) (immigration conditions in HSGP grants were not related to purposes of the authorizing statutes and so violated the Spending Clause).

~~156.~~193. Finally, the Election Administration Conditions are unduly coercive because DHS has taken the position that it may cancel states' HSGP awards in full if states fail to comply with the conditions. Plaintiffs rely on HSGP awards for crucial public safety efforts, leaving the states with an impossible choice. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581–85 (2012) (Congress may not compel states to participate in the Medicaid expansion by threatening the loss of all existing Medicaid funding).

~~157.~~194. The Election Administration Conditions violate the Spending Clause, and Defendants must be enjoined from implementing or enforcing them.

**COUNT IV**
**Violation of the Separation of Powers: Elections Clause**

~~158.~~195. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~159.~~196. This Court has inherent equitable power to enjoin conduct by the Executive Branch that violates the Constitution, including the separation of powers. *See Free Enter. Fund*, 561 U.S. at 491 n.2. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245.

~~160.~~197. Under the Constitution, the Executive's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Where the Executive acts contrary to the will of Congress—express or implied—it operates at the "lowest ebb" of its authority, constrained by Congress's own constitutional powers over the matter. *Id.* at 637 (Jackson, J., concurring).

~~161.~~198. By conditioning receipt of congressionally appropriated HSGP funds on compliance with the Election Administration Conditions, Defendants have violated the separation of powers by usurping Congress's and the states' constitutional power to set the rules for elections.

~~162.~~199. The Constitution vests the states and Congress with authority to establish the "Times, Places and Manner" of holding federal elections. U.S. Const. art. I, § 4, cl. 1. The President and the Executive Branch have no constitutional authority to make rules for elections.

~~163.~~200. The Elections Clause operates as a default provision, vesting states with responsibility for crafting the rules for federal elections "only so far as Congress declines to pre-empt state legislative choices." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (cleaned up). The states' responsibility to regulate elections may be preempted only by Congress, not the Executive Branch acting unilaterally. Indeed, the Constitution assigns "no role for the President" in dictating the procedures for administering federal or state elections. *LULAC*, 808 F. Supp. 3d at 72.

~~164.~~201. Nor does the Executive Branch have any relevant statutory authority.

~~165.~~202. In establishing the HSGP, nowhere did Congress delegate any power to DHS or FEMA to impose election administration policy, including relating to the procedures for casting, counting, and auditing ballots. *See* 6 U.S.C. §§ 601–13. DHS's designation of election

infrastructure as "critical infrastructure"—for which HSGP funds may be used—does not convey any authority on DHS or FEMA to impose policy for the administration of elections.

~~166.~~203. Congress has expressed its will as to authority for voter list maintenance through the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). The NVRA establishes voter registration and voter list maintenance policy for federal elections, as administered by the states. 52 U.S.C. § 20501–11. HAVA sets baseline standards for voter registration lists and provisional voting, while making federal funding available to implement those standards. *See* 52 U.S.C. § 20901–21145.

~~167.~~204. Neither the NVRA nor HAVA delegate policymaking authority over voter list maintenance to DHS or FEMA.

~~168.~~205. HAVA also sets baseline operational requirements and provides funding for states to administer elections. These include a requirement that voting systems have the *capacity* for manual audit, but do not include a mandate to conduct such audits. 52 U.S.C. § 21081(a)(2)(B). HAVA further tasks the Election Assistance Commission with developing and maintaining standards for voting equipment. These standards come in the form of voluntary guidance to states. 52 U.S.C. § 20922(1). HAVA provides no such authority to DHS or FEMA.

~~169.~~206. Defendants have usurped Congress's authority under the Elections Clause by using the Election Administration Conditions to unilaterally prescribe election administration procedures, in violation of the separation of powers, and Defendants must be enjoined from implementing or enforcing the Election Administration Conditions.

**COUNT V**
**Violation of the Administrative Procedure Act: Arbitrary and Capricious**

~~170.~~207. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~171.~~208. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

~~172.~~209. Defendants provided no reasoned explanation for their decision to impose the Election Administration Conditions, nor did Defendants offer any reasoned explanation for including these conditions in the 2026 HSGP NOFO.

~~173.~~210. In adopting the Election Administration Conditions, Defendants abruptly departed from FEMA's prior administration of the HSGP election security National Priority Area. In prior years, FEMA generally permitted states and local governments to determine which election security investments best addressed the needs of their jurisdictions. Defendants have failed to reasonably explain the reasons for the change in policy, such as why the government's prior election security policies were not adequate to protect homeland security.

~~174.~~211. Defendants ignored the factors that Congress required DHS to consider and have considered factors that Congress did not permit DHS to consider. Defendants failed to articulate a rational connection between the Election Administration Conditions and the purposes Congress established for HSGP. Congress directed FEMA to allocate HSGP funds by considering, among other things, the relative threat, vulnerability, and consequences of acts of terrorism facing eligible jurisdictions. Defendants have not explained how a jurisdiction's use of particular ballot systems, audit methodology, voter reconciliation procedure, or citizenship verification bears on the terrorism risks that Congress directed FEMA to address in the HSGP.

~~175.~~212. Defendants have not provided a reasoned explanation, supported by evidence or agency expertise, for concluding that each of the Election Administration Conditions will promote the national security goals of the HSGP. And even putting aside the failure to explain the connection between the conditions and the congressional purposes for HSGP

funding, Defendants have not explained the reasons for the conditions they have imposed, the fact-based problems they are intended to solve, and how these conditions would address those purported problems.

~~176.~~213. Defendants likewise have failed to explain the 20 percent holdback, even if such a holdback were authorized by statute (which it is not). The election security National Priority Area requires recipients to spend 3 percent of their HSGP awards on election security, but Defendants will withhold nearly seven times that amount, without explaining the disconnect. Nor have Defendants explained why it is appropriate to withhold funds allocated for counterterrorism, emergency preparedness, law enforcement training, communications systems, and other public safety activities that have no relationship to the Election Administration Conditions.

~~177.~~214. Defendants failed to consider the practical or legal impact of the Election Administration Conditions on counties, including the time and resources necessary to implement the Election Administration Conditions, the late stage of midterm election preparations in which the Election Administration Conditions are being imposed, and whether the Election Administration Conditions are consistent with state law in each and every state where counties will be subject to the Election Administration Conditions.

~~178.~~215. Defendants further failed to consider the substantial risks associated with delaying or withholding HSGP funds. States and local governments rely on those funds to sustain ongoing counterterrorism, emergency preparedness, law enforcement, cybersecurity, communications, equipment, staffing, and training programs. Withholding 20 percent of HSGP grants until recipients demonstrate compliance with the Election Administration Conditions, or withholding 20 percent permanently if the recipients cannot demonstrate compliance, may force

local governments to postpone projects, cancel contracts, interrupt established programs, and divert funds from other public safety needs.

~~179.~~216. Defendants likewise failed to account for the compliance costs that the Election Administration Conditions impose on states and localities.

~~180.~~217. Defendants failed to consider the serious reliance interests created by FEMA's longstanding administration of HSGP. State and local governments have structured homeland security programs, budgets, and staffing around the anticipated continuation of risk-based HSGP funding.

~~181.~~218. Defendants also failed to consider obvious and less disruptive alternatives. For example, FEMA could have allowed recipients to identify actual election security needs specific to their local communities.

~~182.~~219. Defendants adopted the Election Administration Conditions to advance the Administration's preferred election policies and serve the Administration's partisan goals, rather than as the product of a reasoned assessment of homeland security threats. Defendants' proffered homeland security and election security rationales for the Election Administration Conditions are "contrived," which alone renders the conditions arbitrary and capricious. *Dep't of Com. v. New York*, 588 U.S. 752, 782, 785 (2019).

~~183.~~220. Defendants failed to connect their chosen policy methods, such as requiring paper ballots, with their goal of advancing homeland security.

~~184.~~221. For each of these independent reasons, Defendants' imposition of the Election Administration Conditions on FY2026 HSGP grants is arbitrary and capricious. The Election Administration Conditions must be declared unlawful and set aside as arbitrary and capricious.

**COUNT VI**
**Violation of the Administrative Procedure Act: Contrary to the Constitution**

~~185.~~222. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~186.~~223. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

~~187.~~224. As described in Counts II-IV, Defendants' decision to impose the Election Administration Conditions on FY2026 HSGP grants violates multiple constitutional commands, including the Separation of Powers, the Spending Clause, and associated constitutional provisions.

~~188.~~225. Defendants' decision to impose the Election Administration Conditions on FY2026 HSGP grants must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**COUNT VII**
**Ultra Vires**

~~189.~~226. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~190.~~227. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up).

~~191.~~228. No statute, constitutional provision, or other source of law authorizes Defendants to impose the Election Administration Conditions.

~~192.~~229. The Election Administration Conditions and FEMA's inclusion of them in the 2026 NOFO are ultra vires, and Defendants must be enjoined from implementing or enforcing the Election Administration Conditions.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A. Declare unlawful, vacate, and set aside Defendants' decision to impose the Election Administration Conditions on FY2026 HSGP grants;

B. Stay the decision to impose the Election Administration Conditions on FY2026 HSGP grants, pursuant to 5 U.S.C. § 705;

C. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with them from imposing the Election Administration Conditions as a condition of applying for, or accepting funds under, an HSGP grant;

D. Declare that any certification of compliance with or acceptance of the Election Administration Conditions by any recipient is null and void and shall not be enforced in any way;

E. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with them from imposing any certification requirements or funding conditions for future grants that are substantially the same as the Election Administration Conditions;

F. Award Plaintiffs reasonable costs and attorneys' fees; and

G. Grant any other relief that the Court deems fit and proper.

~~August 17~~September 1, 2026 Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Brian C. Rosen-Shaud (DC Bar No. 90042065)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com

Benjamin L. Berwick (D.D.C. Bar No. MA0004)
Protect Democracy Project
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

Cerin Lindgrensavage (DC Bar No. 1741602)
Jacek Pruski (DC Bar No. 888325144)
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Tel.: (202) 579-4582
cerin.lindgrensavage@protectdemocracy.org
jacek.pruski@protectdemocracy.org

Toby Merrill (D.D.C. Bar ID MA0006)+
Joshua Karsh (DC Bar No. 90035665~~)+~~)+*
Sharanya (Sai) Mohan (CA Bar No. 350675)*
Graham Provost (DC Bar No. 1780222)+
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org
graham.provost@publicrightsproject.org

~~*Counsel for all Plaintiffs*~~
*Counsel for Nashville, Harris County, City of Columbus, El Paso County, and Travis County*

Eliza Sweren-Becker*
Lauren Miller Karalunas*
Derek Tisler*
Brennan Center for Justice at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
millerl@brennan.law.nyu.edu
tislerd@brennan.law.nyu.edu

*Counsel for Harris County, City of Columbus, and Nashville*

The Metropolitan Government of Nashville and Davidson County

Tyler Chance Yarbro, #023553
Director of Law

John K. Whitaker, #039207*
Senior Counsel
Metropolitan Courthouse, Suite 108
Post Office Box 196300
Nashville, Tennessee 37219-6300
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Nashville*

Abbie Kamin
Harris County Attorney

Neal A. Sarkar (D.D.C. Bar ID TX0088)
First Assistant County Attorney
Daniel David Hu (TX Bar No. 10131415)*
Senior Counsel
Edward Swidriski (D.D.C. Bar ID TX0089)
Senior Assistant County Attorney
Office of the Harris County Attorney
1010 Lamar, 11th Floor
Houston, Texas 77002

(713) 274-5101
neal.sarkar@harriscountytx.gov
daniel.hu@harriscountytx.gov
edward.swidriski@harriscountytx.gov

*Counsel for Harris County*

Christina Sanchez*
El Paso County Attorney
TX Bar No. 24062984
Ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz*
Assistant County Attorney
TX Bar No. 24109774
Office of the El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, TX 79901
Tel: 915-273-3247
b.cruz@epcountytx.gov

*Counsel for El Paso County*

DELIA GARZA
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
Telephone: (512) 854-9513
Facsimile: (512) 854-4808
By: */s/ Todd A. Clark**
TODD A. CLARK
State Bar No. 04298850
todd.clark@traviscountytx.gov

*Counsel for Travis County*

JOHN CREUZOT
DALLAS COUNTY CRIMINAL
DISTRICT ATTORNEY
/s/ Barbara S. Nicholas*
Assistant District Attorney
Texas State Bar No. 24032785
barbara.nicholas@dallascounty.org
*/s/ Jason G. Schuette**

Formatted: Font: Italic

Formatted: Indent: Left: 2.5", First line: 0.5", Widow/Orphan control, Don't keep with next, Don't keep lines together

Assistant District Attorney
Texas State Bar No. 17827020
jason.schuette@dallas.county.org
Civil Division
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone: 214.653.7358
Telecopier: 214.653.6149

*Counsel for Dallas County*

* Application for admission pro hac vice forthcoming
+ Admitted in listed states but not licensed to practice law in California.