**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al.*;<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*;<br><br>Defendants. | No. 1:26-cv-02886-AHA |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ... 1

BACKGROUND ... 3

I. The Homeland Security Grant Program ... 3

A. Structure and Purpose ... 3

B. National Priority Areas and the Election Security Requirement ... 5

II. The Administration Has Repeatedly Tried, and Failed, to Interfere with State Election Procedures ... 10

III. Plaintiffs Are Counties and Municipalities That Receive HSGP Funds and That Will Have to Implement the Election Administration Conditions ... 14

LEGAL STANDARD ... 27

ARGUMENT ... 28

I. FEMA Lacks Statutory Authority to Impose the Election Administration Conditions ... 29

II. The Election Conditions Violate the Constitution ... 33

A. The Election Administration Conditions Violate the Separation of Powers in Usurping Congress's Power of the Purse ... 33

B. The Election Administration Conditions Violate the Spending Clause's Requirements for Conditioning Funding to States ... 34

C. The Election Conditions Violate the Separation of Powers in Usurping Congress's Authority to Regulate Federal Elections ... 37

D. The Constitutional Infirmities with the Election Administration Conditions Render Them in Violation of the APA ... 39

III. The Election Administration Conditions Are *Ultra Vires* ... 40

IV. The Court Should Enter APA Relief and Reserve on Permanent Injunctive Relief ... 41

CONCLUSION ... 42

# TABLE OF AUTHORITIES

**Cases**

*Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1 (D.D.C. 2020) .................................. 27

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262 (D.C. Cir. 2001) ....................... 27

*Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*, No. 26-696, 2026 WL 662323 (D.D.C. Mar. 2, 2026) ........................................................................................................ 27

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................................ 38

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ................................... 36

*Biden v. Nebraska*, 600 U.S. 477 (2023) ....................................................................................... 33

*Bond v. United States*, 572 U.S. 844 (2014) .................................................................................. 29

*California v. Trump*, No. 25-cv-10810, 2026 WL 1826535 (D. Mass. June 24, 2026)................ 11

*California v. Trump*, No. 26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026)................ 14

*California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025) ................................................ 37

*Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165 (M.D. Ala. 2011)........................... 13

*Citizens for Resp. & Ethics in Washington (CREW) v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29 (D.D.C. 2025) ........................................................................................... 27, 42

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)................................................................. 34

*City of Chicago v. U.S. Dep't of Just.*, 822 F. Supp. 3d 873 (N.D. Ill. 2026) ............................. 34

*City of Salem v. Mullin*, No. 26-CV-01340, 2026 WL 2445474 (D. Or. Aug. 20, 2026)....... 33, 34

*City of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................... 33, 34

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).......................... 41

*King County v. Turner*, No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) ............. 31, 33

*County of Santa Clara v. Noem*, 815 F. Supp. 3d 979 (N.D. Cal. 2025)..................................... 34

*County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017).................................... 37

*FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022) ........................................................................ 29

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ................................. 40

*Florida v. U.S. Dep't of Homeland Sec.*, No. 24-cv-00509, 2026 WL 1968339 (N.D. Fla. July 7, 2026) ........................................................................................................ 13

*Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023)................................................................... 38

*Glob. Health Council* ("*GHC*") *v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) ..................................... 40

*Hous. Auth. v. Turner*, No. 25-cv-08859, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ........... 34

*Joe Hand Promotions, Inc. v. Molly Malone's LLC*, No. 19cv-3479, 2020 WL 5816219 (D.D.C. Sept. 30, 2020) ........................................................................................................ 27

*League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC*"), 808 F. Supp. 3d 29 (D.D.C. 2025) ........ 11

*League of Women Voters of Massachusetts v. Trump*, 26-cv-11549, 2026 WL 2539946 (D. Mass. Aug. 27, 2026) ........ 14

*League of Women Voters v. DHS*, Civ. Action No. 25-3501 ........ 10

*League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) ........ 13

*Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026) ........ 30, 33

*LULAC*, 780 F. Supp. 3d 135 (D.D.C. 2025) ........ 38

*Marin Audubon Soc'y v. Fed. Aviation Admin*., 121 F.4th 902 (D.C. Cir. 2024) ........ 29

*Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025) ........ 35

*Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 962 F.3d 531 (D.C. Cir. 2020) ........ 29

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ........ 2

*N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) ........ 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ........ 41

*Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960 (D.C. Cir. 2022) ........ 41

*New York v. United States*, 505 U.S. 144 (1992) ........ 36

*Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1 (1981) ........ 37

*Roudebush v. Hartke*, 405 U.S. 15 (1972) ........ 38

*Shelby Cnty v. Holder,* 570 U.S. 529 (2013) ........ 30

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir. 2001) ........ 28

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........ 35

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) ........ 38

*Trump v. California*, No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ........ 14

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) ........ 34

*United States v. Schmidt*, 25-cv-01481, 2026 WL 1850016 (W.D. Pa. June 27, 2026) ........ 12

*ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1 (D.D.C. 2012) ........ 27

*Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026) ........ 11, 12

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023) ........ 37

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........ 30

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........ 39

*Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ........ 39

**Statutes**

5 U.S.C. § 706(2) ........ 27, 38, 39
6 U.S.C. § 101(18) ........ 29
6 U.S.C. § 313(b)(2)(A) ........ 30
6 U.S.C. § 603 ........ 2
6 U.S.C. §§ 604 ........ passim
6 U.S.C. §§ 605 ........ passim
6 U.S.C. §§ 608 ........ 4
6 U.S.C. §§ 609(a) ........ 1, 31, 40
8 U.S.C. § 1373 ........ 10
52 U.S.C. § 20501–11 ........ 38
52 U.S.C. § 20901-21145 ........ 38
52 U.S.C. § 20971 ........ 39
52 U.S.C. § 21081(a)(2)(B) ........ 37
Homeland Security Act of 2002, Pub. L. No. 107-296 tit. I, § 101(b), 116 Stat. 2135 (2002) ...... 3
Immigration Reform and Control Act of 1986, Pub. L. No. 99-603 § 121, 100 Stat. 3359 ........ 13
Tex. Elec. Code § 16.033 *et seq* ........ 18

**Rules**

Fed. R. Civ. P. 56 ........ 27

**Regulations**

2 C.F.R. § 200.339 ........ 8

**U.S. Constitution**

U.S. Const. art. I, § 4 ........ 37
U.S. Const. art. I, § 8 ........ 33

**Executive Orders**

Executive Order 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ........ 13
Executive Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) ........ 11

**Secondary Authorities**

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 24, 2026) ........ 12

**Other Authorities**

*Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities*, 50 Op. O.L.C., 2026 WL 1848177 (June 18, 2026) .......... 34

DHS, *Notice of Funding Opportunity (NOFO): Fiscal Year 2026 Homeland Security Grant Program* 73 (July 9, 2026) ("2026 NOFO"),.......... passim

FEMA, *State Administrative Agency (SAA) Contacts* .......... 4

FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2020 Homeland Security Grant Program (HSGP)* 3–6 (2020) ("2020 NOFO") .......... 5

FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2023 Homeland Security Grant Program* 47 (2023) ("2023 NOFO")..... 5

FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Homeland Security Grant Program* 17–18 (2025) ("2025 NOFO") .......... 6, 26

FEMA, *The U.S. Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2024 Homeland Security Grant Program* 27–28, 33 (2024) ("2024 NOFO") .......... 5, 25

Memorandum from FEMA, Re: Homeland Security Grant Program Border Security and Election Security National Priority Area Requirements 1, 3 (June 8, 2026).......... 36

The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961).......... 33

## INTRODUCTION

This case involves the latest iteration of the Executive Branch seeking to seize control of election administration procedures nationwide for the approaching midterm elections. Here, the Administration seeks to control multiple facets of the voting and ballot counting process through a grant program administered by the Federal Emergency Management Agency (FEMA)—a program that Congress enacted to help states and local jurisdictions prevent and respond to *terrorism*. The scheme is as illegal as it sounds.

Congress established the Homeland Security Grant Program (HSGP) in the aftermath of 9/11 with the explicit and sole purpose of helping states and local communities in "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a), 609(a). Consistent with that purpose, Congress required that FEMA allocate HSGP funds based on the relative threat levels, vulnerabilities, and consequences of terrorist attacks for different jurisdictions. Congress unsurprisingly did not condition HSGP funding on states and counties changing how they administer *elections*. Nor did Congress authorize FEMA or any other part of the Executive Branch to condition access to HSGP funds on states and local communities meeting any aspects of the Administration's policy agenda unrelated to the program's counter-terrorism goals.

But FEMA has now done just that. It is withholding critical counter-terrorism funds from states and local communities unless they comply with five wide-ranging election administration conditions that amount to a FEMA-created nationwide election code (the "Election Administration Conditions"). The conditions notably are not related to how states and localities may use their federal funding. Rather, FEMA is holding back federal counter-terrorism funds unless states and localities—using their own funds—comply with FEMA-prescribed

requirements on how states maintain their voter rolls, who may work at polling sites, how voters may physically vote, and how counties must conduct post-election audits and ballot reconciliation processes.

FEMA has zero statutory authority to impose these conditions, and its actions are unconstitutional several times over. The Constitution places primary responsibility to prescribe the manner of holding federal elections in the states, subject to federal override only by Congress. The President has no power to unilaterally regulate elections. Nor does the President have constitutional authority over federal spending; that authority rests with Congress alone. Through the Election Administration Conditions, Defendants seek to usurp both of these exclusive constitutional powers of Congress. The conditions, moreover, transgress the Spending Clause's limits on conditioning federal funding to states.

The Election Administration Conditions are set to take effect no later than October 1, 2026. The November elections loom just one month later. Plaintiffs seek immediate summary judgment on all of their claims except their arbitrary-and-capricious claim, as the claims subject to this motion present statutory and constitutional questions that may be resolved purely as a matter of law. Every day between now and November 3 matters: Plaintiffs are counties and cities that receive and depend on HSGP funds, and all but one of the Plaintiffs will be responsible for administering or funding the upcoming elections. "[S]tate and local election officials need substantial time to plan for elections," because election administration "is extraordinarily complicated and difficult" and "require[s] enormous advance preparations." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Unless promptly vacated, the Election Administration Conditions would force Plaintiffs to divert significant time, money, and staff

resources away from these efforts to figure out how to comply with the burdensome, unlawful requirements FEMA has suddenly foisted upon them.

## BACKGROUND

### I. The Homeland Security Grant Program

#### A. Structure and Purpose

Following the September 11, 2001 terrorist attacks, Congress established the Department of Homeland Security ("DHS") to reduce America's vulnerability to terrorist attacks and other catastrophic events, and to help communities recover from the same. Homeland Security Act of 2002, Pub. L. No. 107-296 tit. I, § 101(b), 116 Stat. 2135, 2142 (2002). Among various responsibilities that Congress assigned to DHS, the agency was tasked with administering grant programs that support preparedness and resiliency at the state and local level. 6 U.S.C. § 603. These programs include the Homeland Security Grant Program ("HSGP"), which DHS administers through its component agency, the Federal Emergency Management Agency ("FEMA"). Since 2002, Congress has appropriated $1 to $2 billion annually for this grant program, to help state and local governments in "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604, 605.

The HSGP consists of three components: the Urban Area Security Initiative ("UASI"), the State Homeland Security Program ("SHSP"), and Operation Stonegarden ("OPSG").[1] Under the UASI program, the FEMA Administrator "shall designate high-risk urban areas to receive grants" based on an assessment of the "relative threat, vulnerability, and consequences from acts of terrorism" that metropolitan areas face, considering factors such as population and density,

[1] FEMA, No. FM-207-23-001, *Preparedness Grants Manual* 7–8 (2026), https://www.fema.gov/sites/default/files/documents/fema-gov_rsl_fy26_preparedness-grants-manual.pdf.

history of terrorism threats, consequences to critical infrastructure, and proximity to international borders. 6 U.S.C. §§ 604(b)(1), (b)(2)(A), 608(a)(1). Although UASI grants are "awarded" to specific high-risk urban areas, FEMA disburses UASI funds to states, and the states then must provide at least 80% of those funds to the high-risk urban area, retaining the remaining funds only for "items, services, or activities that benefit the high-risk urban area." *Id.* § 604(d)(2).

For the SHSP, FEMA awards grants to states based on the same criteria of "relative threat, vulnerability, and consequences from acts of terrorism." *Id.* § 608(a)(1). States must provide local and tribal governments at least 80% of SHSP grants funds, absent consent from the local or tribal governments to provide less. *Id.* § 605(c).

OPSG funds states' and local governments' efforts to strengthen border security, and is distributed according to risk to border security and the anticipated effectiveness of proposed projects. DHS, *Notice of Funding Opportunity (NOFO): Fiscal Year 2026 Homeland Security Grant Program* 73 (July 9, 2026) ("2026 NOFO"), https://www.fema.gov/sites/default/files/documents/fema_gpd_hsgp-nofo-fy2026_0.pdf (attached as Exhibit A to the Declaration of Daniel F. Jacobson).

Every state has a designated State Administrative Agency ("SAA"), which submits an application on behalf of the state and eligible urban areas for all HSGP grants.[2] The SAA then disburses allocated funding to state, local, and tribal entities across the state. For each fiscal year of awards, FEMA publishes the precise amounts of UASI, SHSP, and OPSG funds that DHS/FEMA has allocated to states and high-risk urban areas. *See, e.g.*, 2026 NOFO, App. I: HSGP Allocations, at 69-75.

---

[2] FEMA, *State Administrative Agency (SAA) Contacts*, https://www.fema.gov/grants/preparedness/about/state-administrative-agency-contacts (last visited Aug. 31, 2026).

### B. National Priority Areas and the Election Security Requirement

Since fiscal year 2020, FEMA has designated National Priority Areas ("NPAs") within HSGP to promote coordinated investment in specified preparedness goals.[3] In some cases, FEMA has required HSGP recipients to devote a stated percentage of awarded funds to projects that address a specific NPA. FEMA has treated election security as either a component of a NPA or a standalone NPA in every year since 2020, except Fiscal Year 2021.

Since fiscal year 2023, FEMA has designated election security as a standalone NPA and required HSGP recipients to devote at least 3% of awarded UASI and SHSP funds to this priority. In fiscal years 2023 and 2024, FEMA required recipients to make "at least one investment . . . to enhance physical election security and/or cyber election security," while affording recipients discretion to select such election security projects suited to their jurisdiction's needs.[4] FEMA guidance provided example project types such as physical security measures for election offices and voting locations (locks, alarms, access controls, etc.) and cybersecurity assessments and mitigations.[5] Prior to 2025, to Plaintiffs' knowledge, FEMA never required or encouraged recipients to alter their rules and procedures governing voter registration, ballot counting, or the conduct of elections.

---

[3] FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2020 Homeland Security Grant Program (HSGP)* 3–6 (2020) ("2020 NOFO"), https://www.fema.gov/sites/default/files/2020-08/fema_homeland-security-grant-program-nofo_fy-2020.pdf.

[4] FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2023 Homeland Security Grant Program* 47 (2023) ("2023 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-23-nofo; FEMA, *The U.S. Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2024 Homeland Security Grant Program* 27–28, 33 (2024) ("2024 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-24-nofo.

[5] *Id.*

In fiscal year 2025, FEMA departed from that practice for the first time, stating that the agency would withhold the 3% election security set-aside until recipients demonstrated compliance with certain election administration conditions. Among other things, FEMA required state and local recipients to prioritize compliance with the latest federal voluntary voting system guidelines, complete voting system testing through a federally-accredited laboratory, and use the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") program to verify the citizenship of election workers.[6] On June 8, 2026, DHS issued "updated compliance requirements" tying the fiscal year 2025 Election Security NPA to Executive Order 14248 and adding three new "certifiable compliance conditions," including use of the SAVE program for both voter-list maintenance and election worker eligibility.[7]

Later in June 2026, FEMA released the NOFO for FY2026 HSGP awards, setting forth the Election Administration Conditions that are the subject of this case. The 2026 NOFO expanded both the list of election administration conditions and the size and nature of the penalty if recipients did not comply. Specifically, FEMA announced that it would withhold 20% of recipients' total awards unless and until they submit proof of their compliance with the five Elections Administration Conditions, and "such proof is verified/confirmed by the Department." 2026 NOFO at 8. That holdback is in addition to, and does not offset, the separate 3% minimum-spent requirement on "investment[s] that support[] physical and/or cyber election security." *Id.* at 15.

---

[6] FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Homeland Security Grant Program* 17–18 (2025) ("2025 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo.

[7] Memorandum from FEMA, Re: Homeland Security Grant Program Border Security and Election Security National Priority Area Requirements (June 8, 2026), https://www.fema.gov/sites/default/files/documents/fema_rsl_gpd_ib-569-border-security-election-security_06082026.pdf.

The five Election Administration Conditions, with which "each state and high-risk urban area election jurisdiction must" comply to receive their full allocated HSGP award, are:

(1) "Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots;"

(2) "Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes;"

(3) "Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary;"

(4) "Voter roll citizenship verification: Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE)[] system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance HSGP counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database;" and

(5) "Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction,

> including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under HSGP."

2026 NOFO at 15–16.

According to the NOFO, states were required to submit HSGP applications by July 24, 2026, and awards will be made no later than September 30, 2026, when the 2026 fiscal year ends. *Id.* at 4.

Since issuing the NOFO, FEMA has twice supplemented it with guidance. First, on July 9, 2026, DHS issued guidance stating that "[s]ustained noncompliance" with the Election Administration Conditions may result in remedies under 2 C.F.R. § 200.339. *See* Declaration of Daniel F. Jacobson ("Jacobson Decl."), Ex. B (the "July 9 Guidance") at 2. Those remedies include that a federal agency may "[s]uspend or terminate the Federal award in part or in its entirety." 2 C.F.R. § 200.339(c). In other words, by failing to comply with the Election Administration Conditions, a state or local government may lose not just the 20% of its award withheld under the NOFO's terms, but the *entire* award.

Second, on August 10, 2026, FEMA released additional guidance, doubling down on the Election Administration Conditions and partially clarifying the standards and methodology it plans to apply. *See* Jacobson Decl., Ex. C (the "August 10 Guidance"). The guidance, which includes detailed requirements for the 5% post-election manual audit condition, reads like a state election code: "The chief election official of the state must ensure that *each election jurisdiction (county or municipality)* conducts a post-election manual audit of the paper ballots in at least 5%

of the precincts in each jurisdiction, and at least 5% of all of the centrally tabulated batches in each jurisdiction." *Id.* at 3 (emphasis added). "All ballots from each randomly selected precinct and from each randomly selected batch must be manually counted," and the random selection of ballots must include "all methods of voting, including Election Day in-person, early in-person, vote by mail or absentee, and provisional ballots." *Id.* Moreover, the audit must "include at least two races with at least one race for federal office," and the audit must be "completed in time for results to inform certification decisions." *Id.* "To support public confidence," counties must "conduct the selection and post-election manual count with bi-partisan observers present, and where feasible, provide livestream or recorded video where consistent with applicable law." *Id.* at 4. The guidance further states that "[u]nless state law mandates post-certification audits, jurisdictions should conduct the audit after completion of the unofficial canvass, including late-arriving, vote by mail, and provisional ballots." *Id.* at 4.

The August 10 Guidance further contains a required methodology for the "Voter and Ballot Reconciliation" condition. "Each election jurisdiction"—meaning counties that administer elections—"must reconcile the number of voters who voted in each federal election with the number of ballots cast." *Id.* at 4. "After all ballots have been cast in a federal election, each jurisdiction must create a static list of each voter who participated in the election." *Id.* at 4. "The list must include the name, unique voter ID number, and the method of voting for each voter who participated in the election," and [t]he method of voting must include all methods of voting in the state, such as Election Day in-person, provisional, absentee or mail, early voting and whether the voter's ballot was counted." *Id.* County officials must complete a "checklist" showing that "[t]he number of voters who voted must be equal to or greater than the number of ballots cast and counted for each method of voting," and "[i]f the number of ballots exceeds the number of voters

for any method of voting, the election official(s) in that jurisdiction should document and attempt to resolve the discrepancy." *Id.* at 5.

For the hand-marked paper ballot condition, the August 10 Guidance provides specific requirements that each State's transition plan must include for jurisdictions currently using barcode or QR code-based tabulation. *Id.* at 2–3. The August 10 Guidance also requires states to either: (1) use SAVE to "verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award," *Id.* at 5, or (2) provide "a list of registered voters with unknown citizenship status to be reviewed by USCIS before the election." *Id.* Acknowledging that "the functionality of SAVE is impacted by the June 22, 2026, order in *League of Women Voters v. DHS*, Civ. Action No. 25-3501," the guidance instructs that while that case is on appeal, "[f]or any person registered to vote for whom the state does not have records of citizenship, the state may resolve this uncertainty by submitting relevant information to USCIS for an immigration records search consistent with 8 U.S.C. § 1373." *Id.* at 2 n.1; *see also id.* at 5 ("Alternate Process (Pending Appeal of Civ. Action No. 253501): Provide a list of registered voters with unknown citizenship status to be reviewed by USCIS before the election.").

Taken together, the 2026 NOFO and the subsequent guidance make Defendants' design unmistakable: Unless states and counties fundamentally alter the way they run elections, FEMA will withhold at least 20% of their HSGP funding and may even terminate their awards in full.

## II. The Administration Has Repeatedly Tried, and Failed, to Interfere with State Election Procedures

FEMA's imposition of the Election Administration Conditions is not the first time the current Administration has attempted to seize control over elections. Since taking office, the second Trump Administration has repeatedly tried to enact sweeping changes to state and local

election procedures, trying through various means to impose the same or similar policies as those required by the 2026 NOFO. Time and time again, federal courts have rejected those changes as unlawful intrusions upon congressional and state authority over elections.

The Administration's efforts began in March 2025, when the President issued a wide-ranging executive order ("2025 Order") purporting to, among other things, overhaul voting system guidelines used by the Election Assistance Commission ("EAC") and grant DHS and the so-called Department of Government Efficiency ("DOGE") access to each state's voter registration files. Executive Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025). Federal courts have since struck down multiple provisions of the 2025 Order, uniformly ruling that only Congress and the states may regulate elections, and the Constitution leaves the president with no role in creating election policy. *See California v. Trump*, No. 25-cv-10810, 2026 WL 1826535, at *3 (D. Mass. June 24, 2026) (The Constitution "does not grant the President any specific powers over elections."); *League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC*"), 808 F. Supp. 3d 29, 79 (D.D.C. 2025) ("Because our Constitution assigns responsibility over election regulation to Congress and the States, not the President, that command exceeds the President's authority."); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1187 (W.D. Wash. 2026) ("[T]he Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections.") (cleaned up)).

Much like several of the Elections Administration Conditions that FEMA seeks to impose, section 4(b) of the 2025 Order directed the EAC to issue amended voting system guidelines that would: (1) prohibit ballots that use a barcode or quick-response code in the vote counting process, except to accommodate voters with disabilities; (2) provide a voter-verifiable paper record; and (3) rescind all previous certifications of voting equipment based on prior

standards. 2025 Order § 4(b). In invalidating the provision, a federal district court in Washington State looked to both the Constitution and the framework Congress designed for decertifying and recertifying voting systems in the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA). *Washington*, 814 F. Supp. 3d at 1219–20. Because "the Constitution assigns no authority to the President over federal election administration," and because HAVA and the NVRA "assign no role to the President in overseeing the certification of voting systems," the court found section 4(b) unlawful. *Id.*

The 2025 Order's requirement that DHS and DOGE review state voter registration files met a similar fate. In an apparent effort to carry out the mandate, the Department of Justice requested complete voter registration lists from at least 48 states and Washington, D.C. It then sued 30 states and Washington D.C. for refusing to comply. As of this filing, all 23 courts that have issued decisions in those cases have dismissed the federal government's complaints.[8]

Notably, proceedings in those lawsuits revealed that, if DOJ obtains voter files, it intends to share them with DHS so that the data can be run through the SAVE program—the same program that the Election Administration Conditions now attempt to force upon Plaintiffs. *See, e.g.*, *United States v. Schmidt*, 25-cv-01481, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026). DHS's U.S. Citizenship and Immigration Service ("USCIS") has historically operated SAVE, first created in 1986 by the Immigration Reform and Control Act, to provide state governments with an additional method to verify the citizenship and immigration status of individuals applying for government benefits, such as food stamps and Medicaid. Immigration Reform and

---

[8] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 24, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

Control Act of 1986, Pub. L. No. 99-603 § 121, 100 Stat. 3359, 3384–94; *see also, e.g.*, *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1178 (M.D. Ala. 2011) ("As its name indicates, SAVE was designed to assist States in determining an alien's eligibility for certain public benefits programs, not for determining an alien's lawful status.").

Following the issuance of the 2025 Order, DHS deployed a series of updates to transform the SAVE system into a national citizenship database that, according to USCIS, will "help verify U.S. citizenship and prevent aliens from voting in American elections."[9] On March 31, 2026, the President issued a second executive order related to elections that went even further: Section 2(a) of the order directed DHS to use information from the SAVE program, SSA records, and other federal databases to create a list of U.S. citizens eligible to vote in each state. Executive Order 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("2026 Order").

Courts rejected these efforts to transform SAVE into a DHS voter eligibility screening tool. On June 22, 2026, Judge Sooknanan set aside and vacated the administration's efforts to overhaul the system as a violation of both the Social Security and Privacy Act. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026); *but see Florida v. U.S. Dep't of Homeland Sec*., No. 24-cv-00509, 2026 WL 1968339, at *4 (N.D. Fla. July 7, 2026) (ordering that four states be permitted to access the overhauled SAVE program). Specifically, Judge Sooknanan determined that in an effort to comply with the 2025 Order, federal agencies had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be

[9] USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.

unreliable" such that they "knowingly trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote." *Id.* at *1.

Likewise, on June 25, 2026, a federal district court in Massachusetts invalidated Section 2(a) of the 2026 Order as *ultra vires*, explaining that "neither in HAVA nor any other federal statute does Congress authorize the federal government to create their own voting database. Instead, Congress, consistent with the Constitution, has left that authority to the States alone." *California v. Trump*, No. 26-cv-11581, 2026 WL 1826490, at *14 (D. Mass. June 25, 2026).[10] On August 27, 2026, the same district court entered a TRO against a final rule issued by the U.S. Postal Service pursuant to a different section of the 2026 Order concerning mail ballots. *League of Women Voters of Massachusetts v. Trump*, 26-cv-11549, 2026 WL 2539946 (D. Mass. Aug. 27, 2026). The court reasoned that it was "unaware of, and no party has proffered, any delegation Congress has made that would permit the USPS to regulate election mail." *Id.* at *4

In short, federal courts have repeatedly rejected the Trump Administration's efforts to remake elections as an unconstitutional intrusion on congressional and state authority.

### III. Plaintiffs Are Counties and Municipalities That Receive HSGP Funds and That Will Have to Implement the Election Administration Conditions

Plaintiffs are counties and municipalities that are harmed by FEMA's imposition of the Elections Administration Conditions. All Plaintiffs receive HSGP funds, and thus all Plaintiffs will lose access to a material portion of their HSGP funds unless and until their state certifies compliance with the Election Administration Conditions. All Plaintiffs except the City of Columbus also administer or fund elections. These Plaintiffs will incur substantial

[10] Although the Supreme Court has since stayed the district court's injunction in that case, it did so on standing and ripeness grounds tailored to the plaintiff States in question; the Court explicitly did not address the district court's findings on Section 2(a)'s legality. *See Trump v. California*, No. 26A124, 2026 WL 2473573, at *5 (U.S. Aug. 24, 2026).

implementation costs if their state *does* accept the Election Administration Condition. Thus, these Plaintiffs will unavoidably suffer financial and other injuries as a result of the Election Administration Conditions, no matter what their state chooses to do.

*Nashville:*

Plaintiff Metropolitan Government of Nashville and Davidson County (Nashville) is a rapidly growing metropolitan area with more than 700,000 residents. Decl. of Timothy Henderson ("Henderson Decl.") ¶ 3. It hosts millions of visitors each year, including high-profile visitors such as the President and Vice President, and large-scale public events such as CMA Fest, professional and collegiate sporting events, and events tied to the Grand Ole Opry's 100th Anniversary. *Id.* Nashville has weathered both natural and human-caused disasters, including a 2020 Christmas Day bombing that devastated a downtown city block. *Id.* Protecting Nashville requires coordination and assistance among multiple local agencies, including the Nashville Fire Department, Metro Nashville Police Department, and Office of Emergency Management, each of which depends on federal grant funding to keep pace with evolving technology and to train personnel adequately to ensure the safety of both residents and tourists alike. *Id.*

Nashville accordingly applies for and receives pass-through grants from the Tennessee Emergency Management Agency ("TEMA") under the HSGP's UASI and SHSP programs. *Id.* ¶ 4. In past years, Nashville has received funding for critical equipment and training for its SWAT team, bomb squad, and other components of its fire department, police department, and office of emergency management. *Id.* ¶¶ 7-10. For FY2026, Nashville is again seeking and expects to receive both UASI and SHSP funding and anticipates an allocation of approximately $1,324,902.84. *Id.* ¶¶ 12, 14. Nashville has already identified the specific equipment and training that funding will support. *Id.* ¶¶ 13, 15. If DHS denies, delays, or reduces the amount of this

funding, it will limit Nashville's ability to acquire the equipment and fund the training it has planned to protect its residents and visitors. *Id.* ¶ 17.

Nashville also funds the Davidson County Election Commission, which administers elections in the County and pays for poll workers, ballots, and most other election-related expenses (with funds provided by Nashville). *See* Decl. of Kenneth Byrd ("Byrd Decl.") ¶ 3. The Election Commission conducts free, fair, and secure elections and conducts post-election audits under the standards dictated by Tennessee state law. *Id.* ¶¶ 9, 13. Complying with the Election Administration Conditions would not enhance Nashville's election security but would impose substantial costs on the Election Commission that would be borne by Nashville. *Id.* ¶ 13.

*Harris County*

Plaintiff Harris County, Texas, is the nation's third-largest county by population, with more than 4.8 million residents and nearly 2.75 million registered voters. Declaration of Erica Lee Carter ("Lee Carter Decl.") ¶ 6; Decl. of Teneshia Hudspeth ("Hudspeth Decl.") ¶ 4. Harris County has participated in the HSGP since 2002 and received approximately $25 million in UASI and SHSP funding from fiscal years 2022 through 2025. Lee Carter Decl. ¶¶ 7, 10(a). Those funds support critical public-safety and counterterrorism programs, including regional emergency radio communications, hazardous-materials and bomb-unit equipment, SWAT units, emergency-management personnel, and accessible emergency alerts. *Id.* ¶¶ 9–10.

For FY2026, the 2026 NOFO allocates $23,347,667 for the designated urban area of Houston-The Woodlands-Sugar Land, TX. 2026 NOFO at 73. Harris County applied for up to $8 million of this UASI funding, plus $1.1 million in SHSP funding. Lee Carter Decl. ¶¶ 10(f), 19. Based on its recent share of the Houston-area UASI allocation, the County expects to receive approximately $5.1 million to $7 million in UASI funding alone, meaning that FEMA's 20%

holdback would deprive Harris County of approximately $1 million to $1.4 million and prevent it from fully carrying out planned homeland-security projects. *Id.* ¶¶ 23–25.

Harris County also administers one of the largest election systems in the country. The County already follows audit and reconciliation procedures required by Texas law. Hudspeth Decl. ¶ 6. Several of the Election Administration Conditions would require Harris County to substantially alter those procedures, expend millions of dollars and substantial staff resources, and in some instances depend upon action by state officials over whom the County has no control. For example, Harris County currently uses the Hart Verity voting system, in which voters make selections on voting devices that generate a voter-verifiable paper record that the voter then deposits into a scanner for tabulation. *Id.* ¶ 14. Transitioning to exclusively hand-marked paper ballots would cost millions of dollars and require new printers and scanners, additional election workers and training, redesigned ballots, testing and certification of new equipment, changes to vendor contracts, pilot testing, and extensive public education. *Id.* ¶¶ 15–17. Texas law also requires counties to finish counting regular ballots within twenty four hours after polls close, and Harris County would be unable to meet that deadline using exclusively hand-marked paper ballots that cannot be tabulated with its current systems. *Id.* ¶ 18.

The required 5% manual audit would likewise substantially expand Harris County's existing audit obligations under Texas law. Harris County estimates that conducting an audit of the magnitude required by FEMA would take approximately three to four months, require approximately 300 additional election workers, and cost approximately $3.84 million, while potentially interfering with the County's ability to satisfy the audit procedures imposed by state law. *Id.* ¶¶ 19–21.

Harris County also cannot itself ensure compliance with FEMA's voter-citizenship verification requirement. The County Clerk does not administer the voter rolls, and the Tax Assessor-Collector and Voter Registrar's Office neither has access to SAVE nor submits voter information to USCIS for immigration-record searches. Hudspeth Decl. ¶ 23; Decl. of Annette Ramirez ("Ramirez Decl.") ¶¶ 6–8. Instead, Harris County would have to depend on the Texas Secretary of State to perform the required searches, even though the County cannot control whether or when the Secretary does so. Ramirez Decl. ¶ 8. Moreover, the Secretary of State has advised Harris County that SAVE matches should be considered to be "weak" matches, meaning that County officials would have to individually investigate any resulting matches and follow Texas's statutory notice, cancellation, and hearing procedures before removing voters from the rolls. *Id.* ¶¶ 9–10; *see, e.g.*, Tex. Elec. Code § 16.033 *et seq*. Because Harris County has no way to know how many voters such searches might identify, it cannot determine in advance the personnel and resources necessary to complete those investigations. Ramirez Decl. ¶ 11.

The election worker condition creates similar problems for Harris County. Texas already requires election workers to be registered voters, but Harris County has no existing process for screening those workers through SAVE. Hudspeth Decl. ¶¶ 24, 26. And Texas law gives presiding election judges and political parties responsibility for selecting certain election clerks, leaving Harris County without authority to exercise the direct control the Election Administration Conditions contemplate unless the Texas Legislature changes state law. *Id.* ¶ 26. FEMA also extends the requirement to temporary workers and vendor employees who work on election systems, even though Texas law does not require citizenship verification of those employees and Harris County has neither the existing systems nor personnel necessary to conduct such screening. *Id.* ¶¶ 25, 27.

*El Paso County*

El Paso County is a multicultural and geographically distinct county. It is home to more than 800,000 residents, more than 82 percent of whom are Hispanic and more than 68 percent of whom speak a language other than English at home. Declaration of Maria Chavez ("Chavez Decl.") ¶ 4. It is the westernmost county of Texas and part of the largest border community on the Rio Grande. *Id*.

El Paso County follows all applicable federal and state laws to protect the security and accuracy of the election process. Decl. of Lisa Wise ("Wise Decl.") ¶ 6. However, the Election Conditions imposed by the NOFO would create new costs for the County in several ways. Currently the County does not just use hand-marked paper ballots, but also uses ballot marking devices for differently abled voters. *Id.* ¶ 9. Transitioning to hand marked paper ballots would "cost several million dollars" and would likely take 12 to 18 months. *Id.* ¶ 10. In addition to the cost to the county of additional equipment, the County expects that the longer time it takes to print ballots on demand would force the county to hire additional workers and purchase "additional equipment to avoid long delays at polling places." *Id.* ¶ 11. Transitioning to hand marked paper ballots could also present other logistical challenges, such as increasing the number of mismarked ballots that need to be duplicated for review. *Id*.

The Election Condition related to post-election audits could also increase costs for the County, which currently complies with the reconciliation procedures and post-election manual audit required by Texas state law. Wise Decl. ¶¶ 6, 14. The sample size for the current audit, however, is significantly less than the 5 percent required by the new Election Conditions, and increasing the audit would impose additional costs on the County, both in terms of resources and also in terms of the time a larger audit could take. *Id.* ¶¶ 14–15.

Regarding reconciliation between the number of voters and the number of ballots cast, currently El Paso's reconciliation takes a few hours, including comparison of several reports such as the electronic poll pad check in of voters with the record of ballots cast. Wise Decl. ¶ 16. Creating a static list of each participating voter would impose additional costs, and imposing new procedures for reconciliation if counts are off by a certain percentage could not just cost the County more, but also cause the County to lose election workers. *Id.*

Regarding use of the SAVE list, the County does use the SAVE system to verify citizenship of voters but does not use the SAVE system to verify the citizenship of poll workers or employees of voting system vendors. Wise Decl. ¶¶ 17-18. The County would find it difficult to use the SAVE system to verify the citizenship of poll workers or employees of vendors, as it has been labeled as inaccurate by the Texas Secretary of State, and El Paso would need to provide election workers with 30 days to respond to disputed flags from the system, a delay which could put the election department behind schedule. *Id.* ¶ 19. Even if the County had a system in place to verify the citizenship of employees of vendors, which it does not, the delays in conducting that verification as vendors add staff closer to a large election could leave the County and the vendor understaffed on Election Day. *Id*.

If the County were forced to comply with these Election Conditions, and did not receive additional funding to cover such costs, the County would have to "reduce voting locations," and "would likely need to cut outreach programs." Wise Decl. ¶¶ 21, 23. In addition, the new Election Conditions would increase the County's costs of training election workers, and force the County to recruit new election workers, as the County has received feedback from election workers that they will stop participating if there is a "significant change in processes." *Id.* ¶ 22.

Across El Paso County's participation in the HSGP since 2016, the County has received over $13 million in HSGP funding including over $1.2 million in SHSP funding, over half a million in LETPA funding, and over $11 million in OPSG funding. Chavez Decl. ¶¶ 5-7.

SHSP and LETPA funds have supported equipment and technology for El Paso County that help law enforcement detect and deter terrorism-related threats, and are vital for lifesaving local law enforcement operations. Chavez Decl. ¶ 27. Funds support much-needed equipment, including items such as radios, protective gear, generators, defibrillators, night vision kits, microphones and earpieces, generators, trailers, ATVs, and rescue harnesses. The loss of SHSP and LETPA funds would weaken the "overall county readiness during emergencies and high risk incidents" as well as the County's "counterterrorism and threat-prevention capabilities." *Id.* ¶¶ 35-36. If SHSP and/or LETPA funds were delayed or reduced by 20 percent, the County would have to reduce the supplies purchased or cover the costs of such a delay through the General Fund, which could "cause the County to exhaust contingency funds, potentially causing the County to forego other grant opportunities." *Id.* ¶ 37.

In El Paso, OPSG funds support "overtime staffing, equipment, and joint operations with federal partners, enabling hundreds of additional patrol hours each quarter." Chavez Decl. ¶ 18. OPSG helps El Paso strengthen "local-federal coordination, rapid response capabilities, and enforcement in high-activity border areas." *Id.* A loss or 20 percent reduction in OPSG funds would force the County to "reduce overtime hours for border patrol" and the County's "ability to support border-security operations." *Id.* ¶¶ 38-39.

El Paso County has submitted proposals for $1.287 million in OPSG funds for Fiscal Year 2026, and based on past participation in the program expects this award is likely. Chavez Decl. ¶¶ 28-29. Similarly, the County has submitted applications for $100,431 in SHSP and

$73,641 in LETPA funds for Fiscal Year 2026, and the prioritization placed on these applications by the Rio Grande Council of Governments, expects those funds to be awarded. *Id.* ¶¶ 30-33.

Accordingly, no matter whether the State of Texas agrees to the Elections Administration Conditions, El Paso County will incur financial injury one way or the other. El Paso County will lose out on HSGP funding if the state does not agree to the conditions, and will have to incur the costs described above in implementing the conditions if the state does agree.

*Dallas County*

Dallas County is the second most populous county in Texas and home to more than 2.66 million residents. The County has participated in the HSGP program since 2022, during which time it has been allocated more than $700,000 in UASI grant funding, which it has used for a range of purposes, including hazardous materials planning, cybersecurity, domestic violence extremism workshops, and election security.

For Fiscal Year 2026, the 2026 NOFO allocates $15,462,065 to the designated urban area of Dallas-Fort Worth-Arlington, TX. *See* 2026 NOFO at 73. Dallas has applied for and expects to be allocated $ 175,000.00 in this UASI funding for FY2026, and to use that funding for election security for sheriff's department overtime. Declaration of Scott Forster ¶ 3.

Dallas County currently uses electronic ballot marking devices designed by Election System & Software (ES&S), certified by the Texas Secretary of State. Declaration of Paul Adams (Adams Decl.) ¶ 6. In order to adopt a hand-marked paper ballot system to comply with FEMA's Election Administration Conditions, Dallas County would have to procure ballot stock and hundreds of ballot on-demand printers to print individualized ballots that can be hand-marked by voters. *Id.* ¶ 7. Dallas County has received a quote for on-demand printers: $7.25 million dollars to purchase 1450 such printers. Texas law requires competitive bidding because

the contract amount would exceed $1 million. *Id.* ¶ 9. From the start of competitive bidding to delivery of new printers would take an estimated 6-9 months, after which the Election Department will need to learn how to use the printers and train several thousand election judges, clerks, and other election officials on their use. *Id.* ¶¶ 10-11. It would be infeasible to procure the equipment and train works on updated procedures before the end of the 2027 election cycle. *Id.* ¶ 12.

Currently the Dallas County Elections Department has no access to USCIS's SAVE system. *Id.* ¶ 14. Accordingly, Dallas County will lose out on HSGP funding if the state does not agree to FEMA's Election Administration Conditions, and it will have to incur the costs described above in implementing the conditions if the state does agree. Either way, it will incur financial injury.

*Travis County*

Plaintiff Travis County, Texas, serves approximately 1.36 million residents and contains substantial critical infrastructure, including hospitals, airports, academic institutions, utilities, communications infrastructure, and emergency-response facilities, as well as major events that bring hundreds of thousands of visitors to the region each year. Decl. of Dashiell Daniels ("Daniels Decl.") ¶¶ 5–6. Travis County participates in the HSGP through the UASI program, and HSGP funds have directly supported both election security and law-enforcement capabilities. Among other things, prior HSGP awards have funded mobile panic buttons for polling sites, law-enforcement equipment, and security training that prepares election staff to respond to active threats at polling locations. *Id.* ¶¶ 7–10. For FY2026, Travis County has been allocated $260,975 in UASI funding. *Id.* ¶¶ 11–13. FEMA's 20% holdback amounts to $52,195 and would

significantly reduce the public-education campaign and prevent the County from purchasing the planned security equipment. *Id.* ¶¶ 14–15.

Travis County also administers elections through its elected County Clerk. Decl. of. Dyana Limon-Mercado ("Limon-Mercado Decl.") ¶¶ 2–3. Travis County employs extensive election-security practices, including restricted access to election systems, pre-election verification of voting equipment and software, logic-and-accuracy testing, tamper-evident security measures, chain-of-custody documentation, law-enforcement oversight of central counting, and post-election audits. *Id.* ¶¶ 12–13.

Several of FEMA's Election Administration Conditions would require Travis County to make substantial and costly changes to those existing election procedures. Travis County currently uses an Election Systems & Software voting system in which voters make their selections on ballot-marking devices that produce a voter-verifiable paper record containing both a text record of the voter's choices and barcodes used for tabulation. *Id.* ¶ 14. The County acquired those ballot-marking devices in 2018, the equipment is expected to have a useful life of at least ten years and potentially much longer, and the County has no current plans to replace it. *Id.* ¶ 15. Transitioning to exclusively hand-marked paper ballots would cost millions of dollars and require additional equipment and election workers, redesigned ballots, testing and certification, changes to agreements with political parties and other jurisdictions, new training, and extensive public education. *Id.* ¶¶ 16–18. FEMA's manual-audit and reconciliation requirements would impose additional burdens. Texas law already requires Travis County to conduct post-election hand-count audits under procedures established by state law. *Id.* ¶ 19. FEMA's separate requirement to manually audit at least 5% of precincts and centrally tabulated batches would expand that obligation, requiring additional personnel, time, and resources and

potentially interfering with the County's ability to fulfill its existing state-law audit obligations. *Id.* ¶ 19. Likewise, although Travis County already conducts ballot reconciliation as required by Texas law, FEMA's reconciliation methodology would require the County to devote additional personnel to identifying and investigating discrepancies, including routine discrepancies caused by spoiled or damaged ballots. *Id.* ¶ 21. Finally, the Travis County Clerk's Office does not independently use SAVE for either voters or election workers.[11] *Id.* ¶¶ 22–23. Texas law already requires election workers to be U.S. citizens. *Id.* ¶ 20. There is no existing process for running poll workers through the SAVE system. Poll workers are already required to be registered voters under state law. Further, this guidance would require the County to incur significant costs in order to create and implement an entirely new system of ensuring that third-party vendors employ only U.S. citizens, not just individuals who are authorized to work in the United States. *Id.* ¶ 25.

*City of Columbus*

Plaintiff City of Columbus is the capital city of the State of Ohio with a population of roughly 938,000 people. Declaration of Christopher Long ("Long Decl.") ¶¶ 4 - 5. Columbus is home to the Ohio General Assembly, Ohio Supreme Court, Ohio Governor's mansion, Ohio National Guard, Ohio Emergency Management Agency, The Ohio State University (OSU), two international airports, and major manufacturers and industries. *Id.* ¶ 5. The City hosts large public events, including for collegiate and professional sports and the upcoming 2028 Olympic and Paralympic Games. *Id.*

[11] The County Clerk's Office is not involved in the voter roll or voter registration process. The Travis County Tax Assessor-Collector and Voter Registrar's Office is responsible for the voter rolls in Travis County. Limon-Mercado Decl. ¶ 22.

The City has participated in the HSGP since approximately 2012 and has received at least approximately $1.7 million in UASI and SHSP funds. *Id.* ¶ 6. In recent years, Columbus has received substantial HSGP funds through SHSP and UASI: the City received SHSP program funds for FY2022 ($185,000), FY2023 ($280,026), and FY2024 ($91,842), *id.* ¶ 6, and DHS allocated UASI funding to the Columbus urban area, including for FY2024 ($1,346,340) and FY2025 ($4,062,892), *id.* ¶ 16; *see also* FY2024 NOFO at 16; FY2025 NOFO at 56. These HSGP funds have enabled critical public safety investments. For example, the City received $477,318 in FY2024 UASI funds for its Fire Department to purchase a bomb detection robot, and the City has used HSGP funds to purchase personal protective equipment (e.g., hazmat suits and air tanks), radio frequency drone detection sensors, handheld infrared chemical identification systems, mass spectrometer chemical detection systems, and video monitoring equipment for its helicopter fleet. Long Decl. ¶¶ 6, 14. The City has also benefited from HSGP investments, whether directly in the City or for neighboring jurisdictions, made or administered by Franklin County Emergency Management and Homeland Security (FCEMHS), which coordinates emergency management and disaster preparedness for Franklin County. *Id.* ¶¶ 7-13.

For FY2026, DHS has allocated $3,662,688 in UASI funds to the Columbus designated urban area. *Id.* ¶¶ 16–17; *see* 2026 NOFO at 72. The City's budget is tight, and a 20 percent or greater withholding of FY2026 UASI funds would deprive the City and region of critical antiterrorism funding allocated to the Columbus area and would negatively impact the services and public safety measures that Columbus could fund. Long Decl. ¶ 20. Examples of equipment that the City needs, and which can best be secured using funding like HSGP, include a radio tower near the City's main drinking water source (to provide coverage for the City's Emergency

Responders) and anti-drone technology to allow first responders to protect mass gathering events (e.g., football games or other sporting events that will take place in the City). *Id.* ¶ 21.

## LEGAL STANDARD

"A party may move 'for summary judgment at any time,' including at the beginning of a case." *Joe Hand Promotions, Inc. v. Molly Malone's LLC*, No. 19cv-3479, 2020 WL 5816219, at *3 (D.D.C. Sept. 30, 2020) (quotations omitted); *see* Fed. R. Civ. P. 56(b). Under Rule 56(a), summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In APA cases, however, the summary judgment standard functions slightly differently, because the reviewing court generally reviews the agency's decision as an appellate court addressing issues of law." *Citizens for Resp. & Ethics in Washington (CREW) v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 44 (D.D.C. 2025) (cleaned up). "The district judge sits as an appellate tribunal, and the entire case on review is a question of law." *Id.* (cleaned up).

Although district courts typically resolve APA claims upon an administrative record, where Plaintiffs assert contrary to law claims that "can be resolved with nothing more than the statute" or constitutional provisions at issue, this Court may adjudicate the merits of the claims without the need for an administrative record. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001); *accord Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*, No. 26-696, 2026 WL 662323, at *3 (D.D.C. Mar. 2, 2026); *Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 16 n.19 (D.D.C. 2012); *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 440 n. 37 (5th Cir. 2001).

## ARGUMENT

The merits of this case are not close. Congress has not provided FEMA any statutory authority to condition access to HSGP funds on states and localities complying with election administration requirements that FEMA has invented from whole cloth. Nothing in the HSGP statute, the relevant HSGP appropriations, or FEMA's organic statute authorizes FEMA to prescribe election-related requirements, or any other policy requirements that state and local governments must meet, to obtain their allocation of HSGP funds—especially requirements that they must meet with their own funds. And FEMA certainly cannot show that Congress provided *clear* statutory authorization for FEMA to impose the Election Administration Conditions, as FEMA must under multiple doctrines that require a clear statement from Congress in such circumstances.

FEMA has acted in excess of statutory authority in enacting the conditions, and the Court may resolve this case based on that alone. *See* 5 U.S.C. § 706(2)(C). But the Elections Administration Conditions are also unconstitutional in multiple ways. FEMA's imposition of the conditions violates the separation of powers twice over—they usurp Congress's exclusive constitutional power to set the terms for federal spending, as well as Congress's exclusive federal authority to regulate federal elections. The conditions independently violate the Spending Clause's requirements for conditions on federal funding to states specifically. Further, the Election Administration Conditions are not at all germane to the purposes of the HSGP, nor does the HSGP statutory scheme clearly set forth the conditions.

Plaintiffs seek straightforward relief in the first instance. Under the APA, the Court must hold unlawful and vacate the Elections Administration Conditions. Given the imminent November elections, Plaintiffs respectfully request that the Court provide this relief promptly,

and allow for subsequent briefing on whether any additional relief, such as a permanent injunction, is warranted.

## I. FEMA Lacks Statutory Authority to Impose the Election Administration Conditions

FEMA's imposition of the Election Administration Conditions is without "statutory [] authority." 5 U.S.C. § 706(2)(C). "Federal agencies . . . are creatures of statute and as such 'literally ha[ve] no power to act' except to the extent Congress authorized them." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 911–12 (D.C. Cir. 2024) (quoting *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)) (second alteration in original). Any "legally binding" action therefore must trace to "some delegation of the requisite legislative authority by Congress." *Id.* at 912 (cleaned up); *see also id.* at 918 (vacating agency rule as exceeding statutory authority on this basis); *Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 962 F.3d 531, 535–36 (D.C. Cir. 2020) (same). That delegation of authority must be affirmative—courts may not "presume" authority "because Congress did not expressly foreclose the possibility." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up).

In the context of this case, that affirmative delegation of authority must come in the form of a clear statutory statement that Congress intended to authorize FEMA to impose the Election Administration Conditions on HSGP funding. Express statutory authority is necessary here under three different doctrines: the Election Administration Conditions regulate an area of traditional state authority, they carry vast political and fiscal consequences, and they implicate Congress's core power of the purse.

First, the Supreme Court has long applied a "clear statement" rule where a proposed interpretation of federal law would intrude upon an "area[] of traditional state responsibility." *Bond v. United States*, 572 U.S. 844, 858 (2014). "[I]t is incumbent upon the federal courts," the

Court has held, "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* (cleaned up). Election administration is the paradigm case for this federalism canon, for it is a bedrock power "reserved to the States," *Shelby Cnty v. Holder,* 570 U.S. 529, 543 (2013), with a single exception that Congress may displace state election rules for federal elections only.

Second, the major questions doctrine independently requires "clear congressional authorization" for FEMA to impose nationwide election administration requirements—a matter undoubtedly of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (cleaned up).

Third, the considerations underlying the major questions doctrine "apply with particular force" where, as here, the purported delegation involves "the core congressional power of the purse." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (Roberts, C.J.) (plurality opinion). Congress does not lightly "relinquish" its power to set the terms for billions of dollars in annual homeland security grants; if it means to, it would say so "clearly." *Id.* (cleaned up).

Here, Defendants cannot point to *any* statutory language, let alone "clear" language, authorizing FEMA to condition HSGP funding on states adopting specific procedures for how they administer elections. The statutory scheme for the HSGP certainly provides no such authority. It authorizes grants to states and localities to assist "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). The five Elections Administration Conditions have nothing to do with preventing or responding to "acts of terrorism." *See* 6 U.S.C. § 101(18) (defining "act of terrorism" for these purposes). Nowhere in the HSGP statute did Congress authorize DHS or FEMA to withhold HSGP funds unless and until states and local governments satisfy FEMA that they have implemented five specific

election-administration policies that are not mentioned in the law and are untethered to any legitimate counter-terrorism purpose.

It bears emphasis in this regard that the Election Administration Conditions do *not* prescribe how states and counties may or must use HSGP funds. Congress has given FEMA discretion to prescribe permissible activities for HSGP recipients and subrecipients "to use grant funds," so long as the activities are "related to preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 609(a). But here, the Elections Administration Conditions impose mandates for which states and counties will have to use their own, non-federal funds to meet the requirements. FEMA makes this clear in its August 10 Guidance: "Meeting the 3% election security minimum investment requirement elsewhere in the FY 2026 HSGP NOFO does not, by itself, release this 20% holdback, which applies to funds beyond the 3% set-aside." Jacobson Decl. Ex. C. In other words, compliance with the five Election Administration Conditions is separate from the requirement that HSGP recipients spend at least 3% of their HSGP funding on election security measures. FEMA is simply unlawfully leveraging critical counter-terrorism funding to impose unfunded election-administration mandates on Plaintiffs and other jurisdictions. *King County v. Turner*, No. 25-3664, 2026 WL 2489361, at *7 (9th Cir. Aug. 25, 2026) ("[W]e conclude that the Local Governments are likely to succeed in establishing that the conditions are unlawful to the extent they cover programs or activities that do *not* receive federal financial assistance.").

The appropriations laws funding the HSGP also do not authorize FEMA to impose the Election Administration Conditions. For Fiscal Year 2026, Congress simply cross-referenced the pre-existing statutory programs, providing $494,000,000 for the State Homeland Security Grant Program under 6 U.S.C. § 605, and $584,250,000 for the Urban Area Security Initiative under

6 U.S.C. § 604. *See* Homeland Security and Further Additional Continuing Appropriations Act of 2026, Pub. L. No. 119-86 div. A, tit. III, 140 Stat. 773, 789. In cross-referencing the statutes establishing the UASI and SHSP programs, Congress required spending on what those statutes authorize, and nothing more.

Nor can FEMA rely on general authorities from its organic statute. Those provisions describe FEMA's emergency-preparedness and response mission. Specifically, Congress created FEMA "[to] lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A). Not a word of it—or of DHS's broader authorities—touches on voter registration, poll workers, how voters cast their ballots, post-election audits, and ballot reconciliation. Congress certainly did not authorize FEMA to prescribe a detailed, nationwide election code as it has now sought to do through the Election Administration Conditions.

For similar reasons, a court in the District of Oregon recently rejected a similar attempt by DHS and FEMA to impose conditions on FEMA grant funds as "a tool to advance unrelated executive policy." *City of Salem v. Mullin*, No. 26-CV-01340, 2026 WL 2445474, at *1 (D. Or. Aug. 20, 2026). There, as here, FEMA could point to no congressional authorization to impose new policy conditions on FEMA funding (there, disaster aid), and the court accordingly enjoined the conditions as exceeding statutory authority, among other grounds. *Id.* at *12.

In short, Defendants cannot point to clear statutory authorization for the Election Administration Conditions. FEMA's imposition of the conditions thus exceeds statutory authority and must be vacated under the APA.

## II. The Election Conditions Violate the Constitution

The Election Conditions are also unconstitutional in multiple independent ways: they violate the separation of powers by usurping Congress' exclusive power of the purse and power under the Elections Clause, and they violate the Spending Clause's requirements on conditioning funding to states.

### A. The Election Administration Conditions Violate the Separation of Powers in Usurping Congress's Power of the Purse

FEMA's imposition of the Election Administration Conditions violates the separation of powers by usurping Congress's constitutional power of the purse. "The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl. 7). "[C]ontrol of the purse" is "[a]mong Congress's most important authorities," *Biden v. Nebraska*, 600 U.S. 477, 505 (2023), so much so that the Framers described this power as Congress's "most complete and effectual weapon," *Learning Res.*, 607 U.S. at 243 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)).

Under the Spending Clause, Congress alone may enact federal spending programs for the "general Welfare." U.S. Const. art. I, § 8, cl. 1, and the power to attach conditions to federal funds is "incident to the spending power, which is exclusively committed to Congress." *King County*, 2026 WL 2489361, at *5 (cleaned up). Federal agencies "cannot impose" conditions on federal funds "absent congressional authorization." *Id.* (cleaned up). The Appropriations Clause further cements Congress's control over spending vis-a-vis the Executive Branch; federal agencies may spend only what Congress appropriates, and only as Congress directs. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).

Here, in blocking access to congressionally appropriated homeland security funds unless recipients adopt the Executive's unilateral, unrelated policy agenda, FEMA has "usurped the power of the legislature to determine spending and to set conditions on that spending." *City of Chicago v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020). FEMA's "use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with [its] policy objectives strikes at the heart of . . . the separation of powers among the branches of the federal government." *Id.* at 892.

Courts have repeatedly held that an agency's imposition of extra-statutory conditions on a federal spending program violates the separation of powers, including just last week in *City of Salem* as to a different FEMA grant program. *City of Salem*, 2026 WL 2445474, at *8; *see also, e.g.*, *San Francisco*, 897 F.3d at 1231; *Washington*, 766 F. Supp. 3d at 1154; *City of Chicago v. U.S. Dep't of Just.*, 822 F. Supp. 3d 873, 887–88 (N.D. Ill. 2026); *County of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1025–26 (N.D. Cal. 2025); *Hous. Auth. v. Turner*, No. 25-cv-08859, 2025 WL 3187761, at *10 (N.D. Cal. Nov. 14, 2025). This case is no different.

### B. The Election Administration Conditions Violate the Spending Clause's Requirements for Conditioning Funding to States

Even if the relevant statutes could be read to authorize FEMA to condition access to HSGP funds on compliance with FEMA-prescribed requirements like the Election Administration Conditions, the conditions would still be unconstitutional because they violate the limits the Constitution places on conditioning federal funding to the States. The "spending power is of course not unlimited," *South Dakota v. Dole*, 483 U.S. 203, 207 (1987), and FEMA's Election Administration Conditions transgress two separate limits on that power. First, they bear no reasonable relationship to the anti-terrorism, disaster relief, and border security interests that SHSP, UASI, and OPSG funds serve. And second, they are ambiguous where the Constitution

demands clarity. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 373 & n.4 (2025). Each defect is independently fatal.

**1. The conditions are not related to the purposes of HSGP funding.**

Federal "grant conditions must relate 'to the federal interest in [the] national projects or programs'" being funded. *Id.* at 373 n.4 (quoting *Dole*, 483 U.S. at 207). DOJ itself recently emphasized this restriction, explaining that Congress could not, for example, "condition the receipt of highway funding on the provision of care to mentally disabled patients in a community-based setting." *Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities*, 50 Op. O.L.C., 2026 WL 1848177, at *13 (June 18, 2026) (slip op. at 21). This germaneness requirement is not a formality. It is what keeps the spending power from swallowing the Constitution's other limits on federal authority. *New York v. United States*, 505 U.S. 144, 167 (1992).

FEMA's Election Administration Conditions bear no nexus to the "federal interest in" the HSGP. *Medina*, 606 U.S. at 373 n.4 (cleaned up). Congress established the relevant HSGP programs solely to assist states and local jurisdictions "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). The 2026 NOFO itself describes UASI, SHSP, and OPSG as programs designed to "prevent, protect against, and respond to terrorist attacks," and it insists that every funded project have a demonstrated nexus to those purposes. 2026 NOFO at 9, 22. That is FEMA's own account of the program it administers. Whatever may be said for hand-marked ballots, 5% audits, and database screening of voter rolls as a matter of election policy, they do not harden a single facility, detect a single intrusion, or prepare a single first responder.

Indeed, in that same NOFO where FEMA accurately describes the purposes of the HSGP, it describes the Election Administration Conditions as intended "[t]o strengthen the integrity of U.S. elections." *Id.* at 15. And the August 10 Guidance prescribes requirements for some of the conditions to purportedly "support public confidence" in election results. Ex. C at 4. Whether the voter-registration, poll worker, ballot-marking, audit, and ballot-reconciliation requirements in the conditions in fact promote "election integrity" or "public confidence" may be a hotly disputed political topic, but it cannot be reasonably disputed that they are not germane to the federal counter-terrorism interest underlying the HSGP. The 2026 NOFO does not even try to make the case that they are.

The fact that DHS designated election infrastructure as "critical infrastructure" in 2017 and subsequently required HSGP recipients to spend at least 3% of their funding on election security measures does not render the new Election Administration Conditions lawful. The 3% election-security spending requirement is limited to investments that "support[] physical and/or cyber election security," which specifically helps states and localities prevent and recover from terrorist attacks on election infrastructure. 2026 NOFO at 8, 15; Memorandum from FEMA, Re: Homeland Security Grant Program Border Security and Election Security National Priority Area Requirements 1, 3 (June 8, 2026), https://perma.cc/PF3H-RJ9E?type=standard. When DHS announced it was deeming election infrastructure critical, then-DHS Secretary Jeh Johnson took pains to explain that that designation "does nothing to change the role state and local governments have in administering and running elections."[12] Yet Defendants now seek to use FEMA funding to do precisely that.

[12] Press Release, U.S. Dep't of Homeland Sec., Off. of Press Sec'y, Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (Jan. 6, 2017), https://perma.cc/2442-HMNN.

#### 2. The conditions do not give the clear notice the Spending Clause demands.

Conditions on federal funding to states also must be imposed "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981); *accord Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

The Election Administration Conditions fail that standard, because *Pennhurst'*s clear notice rule runs to the terms on which "*Congress*" offers funds. 451 U.S. at 17 (emphasis added). That reason is structural: a funding recipient cannot knowingly accept terms that Congress, as the offeror, never stated. An agency cannot cure that defect by introducing or clarifying terms on its own after the fact—"the 'needed clarity' under the Spending Clause 'must come directly from the statute.'" *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021)). "Relying on [executive action] to present the clear condition . . . is an acknowledgment that Congress's condition was not unambiguous," which "would not meet the requirements of *Dole*." *Tex. Educ. Agency*, 992 F.3d at 361. Courts have thus rejected funding conditions that were made clear only in subsequent executive actions, and not the relevant statutes itself. *See, e.g.*, *id.* at 361–62; *Morrisey*, 59 F.4th at 1147; *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017). As described *supra*, there can be no argument that the Elections Administration Conditions are made unambiguous in any relevant statutes.

### C. The Election Conditions Violate the Separation of Powers in Usurping Congress's Authority to Regulate Federal Elections

The Election Administration Conditions violate the constitutional separation of powers for the additional reason that they usurp Congress's authority to set nationwide rules for federal elections. The Elections Clause empowers Congress—not the Executive—to regulate the "Times, Places, and Manner" of conducting federal elections. *See* U.S. Const. art. I, § 4. It

operates as a default provision, vesting states with responsibility for crafting the rules for federal elections "only so far as Congress declines to pre-empt state legislative choices." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (cleaned up). Thus, Congress—and Congress alone—"is the check on States' authority to regulate federal elections." *LULAC*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025). In other words, "the Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections,'" and "spell[s]" no "role for the President in the operation of state voting procedures in federal elections." *Georgia v. Meadows*, 88 F.4th 1331, 1346–47 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024) (first alteration in original) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)); *see also California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025) ("Congress, not the President, has the ultimate constitutional authority over elections.").

As explained, nothing in the HSGP statutory scheme or FEMA's organic statute delegates Congress's authority to prescribe rules for federal elections to the Executive. To the contrary, Congress has made its intent as to who should administer elections—and how—abundantly clear in enacting the NVRA and HAVA, which speak directly to some of the same aspects of election administration that FEMA now seeks to dictate. The NVRA already establishes voter registration and voter list maintenance policy for federal elections, as administered by the states. *See* 52 U.S.C. § 20501–11. HAVA sets baseline standards for voter registration lists and provisional voting and makes federal funding available to implement those standards. *See id.* § 20901-21145. HAVA also already requires voting systems to have the *capacity* for a manual audit, but does not include a mandate to conduct such audits. 52 U.S.C. § 21081(a)(2)(B). And HAVA tasks the Election Assistance Commission—not DHS or FEMA—

with developing and maintaining voting-equipment standards through a voluntary certification program and allows states to make *optional* use of this program. 52 U.S.C. § 20971.

In short, Congress has already established a detailed statutory and regulatory scheme to govern election administration, one that contemplates no role for DHS or FEMA in setting state election policy. Defendants' attempt to exercise unilateral control through the Election Administration Conditions is therefore "incompatible with the expressed or implied will of Congress." *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). In these circumstances, Defendants' power is "at its lowest ebb" and they "can rely only upon [the Executive's] own constitutional powers minus any constitutional powers of Congress over the matter." *Zivotofsky*, 576 U.S. at 10 (cleaned up). To prevail, they must show that their asserted power is "both exclusive and conclusive on the issue." *Id.* (cleaned up). But as established above, they cannot: the Executive Branch lacks *any* constitutional authority to unilaterally regulate federal elections, let alone "exclusive" and "conclusive" authority.

Defendants have no power, under the Constitution or by statute, to regulate state election procedures, much less in the expansive and unprecedented way set out in the Election Administration Conditions. Plaintiffs are therefore entitled to summary judgment on Count IV.

### D. The Constitutional Infirmities with the Election Administration Conditions Render Them in Violation of the APA

Plaintiffs assert their constitutional claims both as standalone equitable causes of action (Counts II-IV) and under the APA (Count VI). The APA claim challenges the Election Administration Conditions as final agency action "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). For the reasons explained above, the Election Administration Conditions violate the Constitution in three separate ways. Plaintiffs are

accordingly entitled to summary judgment on all four counts, and to relief at a minimum under the APA, as described above.

## III. The Election Administration Conditions Are *Ultra Vires*

If Plaintiffs are unable to obtain the relief they seek through Counts I-IV or Count VI, the court should grant summary judgment on Plaintiffs' *ultra vires* claims in Count VII. *Ultra vires* review is available when no statute expressly precludes review, no alternative procedure affords meaningful and adequate review, and the challenged conduct is plainly beyond the agency's delegated authority and contrary to a specific, clear, and mandatory statutory prohibition. *Glob. Health Council* ("*GHC*") *v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The third requirement includes circumstances where an agency engages in action that is "blatantly lawless," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up), or exceeds the "plain[] . . . outer limits of agency authority" under a statute, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). The disregarded statute must also confer rights upon the plaintiff. *GHC*, 153 F.4th at 20.

Defendants' imposition of the Election Administration Conditions on HSGP awards meets this standard. Conditioning HSGP funding on compliance with election-administration requirements that FEMA invented from whole cloth is blatantly lawless and exceeds the outer limits of FEMA's authority under the HSGP scheme, which authorizes funds only to help states and local communities prepare for, prevent, and respond to "acts of terrorism." 6 U.S.C. §§ 604(a), 605(a), 609(a). The HSGP statutory scheme also confers rights on Plaintiffs directly, in the form of pass-through funding earmarked for them. *See id.* §§ 604(d)(2)(A), 605(c)(1).

## IV. The Court Should Enter APA Relief and Reserve on Permanent Injunctive Relief

The Court should set aside the Election Administration Conditions pursuant to 5 U.S.C. § 706(2). The APA directs courts to "set aside agency action" that is "otherwise not in accordance with law," "in excess of statutory . . . authority," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

The D.C. Circuit has "made clear that when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). Indeed, "the text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," make clear that to "set aside" an unlawful agency action means to "*vacat[e]*" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring) (emphasis added). APA vacatur is thus not a party-specific remedy. *See id.* at 830 (Kavanaugh, J., concurring); *Nat'l Mining Ass'n*, 145 F.3d at 1409.

APA vacatur is warranted here because the Election Administration Conditions violate the APA for the multiple reasons described above. This Court should vacate the Election Administration Conditions in their entirety, such that they no longer condition HSGP funding for any state or local jurisdiction.

Given the imminent upcoming elections, Plaintiffs respectfully request that the Court grant this APA relief now and then permit supplemental briefing on whether a permanent injunction is also warranted. That approach would provide immediate relief to Plaintiffs while giving the parties and the Court more time to address any remaining need for equitable relief in light of the scope and effect of the Court's vacatur order.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' partial motion for summary judgment on Counts I-IV and VI of Plaintiffs' amended complaint, or, in the alternative, Count VII. If the Court awards summary judgment on any of these counts, it may dismiss Count V (the arbitrary and capricious claim) without prejudice as prudentially moot. *See CREW*, 791 F. Supp. 3d at 59.

Dated: September 1, 2026

Washington, DC

Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Brian C. Rosen-Shaud (DC Bar No. 90042065)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com

Benjamin L. Berwick (D.D.C. Bar No. MA0004)
Protect Democracy Project
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

Cerin Lindgrensavage (DC Bar No. 1741602)
Jacek Pruski (DC Bar No. 888325144)
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Tel.: (202) 579-4582
cerin.lindgrensavage@protectdemocracy.org

jacek.pruski@protectdemocracy.org

Toby Merrill (D.D.C. Bar ID MA0006)+
Joshua Karsh (DC Bar No. 90035665)+*
Sharanya (Sai) Mohan (CA Bar No. 350675)*
Graham Provost (DC Bar No. 1780222)+
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org
graham.provost@publicrightsproject.org

*Counsel for Nashville, Harris County, City of Columbus, El Paso County, and Travis County*

Eliza Sweren-Becker*
Lauren Miller Karalunas*
Derek Tisler*
Brennan Center for Justice at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
millerl@brennan.law.nyu.edu
tislerd@brennan.law.nyu.edu

*Counsel for Harris County, City of Columbus, and Nashville*

The Metropolitan Government of Nashville and Davidson County

Tyler Chance Yarbro, #023553
Director of Law

John K. Whitaker, #039207*
Senior Counsel
Metropolitan Courthouse, Suite 108
Post Office Box 196300
Nashville, Tennessee 37219-6300

(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Nashville*

Abbie Kamin
Harris County Attorney

Neal A. Sarkar (D.D.C. Bar ID TX0088)
First Assistant County Attorney
Daniel David Hu (TX Bar No. 10131415)*
Senior Counsel
Edward Swidriski (D.D.C. Bar ID TX0089)
Senior Assistant County Attorney
Office of the Harris County Attorney
1010 Lamar, 11th Floor
Houston, Texas 77002
(713) 274-5101
neal.sarkar@harriscountytx.gov
daniel.hu@harriscountytx.gov
edward.swidriski@harriscountytx.gov

*Counsel for Harris County*

Christina Sanchez*
El Paso County Attorney
TX Bar No. 24062984
Ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz*
Assistant County Attorney
TX Bar No. 24109774
Office of the El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, TX 79901
Tel: 915-273-3247
b.cruz@epcountytx.gov

*Counsel for El Paso County*

DELIA GARZA
County Attorney, Travis County
P. O. Box 1748
Austin, Texas 78767
Telephone: (512) 854-9513
Facsimile: (512) 854-4808
By: *<u>/s/ Todd A. Clark*</u>*

TODD A. CLARK
State Bar No. 04298850
todd.clark@traviscountytx.gov

*Counsel for Travis County*

JOHN CREUZOT
DALLAS COUNTY CRIMINAL
DISTRICT ATTORNEY
/s/ Barbara S. Nicholas*
Assistant District Attorney
Texas State Bar No. 24032785
barbara.nicholas@dallascounty.org
*/s/ Jason G. Schuette**
Assistant District Attorney
Texas State Bar No. 17827020
jason.schuette@dallas.county.org
Civil Division
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone: 214.653.7358
Telecopier: 214.653.6149

*Counsel for Dallas County*

* Application for admission pro hac vice forthcoming
\+ Admitted in listed states but not licensed to practice law in California.