**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al*.<br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al*.,<br><br>*Defendants*. | No. 1:26-cv-02886-AHA |

# **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Homeland Security Grant Program ("HSGP") ..... 2

A. SHSP and UASI Funding Priorities and Requirements ..... 4

B. Enhancing Election Security NPA ..... 5

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek to Modify the Terms of Federal Grants and Order Payment to the States Under the Modified Terms. ..... 7

II. Plaintiffs Fail to Join Indispensable Parties Under Rule 19—the Third-Party States Who May Accept Conditioned HSGP Grant Awards from FEMA. ..... 9

A. The States are Necessary (or Required) Parties. ..... 10

B. The States are Indispensable Parties. ..... 11

III. Plaintiffs' Count I Fails Because Imposition of the Election Security Conditions is Consistent with FEMA's Broad Statutory Authority ..... 13

IV. The Election Security Conditions are Lawful Under the Constitution. ..... 15

A. The Election Security Conditions are Consistent with Congress's Power of the Purse. ..... 17

B. Plaintiffs' Spending Clause Challenge Fails ..... 17

C. The Election Security Conditions are Consistent with Congress's Authority to Regulate Federal Elections. ..... 20

V. Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law. ..... 21

VI. Any Relief Should be Limited to Plaintiff Jurisdictions. ..... 23

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

## CASES

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ........ 8

*Bd. of Governors, FRS v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ........ 22, 24

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ........ 8

*Broussard v.* Columbia *Gulf Transmission Co.*,
398 F.2d 885 (5th Cir. 1968) ........ 12

*California v. Texas*,
593 U.S. 659 (2021) ........ 24

*Chiropartners, Inc. v. Gravely*,
No. 1:12-cv-00223-CG-C, 2012 WL 4050840 (S.D. Ala. Aug. 24, 2012) ........ 11

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ........ 17

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ........ 18

*Corsi v. Eagle Publ'g, Inc.*,
No. 1:07-CV-02004ESH, 2008 WL 239581 (D.D.C. Jan. 30, 2008) ........ 11

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 16

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
192 F. Supp. 3d 54 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017),
*opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018) ........ 11

*Doran v. Salem Inn, Inc*.,
422 U.S. 922 (1975) ........ 24

*Fed. Express Corp. v. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........ 22

*Fla. Wildlife Fed'n. Inc. v. U.S. Army Corps. of Eng'rs*,
859 F.3d 1306 (11th Cir. 2017) ........ 12

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 17, 23

*Harris Cnty. v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) .......... 18

*Holley v. United States*,
124 F.3d 1462 (Fed. Cir. 1997) .......... 9

*Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Babbitt*,
43 F.3d 1491 (D.C. Cir. 1995) .......... 10

*Lomayaktewa v. Hathaway*,
520 F.2d 1324 (9th Cir. 1975) .......... 12

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .......... 24

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 8, 9

*Nat'l Treasury Emps. Union v. Vought*,
149 F.4th 762 (D.C. Cir. 2025),
*reh'g en banc granted, vacated by*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) .......... 16

*New York v. Nat'l Sci. Found.*,
793 F. Supp. 3d 562 (S.D.N.Y. 2025) .......... 16

*New York v. United States*,
505 U.S. 144 (1992) .......... 18

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 22, 23

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) .......... 18, 19, 20

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) .......... 8, 9

*Republic of the Philippines. v. Pimentel*,
553 U.S. 851 (2008) .......... 10, 12

*State ex rel. Becerra v. Sessions*,
284 F. Supp. 3d 1015 (N.D. Cal. 2018) .......... 19

*Swanson Grp. Mfg. LLC v. Jewell*,
790 F.3d 235 (D.C. Cir. 2015) .......... 6

*Talavera v. Shah*,
638 F.3d 303 (D.C. Cir. 2011) .......... 6

*Teamsters Loc. Union No. 171 v. Keal Driveaway Co.*,
173 F.3d 915 (4th Cir. 1999) .......... 11

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 23

*U.S. ex rel. Hall v. Tribal Dev. Corp.*,
100 F.3d 476 (7th Cir. 1996) .......... 11

*United States v. Texas*,
599 U.S. 670 (2023) .......... 23

**CONSTITUTION**

U.S. Const. art. I, § 4, cl. 1 .......... 21

**STATUTES**

5 U.S.C. § 706 .......... 15, 21, 23

6 U.S.C. § 313 .......... 13, 17, 20, 22

6 U.S.C. § 604 .......... 3, 4, 9, 19

6 U.S.C. § 605 .......... 3, 19

6 U.S.C. § 608 .......... *passim*

6 U.S.C. § 609 .......... 3

6 U.S.C. §§ 603–609 .......... 3, 4

28 U.S.C. § 1491(a)(1) .......... 7

42 U.S.C. § 5195c(e) .......... 19

The Homeland Security Act of 2002,
Pub. L. No. 107-296, 116 Stat. 2135 .......... 2

Implementing Recommendations of the 9/11 Commission Act of 2007,
Pub. L. No. 110-53, 121 Stat. 266 (codified as amended at 6 U.S.C. §§ 603–609) .......... 2

**RULES**

Fed. R. Civ. P. 19 ........ 1, 9, 10, 12

Fed. R. Civ. P. 56 ........ 6, 7

## INTRODUCTION

Plaintiffs—six counties and municipalities—challenge, under the Administrative Procedure Act (the "APA") and the Constitution, the Election Security Conditions outlined in the fiscal year 2026 Homeland Security Grant Program ("HSGP") Notice of Funding Opportunity ("FY26 HSGP NOFO"). Plaintiffs seek to alter the terms of future grant agreements between the Federal Emergency Management Agency ("FEMA") and the states, and to require payment under Plaintiffs' preferred terms. But this Court lacks jurisdiction to alter the terms of existing grant agreements and order payment by the Government under those modified terms. Such relief can only be granted, if at all, by the Court of Federal Claims. Regardless, Plaintiffs' Motion must be dismissed where Plaintiffs fail to join indispensable parties under Federal Rule of Civil Procedure 19—the states who decide whether to contract with FEMA, who are the entities that actually contract with FEMA, and whose contractual agreements would be altered if the Court enters the relief Plaintiffs seek.

Even if this Court has jurisdiction over Plaintiffs' claims *and* the suit is permitted to continue despite the absence of the third-party states whose interests would be significantly impaired by an order impacting their ability to contract freely with the Government, Plaintiffs fail to show that the Election Security Conditions are unlawful under FEMA's statutory authority, the HSGP statute, or the Constitution. And Plaintiffs' *ultra vires* claim fails because Defendants have not acted plainly beyond the bounds of their statutory authority, and the APA provides an alternative path to judicial review. As such, this Court should deny Plaintiffs' motion for partial summary judgment, and grant Defendants' cross-motion for summary judgment on Counts I-IV, VI, and VII of Plaintiffs' Amended Complaint.

## BACKGROUND

### I. Homeland Security Grant Program ("HSGP")

This suit concerns a federal grant program created by Congress to strengthen the Nation's preparedness and its ability to respond to major disasters and emergencies: the Homeland Security Grant Program. This grant program is "part of a comprehensive set of measures authorized by Congress and implemented by the Department of Homeland Security [("DHS")/FEMA]" to assist state, local, tribal and territorial emergency management agencies to implement the National Preparedness System and the National Preparedness Goal ("NPG") of a "secure and resilient nation." Ex. 1, FY 2026 HSGP NOFO at 9. The program authorizes grant recipients "to use grant funds to achieve target capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism[.]" 6 U.S.C. § 609(a). Permitted uses of grant funds include: developing and enhancing homeland security and emergency management; designing, conducting, and evaluating training and exercises; protecting critical infrastructure; purchasing, upgrading, storing, or maintaining equipment, including computer hardware and software; ensuring operability of emergency communications systems; enhancing school preparedness; and paying intelligence analysts. *Id*.

The HSGP was created in 2003. Ex. 1, FY 2026 HSGP NOFO at 9. The authorizing section is Section 2002 of The Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191–92. The program was codified in its current form by amendments made to the Homeland Security Act of 2002 and by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 101, 121 Stat. 266, 273–85 (codified as amended at 6 U.S.C. §§ 603–609). *See* Ex. 1, FY 2026 HSGP NOFO at 29. HSGP includes three key grant subprograms. The State Homeland Security Grant Program ("SHSP") and the Urban Area Security Initiative ("UASI") aim to enhance the capabilities of state, local, tribal, and territorial governments, as well as nonprofits, in preventing, protecting against, and responding to terrorist attacks. *Id*. at 4, 9. Operation Stonegarden ("OPSG") is focused on improving

cooperation between local, tribal, state, and federal law enforcement to secure America's borders. *Id*. at 9-10. These programs work together to build a secure and resilient nation, giving communities the tools and resources needed to efficiently handle various threats and emergencies. *Id*. at 10.

A State Administrative Agency ("SAA") is the only entity eligible to submit HSGP applications to DHS/FEMA. *Id*. at 5. When an eligible local jurisdiction seeks funding under the HSGP subgrants, it submits an application to its SAA, and the SAA reviews and submits the application to FEMA on behalf of the locality. *Id*. When FEMA offers a state an HSGP award and the state accepts, awarded funds are provided to the SAA, which then manages and distributes "pass-through funds" to its "subrecipient" jurisdictions, like Plaintiffs, via subawards. *Id*.

"The goal of the SHSP is to support statewide and state, local, tribal, and territorial (SLTT) governments in building, enhancing, and sustaining the capabilities needed to prevent, prepare for, protect against, and respond to acts of terrorism." *Id*. at 10. A locality applying for an SHSP subgrant submits its application to its SAA, who then compiles local applications into one unified state-wide application and submits the state's consolidated proposal to FEMA. *See* 6 U.S.C. § 605(b)(1)-(2). A state must pass at least 80% of its awarded SHSP funds to local and tribal governments within 45 days of the state accepting its award and receiving the funds. *Id*. § 605(c)(1); Ex. 1, FY26 HSGP NOFO at 47.

The aim for the UASI program is to enhance the security and resilience of high-risk urban areas by building, sustaining, and improving capabilities to prevent, prepare for, protect against, and respond to acts of terrorism. Ex. 1, FY 2026 HSGP NOFO at 10. A high-risk urban area applying for UASI funding submits its application to its SAA, who then submits the application to FEMA. 6 U.S.C. § 604(c)(4). If FEMA approves the application, FEMA shall distribute grant funds to the state and, not later than 45 days after the date that a state receives UASI funds, the state shall then provide the high-risk urban area awarded that grant not less than

80% of the grant (with any withheld funds spent by the State on items/services/activities that benefit that high-risk urban area). *Id.* § 604(d)(1)-(2); Ex. 1, FY26 HSGP NOFO at 47.

OPSG supports enhanced cooperation and coordination among U.S. Customs and Border Protection ("CBP") and federal, state, local, tribal, and territorial law enforcement agencies to strengthen border security. Ex. 1, FY26 HSGP NOFO at 22-23. Under OPSG, FEMA distributes grant funding to states, who then make subgrants to "county-level or equivalent governments and federally recognized tribal governments in states bordering Canada or Mexico," or "with international water borders[,]" and who "have active U.S. Border Patrol operations coordinated with [CBP]." *Id.* at 5.

**A. SHSP and UASI Funding Priorities and Requirements**

HSGP establishes specific funding requirements to ensure resources are allocated effectively and address critical national priorities. Ex. 1, FY26 HSGP NOFO at 10. Law Enforcement Terrorism Prevention Activities ("LETPA") "are initiatives funded through HSGP aimed at enhancing law enforcement's ability to prevent terrorist attacks." *Id.* "These activities focus on building and sustaining capabilities in areas such as intelligence analysis, information sharing, threat recognition, and terrorist interdiction." *Id.* "At least 35% of each state/territory SHSP/UASI . . . allocation must be allocated to LETPA activities." *Id.* "LETPA funds can be applied to projects across the [National Priority Areas ("NPAs")] or other investments that meet LETPA criteria." *Id.*

Through SHSP and UASI, "HSGP supports the development and sustainment of core capabilities essential to achieving the [NPG]: 'A secure and resilient nation.'" *Id.* at 11. "To ensure strategic focus" on that goal, "DHS has identified five NPAs that reflect the evolving risk landscape and national policy objectives." *Id.* The required NPAs for FY 2026 SHSP and UASI funds are: "(1) [e]nhancing the protection of soft targets and crowded places, [including] faith-based organizations and election sites; (2) [s]upporting Homeland Security Task Forces and fusion centers; (3) [e]nhancing and integrating cybersecurity resiliency; (4) [e]nhancing election

security; and (5) [s]upporting border crisis response and enforcement." *Id*. "Recipients must allocate at least 30% of their SHSP and UASI funds to the five NPAs." *Id*. Of the 30%, a minimum of 3% of a jurisdiction's total SHSP and UASI funds must be spent on enhancing election security, and a minimum of 10% of a jurisdiction's total SHSP and UASI funds must be spent on supporting border crisis response and enforcement. *Id*.

**B. Enhancing Election Security NPA**

In 2017, "DHS designated the infrastructure used to administer the nation's elections as critical infrastructure." Ex. 1, FY26 HSGP NOFO at 15; Ex. 4, U.S. DHS, Press Release: Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector (January 6, 2017) ("2017 Designation"). "This designation recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." *Id*. "Additionally, the Homeland Threat Assessment 2024 indicates that electoral processes remain an attractive target for many adversaries." *Id*.; Ex. 3, 2024 Homeland Threat Assessment at 19.

On June 24, 2026, FEMA issued the FY26 HSGP NOFO, setting forth conditions for FY2026 HSGP awards, including the Election Security Conditions. The FY26 HSGP NOFO outlines that, because securing election infrastructure, "ensuring its continued operation in the face of threats and harassment, advancing the safety of election officials, and protecting against foreign interference are national security priorities[,] . . . each state and high-risk urban area must dedicate at least 3% of its [fiscal year 2026] SHSP and UASI award to eligible election security investments . . . that support physical and/or cyber election security." Ex. 1, FY26 HSGP NOFO at 15-16.

Additionally, to strengthen the integrity of U.S. elections, each state must submit evidence of compliance with the following five election security requirements: (1) submit a plan for transitioning from electronic voting systems that utilize barcodes or QR codes to count votes to equipment that accepts hand-marked paper ballots; (2) conduct a post-election 5% manual

audit of paper ballots and compare it to electronic voting system results to ensure that electronic voting systems accurately count votes; (3) confirm that the number of voters who voted in each federal election matches the number of ballots cast, using the methodology established by the Secretary; (4) utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") system or another authorized government system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award—the state's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database; (5) utilize the SAVE system or another authorized government system to verify U.S. citizenship of any person working at a polling place in any capacity, or operating any election system in the jurisdiction. Ex. 2, Aug. 10 FY26 Election Security Guidance at 1-6.[1] FEMA will withhold from drawdown an amount equal to 20% of a recipient state's total HSGP award (including awards under SHSP, UASI, and OPSG) until the state submits proof of compliance with the FY26 Election Security Requirements and DHS verifies that proof. *Id*. at 2. Upon verification of compliance, FEMA will notify the state and release the withheld funding for drawdown in accordance with applicable grant administration requirements. *Id*.

**<u>LEGAL STANDARD</u>**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Summary judgment is appropriate "if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case," *id.* (citation omitted), including for an element of standing, *see Swanson Grp. Mfg.*

[1] On August 10, 2026, FEMA issued Grants Program Directorate Information Bulletin No. 580 ("Aug. 10 FY26 Election Security Guidance") to provide additional clarity as to the Election Security Requirements in the Fiscal Year 2026 HSGP Notice of Funding Opportunity.

*LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). A party may "file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

## ARGUMENT

### I. The Court Lacks Subject-Matter Jurisdiction Where Plaintiffs Seek to Modify the Terms of Federal Grants and Order Payment to the States Under the Modified Terms.

Congress has specifically divested federal courts of jurisdiction over matters seeking payment under Government contracts. Here, Plaintiffs ask the Court to "set aside" grant terms they dislike, ECF No. 28-1, Plaintiffs' Motion for Partial Summary Judgment ("Mem.") at 41; and even to declare "null and void" any state's acceptance of the Election Security Conditions that may occur before this Court rules on the Parties' cross motions, ECF No. 26, Amended Complaint ("Am. Compl.") at 51. To the extent Plaintiffs seek relief in the form of an order requiring the Government to modify the terms of HSGP grant agreements between FEMA and the states once they exist[2] and pay the states—and, in turn, Plaintiffs through pass-through funding—under the agreements amended to Plaintiffs' liking, this is relief that could only be granted by the Court of Federal Claims. Indeed, the Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" involving amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.*

---

[2] FEMA will issue the FY26 HSGP awards "[n]o later than September 30, 2026[.]" Ex. 1, FY26 HSGP NOFO at 4. "Recipients must [then] accept their awards no later than 60 days from the award date." *Id.* at 47. As of the date of this filing, FY26 HSGP grant agreements between FEMA and the states do not exist. It is Defendants' position that, an order requiring FEMA to amend the terms of a grant agreement between FEMA and a state, executed after the state accepts FEMA's conditioned award offer, must come, if at all, from the Court of Federal Claims.

As the D.C. Circuit has long recognized, regardless of how a claim is styled, a case must proceed only in the Court of Federal claims if a case "is in 'its essence' contractual[.]" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). This prohibition on district court jurisdiction extends to claims founded on grants that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

Determining whether "a particular action" is "at its essence a contract action" outside the jurisdiction of district courts requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *Perry Cap. LLC*, 864 F.3d at 619 (applying *Megapulse*). Here, both prongs point toward a lack of district court jurisdiction.

Plaintiffs identify "[t]he statutory scheme for the HSGP" as the source of their right to HSGP awards to the states free of the Election Security Conditions and absent the related holdback. Mem. at 30. But Plaintiffs have not identified any statute or regulation that could plausibly be read to entitle them—or, more specifically, non-party states—to federal funds absent conditions aimed at achieving HSGP's purpose: to protect national security and "build a secure and resilient nation, giving communities the tools and resources they need to handle various threats and emergencies effectively." Ex. 1, FY 2026 HSGP NOFO at 10. And neither the HSGP statute, nor the Constitution, require the Government to provide a grantee (or subgrantee) with access to its entire award on the date the award agreement is executed. Rather, it is an executed grant agreement itself that entitles Plaintiffs to funds—and only then if they comply with the criteria set out in that agreement.

The relief prong likewise weighs against this Court's jurisdiction to order the amendment of executed FY26 HSGP grant agreements between FEMA and the states (or the execution of

those contracts under Plaintiffs' specific set of terms). Although Plaintiffs purport to seek the vacatur of the Election Administration Conditions from the FY26 HSGP grant agreements, the relief Plaintiffs request is fundamentally contractual and monetary. Plaintiffs seek to amend the terms of future FY26 HSGP grant awards so they are not required to implement the Election Administration Conditions, and so they can have immediate access to the entirety of their subaward funds. Mem. at 41 ("This Court should vacate the Election Administration Conditions in their entirety, such that they no longer condition HSGP funding for any state or local jurisdiction"). Because Plaintiffs' theories of standing, relief, and harm hinge entirely on the terms of the future FY26 HSGP grant agreements, cloaking their claims as seeking equitable relief under the Constitution and the APA is irrelevant to the extent the relief they seek is the modification or requirement to execute their preferred contracts. *See, e.g.*, *Perry Cap. LLC*, 864 F.3d at 619 (district court lacks jurisdiction over any case that "is in 'its essence' contractual" (quoting *Megapulse*, 672 F.2d at 968); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act . . . .").

In short, to the extent Plaintiffs seek to alter the terms of future grant agreements between FEMA and the states, this is relief that can only be granted by the Court of Federal Claims.

## II. Plaintiffs Fail to Join Indispensable Parties Under Rule 19—the Third-Party States Who May Accept Conditioned HSGP Grant Awards from FEMA.

Even if the Tucker Act does not apply, Plaintiffs' Motion fails where Plaintiffs have not joined indispensable parties under Federal Rule of Civil Procedure 19—namely, the states who may enter into conditioned HSGP agreements with FEMA and whose award agreements would be altered if the Court enters the relief Plaintiffs seek. *See* 6 U.S.C. §§ 605(c)(1), 604(d). Notably, Plaintiffs seek to alter the terms of *every* state's FY26 HSGP grant agreement—not just the terms of the grant agreements between FEMA and the states in which the Plaintiff Jurisdictions are located. Rule 19 establishes a three-prong test for the dismissal of claims for failure to join an indispensable party: "whether a party is indispensable for a just adjudication

requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless proceed in equity and good conscience." *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v. Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995) (citation omitted).

**A. The States are Necessary (or Required) Parties.**

The first step in the Rule 19 analysis is to determine whether a party is a "required part[y]," sometimes termed a "'necessary' part[y] under the old terminology." *Republic of the Philippines. v. Pimentel*, 553 U.S. 851, 859 (2008). A party must be joined when the party has "an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may…impair or impede the [party's] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). HSGP funding is awarded by FEMA *to the states*. Ex. 1, FY26 HSGP NOFO at 47. If a state chooses to accept its HSGP award, a grant agreement is executed between FEMA and the state, with the state acknowledging that it consents to the grant's conditions. This includes the requirement that the state must certify compliance with the five Election Security Conditions to release the 20% of its award held back by FEMA.

Here, Plaintiffs seek to prevent the states from entering into FY26 HSGP grant agreements with FEMA if the awards contain conditions Plaintiffs—non-parties to those agreements—dislike. *See, e.g.*, Am. Compl., Request for Relief ¶ C ("Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with them from imposing the Election Administration Conditions as a condition of applying for, or accepting funds under, an HSGP grant."). Alternatively, Plaintiffs seek to prevent FEMA from enforcing the FY26 HSGP Election Security Conditions *even if a state has accepted its conditioned award*. *See, e.g.*, *id.*, Request for Relief ¶ D ("Declare that any certification of compliance with or acceptance of the Election Administration Conditions by any recipient is null and void").

As parties to the relevant grant agreements, the third-party states have an interest in (1)

their own ability to contract with the Government unimpeded by the interests of nonparties to those contracts, and (2) the validity of any contract they have chosen to enter into with the Government. Their absence in this lawsuit—and the prospect of relief being entered as relates to those interests—significantly impedes their ability to protect those interests. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 68 (D.D.C. 2016) ("Rule 19 provides that all parties to a contract are necessary in litigation seeking to decimate that contract" (citation omitted)), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018); *Corsi v. Eagle Publ'g, Inc.*, No. 1:07-CV-02004ESH, 2008 WL 239581, at *4 (D.D.C. Jan. 30, 2008) (an absent contracting party must be joined under Rule 19(a)); *Teamsters Loc. Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999) (contract parties are necessary parties to suits regarding that contract); *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 478-79 (7th Cir. 1996) ("A judicial declaration as to the validity of a contract necessarily affects, 'as a practical matter,' the interests of both parties to the contract.").

Because Plaintiffs seek to directly intercede into the contractual relationships between FEMA and the states in which Plaintiffs are located, and the states may have their interests impaired by an order impacting their ability to contract with the Government, they are parties that must be joined.

**B. The States are Indispensable Parties.**

If a person is a required party under Rule 19(a), and "cannot be joined,"[3] the court must ask "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The first factor in determining if the action

[3] Defendants take no position in this filing on whether the states are amenable to suit in this Court, but at a minimum, Plaintiffs should be required to attempt to bring the states into this suit via proper service of process. *See, e.g., Chiropartners, Inc. v. Gravely*, No. 1:12-cv-00223-CG-C, 2012 WL 4050840, at *3-4 (S.D. Ala. Aug. 24, 2012) (proper remedy when party was indispensable was to dismiss complaint without prejudice to allow the plaintiff to attempt to add the indispensable party). Additionally, Plaintiffs have not complied with Rule 19(c)'s disclosure requirements. *See* Fed. R. Civ. P. 19(c) (requiring parties filing claims for relief to identify necessary parties and explain why they are not joined).

should be dismissed is "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." *See id*. 19(b)(1). Any judgment in this case would prejudice the states because it would impair their right to contract freely with the federal government. *See Fla. Wildlife Fed'n. Inc. v. U.S. Army Corps. of Eng'rs*, 859 F.3d 1306, 1318 (11th Cir. 2017) (noting that the Rule 19(b)(1) factor overlaps with the practical impairment requirement of Fed. R. Civ. P. 19(a)). Indeed, "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) (citing *Broussard v. Columbia Gulf Transmission Co.*, 398 F.2d 885 (5th Cir. 1968)).

The second Rule 19(b) factor is whether that prejudice could be "lessened or avoided" in some way. Fed. R. Civ. P. 19(b)(2). This factor also weighs in favor of dismissal given that the relief sought by Plaintiffs requires the amendment of an award package to remove conditions the states may already be working to implement or the amendment of an executed grant agreement. The third factor is whether "a judgment rendered in the person's absence would be adequate." *Id*. 19(b)(3). This factor reflects "the public stake in settling disputes by wholes, whenever possible." *Fla. Wildlife Fed'n*, 859 F.3d at 1319 (quoting *Pimentel*, 553 U.S. at 870). Here, an order impairing the contract of a third-party when that third-party was not present invites litigation, thereby multiplying, not consolidating, disputes. Finally, courts look to whether "plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Here, following dismissal without prejudice, Plaintiffs could simply re-file an action, naming the proper parties to any HSGP agreement whose terms Plaintiffs challenge.

## III. Plaintiffs' Count I Fails Because Imposition of the Election Security Conditions is Consistent with FEMA's Broad Statutory Authority.

Even if the suit could proceed despite Plaintiffs' failure to join indispensable parties, Plaintiffs' first APA claim fails because imposition of the Election Security Conditions is consistent with FEMA's broad statutory authority. Plaintiffs assert that "FEMA's imposition of

the Election Administration Conditions is without 'statutory authority[,]'" in violation of the APA. Mem. at 29 (Count I). But Congress created FEMA to "lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A). What is more, the HSGP statute explicitly acknowledges that HSGP funding priorities include consideration of "threat, vulnerability, and consequences related to critical infrastructure (for all infrastructure sectors) or key resources identified by the Administrator or the State homeland security plan" and "the most current threat assessments available to the Department." *Id*. § 608(a)(1)(D)-(E). And on the list of "threat[s] to critical infrastructure sectors" that Congress directed FEMA to consider as it allocates HSGP funding is "types of threat determined relevant by the Administrator." *Id*. § 608(b)(9). Through these provisions, Congress both delegated considerable discretion to FEMA to effectuate the goals of its grant programs, and made clear that, as a designated critical infrastructure subset subject to documented evolving threats, election infrastructure falls within the HSGP statute.

On January 6, 2017, Secretary of Homeland Security Jeh Johnson designated U.S. election systems as part of the Nation's critical infrastructure, including "storage facilities, polling places, and centralized vote tabulations locations used to support the election process, and information and communications technology to include voter registration databases, voting machines, and other systems to manage the election process and report and display results on behalf of state and local governments." Ex. 4, 2017 Designation at 1. As outlined in the DHS's Office of Intelligence and Analysis 2024 Homeland Threat Assessment, the Nation's "electoral processes remain an attractive target for many adversaries," and there is a high likelihood of attempted influence and interference with U.S. elections. Ex. 3, 2024 Homeland Threat Assessment at 19 ("Nation-state threat actors likely will seek to use novel technologies and cyber tools to enhance their capabilities and malign influence campaigns, ultimately to undermine our confidence in a free and fair election. Cyber actors likely will seek to exploit election-related

networks and data, including state, local, and political parties' networks and election officials' personal devices and e-mail accounts."). Further, the Cybersecurity and Infrastructure Security Agency ("CISA") issued an Election Report on July 13, 2026 based on "a set of technical and operational activities" conducted by CISA from 2019 to 2024 "to evaluate the security of certain U.S. election systems." Ex. 5, CISA 2026 Election Report at 1. These activities included "penetration testing of state, local, tribal, and territorial [("SLTT")] networks." *Id.* "CISA's findings highlight the reality that election-related software, like all complex software, contains vulnerabilities" and "the IT networks operated by SLTT election offices lack cybersecurity hygiene." *Id.* The report further details that "vulnerabilities persist for months or years on production election systems" due to constraints on conducting timely security updates to election software, thereby "increasing exposure to opportunistic or targeted threats." *Id.* at 3. In multiple instances, "CISA assessors gained full network control [of SLTT voting systems] within hours or days, demonstrating that many SLTT partners remain soft targets incapable of stopping even moderately skilled adversaries." *Id.* at 4. CISA's report confirms that SLTT voting systems remain vulnerable to threat and recommends that SLTT election officials "[u]se human-readable paper ballots" and "[c]onduct post-election manual audits of paper ballots to confirm that voting systems function as intended[.]" *Id.* at 5-6.

The Election Security Conditions were each selected to address the well documented vulnerabilities in our election system, consistent with Congress's direction in the HSGP statute to protect critical infrastructure and consider recent threat assessments. Each condition contributes toward mitigating operational vulnerabilities exploitable by bad actors and prevents the potential for sabotage, infiltration, and foreign interference. Submitting a transition plan (Condition 1) ensures that jurisdictions gradually phase out electronic voting systems vulnerable to manipulation, and transition to hand-marked paper ballots. Post-election manual audits (Condition 2) and voter/ballot reconciliation (Condition 3) allow for confirmation that electronic voting systems accurately count votes and have not been tampered with. Voter roll citizenship

verification (Condition 4) ensures that only U.S. citizens are voting in U.S. elections. Finally, election worker citizenship verification (Condition 5) ensures that only U.S. citizens control voting systems.

Plaintiffs acknowledge that an appropriate use of HSGP funding is to "help[] states and localities prevent and recover from terrorist attacks on election infrastructure[,]" and they take no issue with the requirement that HSGP recipients spend at least 3% of their funding on physical and/or cyber election security measures. Mem. at 36. Yet Plaintiffs take issue with the Election Security Conditions similarly aimed at detecting and preventing threats to election infrastructure. For example, the first condition requires jurisdictions to develop a plan and timeline for transitioning to the use of handmarked paper ballots; the second condition requires a manual post-election audit of a random sampling of ballots; and the third condition requires confirmation that the number of voters who voted in each federal election matches the number of ballots cast—each condition is plainly aimed at implementing an election system designed to detect and prevent interference with the integrity of the Nation's election infrastructure. *See* Ex. 2, Aug. 10 FY26 Election Security Guidance at 2-4.

The man-made threats faced by the Nation, including those intended to undermine the integrity of the country's election systems, are constantly evolving, and defending against these threats falls squarely within FEMA's statutorily defined ambit, as well as the goals of the HSGP.

## IV. The Election Security Conditions are Lawful Under the Constitution.

Plaintiffs' constitutional challenges (Counts II, III, and IV)—and accompanying APA challenge under 5 U.S.C. § 706(2)(B) (Count VI)—to the Election Security Conditions fail where imposition of the conditions is consistent with the Separations of Powers—both Congress's Power of the Purse and the Elections Clause—and the Spending Clause.

As a threshold matter, *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses Plaintiffs' ability to raise essentially statutory arguments with constitutional window dressing. There, the Supreme Court reversed a federal circuit court that reasoned "that whenever the President acts in

excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Court stated this reasoning was incorrect because the Supreme Court's "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Instead, the Court "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* Therefore, "claims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473. The Court should thus ignore Plaintiffs' attempt to constitutionalize its statutory claim, *i.e.*, to argue that the conditions violate specific statutory authorities. *See New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 605 (S.D.N.Y. 2025) (challenge to directives and grants was statutory, not constitutional, under *Dalton*).

Here, Plaintiffs' asserted constitutional claims are really "statutory" claims asserting that Defendants exceeded their statutory authority. *Dalton*, 511 U.S. at 474. For example, Plaintiff alleges that Defendants violated the separation of powers by supposedly overriding the careful judgments of Congress as expressed in the HSGP statutory scheme. *See* Mem. at 34. This is precisely the sleight of hand rejected by the Supreme Court in *Dalton*. "[S]tatutory claims do not become constitutional ones by operation of the separation-of-powers principles. . . ." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 792 (D.C. Cir. 2025), *reh'g en banc granted, vacated by*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025). If Plaintiffs' arguments were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision could be used to "transform a statutory claim into a constitutional one to avoid limits on judicial review," contrary to *Dalton*. *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025), *reh'g en banc denied by*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

### A. The Election Security Conditions are Consistent with Congress's Power of the Purse.

Plaintiffs' Second Count contends that "FEMA's imposition of the Election

Administration Conditions violates the separation of powers by…"'usurp[ing] the power of the legislature to determine spending and to set conditions on that spending.'" Mem. at 33-34 (quoting *City of Chicago v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020)). But, as outlined above, Congress created FEMA "[t]o lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A). Additionally, the HSGP statute—broadly designed to protect and enhance national security, and providing FEMA considerable discretion to achieve these goals—explicitly emphasizes the importance of considering "threat[s]…to critical infrastructure (for all infrastructure sectors)" and "the most current threat assessments available to the Department." *Id.* § 608(a)(1)(D)-(E). The Election Security Conditions are directly in line with this mandate from Congress, as they are aimed at protecting the Nation's election security infrastructure from threats identified in recent threat assessments. *See* Ex. 3, 2024 Homeland Threat Assessment at 18.

**B. Plaintiffs' Spending Clause Challenge Fails.**

Plaintiffs' Count III asserts that the Election Security Conditions violate the Spending Clause because (1) they are not "reasonably related" to the anti-terrorism, disaster relief, and border security purposes of HSGP funding; and (2) they are not unambiguously outlined in the HSGP statute. Mem. 34-37. But Plaintiffs' Spending Clause challenge fails at the outset because Plaintiffs challenge Executive, rather than Congressional, action. Regardless, the Election Security Conditions are tied to the HSGP's purpose of promoting national security, and Congress provided clear notice to HSGP recipients that acceptance of HSGP funds requires those recipients to take actions intended to promote national security and protect critical infrastructure.

As an initial matter, Plaintiffs do not challenge Congressional action, which is a predicate to any Spending Clause claim. The Spending Clause is implicated only when Congress imposes a spending or funding condition, and without challenging congressional action, a plaintiff cannot state a claim under the Spending Clause. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451

U.S. 1, 25 (1981) ("The crucial inquiry . . . [is] whether *Congress* spoke so clearly that we can fairly say that the State could make an informed choice. In this case, *Congress* fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with . . . ." (emphasis added)); *see also Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 212 (D.D.C. 2025) ("At the outset, it is unclear that [the Spending Clause's] limitation on Congress's spending power applies to the Executive Branch."). Indeed, the Spending Clause is one of *Congress's* enumerated powers found in Article I; it does not restrict (or empower) the President or the Executive Branch, whose powers are conferred by Article II. Here, Plaintiffs do not state a viable Spending Clause claim where they challenge the Defendant Agencies' imposition of the Election Security Conditions, rather than Congress's imposition of the conditions. *See* Mem. at 27. Plaintiffs' challenge to Executive Branch action is not a valid Spending Clause claim.

Regardless, Plaintiffs' Spending Clause challenge fails because the Election Security Conditions "bear some relationship to the purpose of the federal spending"—to the counterterrorism purpose of the HSGP grants. *New York v. United States*, 505 U.S. 144, 167 (1992). The Supreme Court's "'*some relationship*'. . . language does not support a demanding reading of the relatedness requirement. Rather, it appears to enforce a rather low-threshold relatedness test." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018) (quoting *New York*, 505 U.S. at 167). Indeed, the Supreme Court "has never struck down a condition on federal grants based on th[e] relatedness prong." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019).

Here, Congress established the SHSP and UASI grant programs to provide grants to assist "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). Acts of terrorism include acts "dangerous to human life or potentially destructive of critical infrastructure or key resources," *Id*. § 101(18), and election infrastructure is a critical infrastructure subsector, Ex. 4, 2017 Designation at 1. As outlined in the FY26 HSGP NOFO, "[t]his designation recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." Ex. 1, FY 2026 HSGP NOFO at 15. To be sure, the critical infrastructure designation is given only to "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). Accordingly, Election Security Conditions aimed at detecting and preventing threats to election infrastructure and protecting "a secure, transparent, and resilient electoral process[,]" Ex. 1, FY26 HSGP NOFO at 15, bear a clear relationship to HSGP's purpose of protecting against destructive acts with widespread impacts on the Nation.

As to Plaintiffs' contention that Defendants have run afoul of *Pennhurst'*s clear notice rule, Mem. at 37 (citing *Pennhurst,* 451 U.S. at 17), all potential HSGP fund recipients are put on notice by the text of the HSGP statute that HSGP funds are intended to prevent, prepare for, protect against, and respond to threats to national security and critical infrastructure. *See* 6 U.S.C. §§ 605(c)(1), 604(d), 608(a). Section 608(a) outlines that funds are to be allocated "among States and high-risk urban areas applying for [UASI and SHSP grants]" based on considerations that include "degree of threat, vulnerability, and consequences related to critical infrastructure (for all infrastructure sectors) or key resources identified by the Administrator or the State homeland security plan" and "the most current threat assessments available to the Department." *Id*. § 608(a)(1)(D)-(E). Given these focuses, it is unsurprising that receipt of a

portion of HSGP funding requires recipient actions intended to detect and prevent threats to such critical infrastructure—threats flagged in recent threat assessments. That Plaintiffs are unconcerned with the requirement that HSGP recipients spend at least 3% of their funding on physical and/or cyber election security measures—a "condition" nowhere explicitly mentioned in the HSGP statute—undermines their suggestion that the Election Security Conditions were unforeseeable.

Regardless, here, the third-party states and Plaintiff Jurisdictions are aware of the Election Security Conditions—as evidenced by this suit—prior to their potential acceptance of FY26 HSGP award funding and pass-through subaward funding. Therefore, the decision of any recipient jurisdiction to accept HSGP funding will be a decision by which the jurisdiction "voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Put differently, no jurisdiction will be surprised "with post acceptance or 'retroactive' conditions[,]" as was the concern in *Pennhurst*. *Id*. at 25.

Congress "provid[ed] clear notice to the States that," "by accepting funds" from Defendants, States would "be obligated to" take actions intended to promote national security. *Id.*. *Pennhurst* does not require more.

### C. The Election Security Conditions are Consistent with Congress's Authority to Regulate Federal Elections.

In their Count IV, Plaintiffs posit that the Election Security Conditions impermissibly encroach on the power of the States and Congress to regulate federal elections, and "nothing in the HSGP statutory scheme or FEMA's organic statute delegates Congress's authority to prescribe rules for federal elections to" Defendants. Mem. at 37-38. These arguments attack a strawman. The Election Security Conditions are a modest exercise of FEMA's own judgment about how to exercise its statutory authority—granted by Congress—to "lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters[,]" 6 U.S.C. § 313(b)(2)(A), via grants

explicitly intended to anticipate evolving threats to the Nation's security and safeguard the country's critical infrastructure, *id*. § 608(a)(1)(D)-(E). Through the HSGP statute, Congress delegated power to FEMA to prioritize efforts to protect "all critical infrastructure sectors" and in response to "the most current threat assessments available to the Department[.]" *Id*. § 608(a)(1)(D)-(E). Election infrastructure is a designated critical infrastructure sector, and recent threat assessments have outlined evolving threats to that infrastructure. Ex. 3, 2024 Homeland Threat Assessment; Ex. 4, 2017 Designation; Ex. 5, CISA 2026 Election Report. As such, imposition of the Election Security Conditions is an exercise of FEMA's authority as delegated by Congress.

Moreover, it is undisputed that *Congress* can directly regulate the manner of elections, U.S. Const. art. I, § 4, cl. 1 (Elections Clause). If the Election Security Conditions are unauthorized by Congress, *but see supra*, then they fail on statutory grounds and there is no need to address the Constitution at all. And if the conditions are authorized by Congress, Plaintiffs' Elections Clause theory adds nothing.

Plaintiffs' constitutional objections prove far too much. Again, the HSGP grants have long-included election specific spending requirements—none of which have been challenged by Plaintiffs or others. That is so because they are not an inappropriate election regulation, but conditions on federal funding—funding that a potential recipient may choose to forgo entirely, thereby eliminating any requirement to implement the conditions.

Because the Election Security Conditions are permitted by the Constitution, Plaintiffs' APA Count VI also fails. *See* Mem. at 39 (challenging the Election Security Conditions as "final agency action 'contrary to constitutional right, power, privilege, or immunity,' 5 U.S.C. § 706(2)(B).").

### V. Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law.

Plaintiffs assert that, if they are unable to obtain the relief they seek through their Counts I-IV or VI, the Court should grant summary judgment on their *ultra vires* claims in Count VII. Mem. at 40. As a threshold matter, Plaintiffs' *ultra vires* claims (Count VII) are merely a repackaging of their APA claims in Count I and, thus, fail for the same reasons: Defendants have not exceeded their statutory authority. Like their APA claims, Plaintiffs' *ultra vires* claims argue that Defendants lack statutory authority to impose the Election Administration Conditions. Am. Compl. ¶ 228; *see also* Mem. at 40 ("Conditioning HSGP funding on compliance with election-administration requirements . . . exceeds the outer limits of FEMA's authority under the HSGP scheme[.]") Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025), *on remand to* 152 F.4th 686 (5th Cir. 2025) "That is a fairly common maneuver" in trying to bring an ultra vires claim—which the Supreme Court has now squarely rejected. *Id.*

*Ultra vires* claims are confined to "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority or acted so clearly in defiance of it." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (citation modified). As discussed above, FEMA is tasked with "leading the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A). And the HSGP statute envisions spending to detect threats to and safeguard critical infrastructure, including the Nation's election security infrastructure. *Id.* § 608(a)(1)(D)-(E). Thus, Defendants have not violated the statute, much less in a "plain" or "extreme" way. *Fed. Express Corp.,* 39 F.4th at 764 (citation omitted); *see Glob. Health Council*, 153 F.4th at 12 (no *ultra vires* claim when plaintiffs could point to no statutory violation).

Plaintiffs' claims fail for the independent reason that *ultra vires* review is unavailable if "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate

opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, Congress enacted the APA to enable courts to review appropriate challenges to final agency actions, and the Tucker Act to provide review by the Court of Federal Claims over challenges to the terms of existing grant agreements with the Government. Given these "alternative path[s] to judicial review," *id.*, an *ultra vires* claim is not available.

## VI. Any Relief Should be Limited to Plaintiff Jurisdictions.

Plaintiffs' request—that the Court "set aside the Election Administration Conditions pursuant to 5 U.S.C. § 706(2)" and "vacate the Election Administration Conditions in their entirety, such that they no longer condition HSGP funding for any state or local jurisdiction[,]" Memo. at 41—constitutes an over-broad equitable remedy that exceeds any harm to the Plaintiff Jurisdictions.

As an initial matter, the APA does not permit vacatur of agency action. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise)."). The history and structure of the APA do not support that the "set aside" language in Section 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case. *Id.* ("Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them.").

Even if Section 706 could be read to authorize vacatur of agency action, as the Supreme Court recently explained in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit. *Id.* at 833 ("The Court's early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate the Court's understanding of equity.

'[N]either declaratory nor injunctive relief,' the Court has said, 'can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Accordingly, any equitable remedy applied in the nature of vacatur should apply only to the named parties. *See California v. Texas*, 593 U.S. 659, 672 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (citations omitted).

To the extent the Court is inclined to grant any relief, this relief should be narrowly tailored to Plaintiff Jurisdictions. Any order directing Defendants to remove the Election Security Conditions from HSGP award packages should be limited to amending the FY26 HSGP awards to the states in which the Plaintiff Jurisdictions are located.

## CONCLUSION

For all the reasons discussed herein, the Court should deny Plaintiffs' partial Motion for summary judgment on Counts I-IV, VI, and VII of Plaintiffs' Amended Complaint, and grant Defendants' Cross-Motion for summary judgment on the same.

Dated: September 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Alexandra L. Yeatts*
ALEXANDRA L. YEATTS (CA Bar No. 358762)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

Washington, DC 20005
Telephone: (202) 353-5677
Email: Alexandra.Yeatts@usdoj.gov

*Attorneys for Defendants*