UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al.*;<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*;<br><br>*Defendants*. | No. 1:26-cv-02886-AHA |

**DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Defendants U.S. Department of Homeland Security, *et al*., respectfully submit the following response to Plaintiffs' statement of material facts that are not in genuine dispute, ECF No. 28-2.

1. Following the September 11, 2001 terrorist attacks, Congress established the Department of Homeland Security ("DHS") to reduce America's vulnerability to terrorist attacks and other catastrophic events, and to help communities recover from the same. Homeland Security Act of 2002, Pub. L. No. 107-296 tit. I, § 101(b), 116 Stat. 2135, 2142 (2002).

   **Response: Undisputed.**

2. Among various responsibilities that Congress assigned to DHS, the agency was tasked with administering grant programs that support preparedness and resiliency at the state and local level. 6 U.S.C. § 603.

   **Response: Undisputed.**

3. These programs include the Homeland Security Grant Program ("HSGP"), which DHS administers through its component agency, the Federal Emergency Management Agency ("FEMA"). Since 2002, Congress has appropriated $1 to $2 billion annually for this grant program, to help state and local governments in "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604, 605.

   **Response: Undisputed.**

4. The HSGP consists of three components: the Urban Area Security Initiative ("UASI"), the State Homeland Security Program ("SHSP"), and Operation Stonegarden ("OPSG"). *See* 6 U.S.C. §§ 604, 605; FEMA, No. FM-207-23-001, *Preparedness Grants Manual* 7–8 (2026), https://www.fema.gov/sites/default/files/documents/fema-gov_rsl_fy26_preparedness-grants-manual.pdf.

   **Response: Undisputed.**

5. OPSG funds states' and local governments' efforts to strengthen border security, and is distributed according to risk to border security and the anticipated effectiveness of proposed projects. Declaration of Daniel F. Jacobson, Exhibit A (2026 NOFO).

   **Response: Undisputed.**

6. Every state has a designated State Administrative Agency ("SAA"), which submits an application on behalf of the state and eligible urban areas for all HSGP grants.[1] The SAA then disburses allocated funding to state, local, and tribal entities across the state. For each fiscal year of awards, FEMA publishes the precise amounts of UASI, SHSP, and OPSG funds that DHS/FEMA has allocated to states and high-risk urban areas. *See, e.g.*,

[1] FEMA, *State Administrative Agency (SAA) Contacts*, https://www.fema.gov/grants/preparedness/about/state-administrative-agency-contacts (last visited Aug. 31, 2026).

2026 NOFO, App. I: HSGP Allocations, at 69-75.

**Response: Undisputed** that every state has a designate SAA, which submits an application and then disperses allocated funding to state, local, and tribal entities. Undisputed that for each discal year of awards, FEMA publishes the amounts to UASI, SHSP, and OPSG funds that DHS/FEMA has allocated to states and high-risk urban areas.

7. Since fiscal year 2020, FEMA has designated National Priority Areas ("NPAs") within HSGP to promote coordinated investment in specified preparedness goals. FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2020 Homeland Security Grant Program (HSGP)* 3–6 (2020) ("2020 NOFO"), https://www.fema.gov/sites/default/files/2020-08/fema_homeland-security-grant-program-nofo_fy-2020.pdf. In some cases, FEMA has required HSGP recipients to devote a stated percentage of awarded funds to projects that address a specific NPA. FEMA has treated election security as either a component of a NPA or a standalone NPA in every year since 2020, except Fiscal Year 2021. *Id.*

   **Response: Undisputed.**

8. Since fiscal year 2023, FEMA has designated election security as a standalone NPA and required HSGP recipients to devote at least 3% of awarded UASI and SHSP funds to this priority. *See* FEMA, *The Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2023 Homeland Security Grant Program* 47 (2023) ("2023 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-23-nofo; FEMA, *The U.S. Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2024 Homeland Security Grant Program* 27–28, 33

(2024) ("2024 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-24-nofo.

**Response: Disputed**. FEMA has designated election security as a stand-alone NPA since fiscal year 2022*, see* Fiscal Year 2022 Homeland Security Grant Program Notice of Funding Opportunity, https://www.fema.gov/grants/preparedness/homeland-security/fy-22-nofo; and has required HSGP recipients to devote at least 3% of awarded UASI and SHSP funds to this priority since fiscal year 2023, see, e.g., Fiscal Year 2023 Homeland Security Grant Program Notice of Funding Opportunity at 47, https://www.fema.gov/grants/preparedness/homeland-security/fy-23-nofo; Fiscal Year 2024 Homeland Security Grant Program Notice of Funding Opportunity at 27–28, 33, https://www.fema.gov/grants/preparedness/homeland-security/fy-24-nofo.

9. In fiscal years 2023 and 2024, FEMA required recipients to make "at least one investment . . . to enhance physical election security and/or cyber election security," while affording recipients discretion to select such election security projects suited to their jurisdiction's needs. *Id.* FEMA guidance provided example project types such as physical security measures for election offices and voting locations (locks, alarms, access controls, etc.) and cybersecurity assessments and mitigations. *Id.* Prior to 2025, to Plaintiffs' knowledge, FEMA never required or encouraged recipients to alter their rules and procedures governing voter registration, ballot counting, or the conduct of elections.

**Response: Undisputed.**

10. In fiscal year 2025, FEMA departed from that practice for the first time, stating that the agency would withhold the 3% election security set-aside until recipients demonstrated compliance with certain election administration conditions. FEMA, *The Department of*

*Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Homeland Security Grant Program* 17–18 (2025) ("2025 NOFO"), https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo. Among other things, FEMA required state and local recipients to prioritize compliance with the latest federal voluntary voting system guidelines, complete voting system testing through a federally-accredited laboratory, and use the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") program to verify the citizenship of election workers. *Id.*

**Response: Undisputed** that for FY2025, the HSGP NOFO included a term that a state recipient must "[d]emonstrate proof of compliance before accessing the full HSGP award—3% of the award will be withheld from drawdown until compliance is confirmed."

11. On June 8, 2026, DHS issued "updated compliance requirements" tying the fiscal year 2025 Election Security NPA to Executive Order 14248 and adding three new "certifiable compliance conditions," including use of the SAVE program for both voter-list maintenance and election worker eligibility Memorandum from FEMA, Re: Homeland Security Grant Program Border Security and Election Security National Priority Area Requirements (June 8, 2026), https://www.fema.gov/sites/default/files/documents/fema_rsl_gpd_ib-569-border-security-election-security_06082026.pdf.

**Response: Undisputed.**

12. Later in June 2026, FEMA released the NOFO for FY2026 HSGP awards, setting forth the Election Administration Conditions that are the subject of this case. *See* 2026 NOFO.

**Response: Undisputed.**

13. The 2026 NOFO expanded both the list of election administration conditions and the size and nature of the penalty if recipients did not comply. Specifically, FEMA announced that it would withhold 20% of recipients' total awards unless and until they submit proof of their compliance with the five Elections Administration Conditions, and "such proof is verified/confirmed by the Department." FY26 HSGP NOFO at 8. That holdback is in addition to and does not offset, the separate 3% minimum-spent requirement on "investment[s] that support[] physical and/or cyber election security." *Id.* at 15.

**Response: Disputed** as to Plaintiffs' characterization of the spending requirement and the funding holdback. The 3% spending requirement and the 20% holdback are not penalties. *See* FY26 HSGP NOFO at 16. The 3% spending requirement has been in place since fiscal year 2025, and the 20% funding holdback is to ensure that the recipients comply with the Election Security Conditions. *See* Fiscal Year 2024 Homeland Security Grant Program Notice of Funding Opportunity at 17-18, https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo; FY26 HSGP NOFO at 16.

14. The five Election Administration Conditions, with which "each state and high-risk urban area election jurisdiction must" comply to receive their full allocated HSGP award, are:

(1) "Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots;"

(2) “Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes;”

(3) “Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary;”

(4) “Voter roll citizenship verification: Utilize the U.S. Citizenship and Immigration Services’ Systematic Alien Verification for Entitlements (SAVE)[] system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance HSGP counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database;” and

(5) “Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under HSGP.” 2026 NOFO at 15–16.

**Response: Undisputed.**

15. According to the NOFO, states were required to submit HSGP applications by July 24,

2026, and awards will be made no later than September 30, 2026, when the 2026 fiscal year ends. *Id.* at 4.

**Response: Undisputed.**

16. Since issuing the NOFO, FEMA has twice supplemented it with guidance. First, on July 9, 2026, DHS issued guidance stating that "[s]ustained noncompliance" with the Election Administration Conditions may result in remedies under 2 C.F.R. § 200.339. *See* Jacobson Decl., Ex. B (the "July 9 Guidance") at 2. Those remedies include that a federal agency may "[s]uspend or terminate the Federal award in part or in its entirety." 2 C.F.R. § 200.339(c). By failing to comply with the Election Administration Conditions, a state or local government may lose not just the 20% of its award withheld under the NOFO's terms, but the entire award. *See id.*

**Response: Undisputed.**

17. Second, on August 10, 2026, FEMA released additional guidance, doubling down on the Election Administration Conditions and partially clarifying the standards and methodology it plans to apply. *See* Jacobson Decl., Ex. C (the "August 10 Guidance").

**Response: Undisputed** that FEMA released additional guidance on August 10, 2026**.**

18. The August 10 Guidance includes detailed requirements for the 5% post-election manual audit condition, including: "The chief election official of the state must ensure that each election jurisdiction (county or municipality) conducts a post-election manual audit of the paper ballots in at least 5% of the precincts in each jurisdiction, and at least 5% of all of the centrally tabulated batches in each jurisdiction." *Id.* at 3. "All ballots from each randomly selected precinct and from each randomly selected batch must be manually counted," and the random selection of ballots must include "all methods of voting,

including Election Day in-person, early in-person, vote by mail or absentee, and provisional ballots." *Id.* Moreover, the audit must "include at least two races with at least one race for federal office," and the audit must be "completed in time for results to inform certification decisions." *Id.* "To support public confidence," counties must "conduct the selection and post-election manual count with bi-partisan observers present, and where feasible, provide livestream or recorded video where consistent with applicable law." *Id.* at 4. The guidance further states that "[u]nless state law mandates post-certification audits, jurisdictions should conduct the audit after completion of the unofficial canvass, including late-arriving, vote by mail, and provisional ballots." *Id.* at 4.

**Response: Undisputed.**

19. The August 10 Guidance further contains a required methodology for the "Voter and Ballot Reconciliation" condition. "Each election jurisdiction"—meaning counties that administer elections—"must reconcile the number of voters who voted in each federal election with the number of ballots cast." *Id.* at 4. "After all ballots have been cast in a federal election, each jurisdiction must create a static list of each voter who participated in the election." *Id.* at 4. "The list must include the name, unique voter ID number, and the method of voting for each voter who participated in the election," and [t]he method of voting must include all methods of voting in the state, such as Election Day in-person, provisional, absentee or mail, early voting and whether the voter's ballot was counted." *Id.* County officials must complete a "checklist" showing that "[t]he number of voters who voted must be equal to or greater than the number of ballots cast and counted for each method of voting," and [i]f the number of ballots exceeds the number of voters for any method of voting, the election official(s) in that jurisdiction should

document and attempt to resolve the discrepancy." *Id.* at 5.

**Response: Disputed** to the extent that election jurisdictions can consist of more than counties. *See* August 10 FY26 Election Security Guidance at 3 (stating that an election jurisdiction may consist of a "county or municipality"). They can include among others, incorporated cities not located in counties and tribal lands. *Id.*

20. For the hand-marked paper ballot condition, the August 10 Guidance provides specific requirements that each State's transition plan must include for jurisdictions currently using barcode or QR code-based tabulation. *Id.* at 2–3. The August 10 Guidance also requires states to either: (1) use SAVE to "verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award," *Id.* at 5, or (2) provide "a list of registered voters with unknown citizenship status to be reviewed by USCIS before the election." *Id.* Acknowledging that "the functionality of SAVE is impacted by the June 22, 2026, order in *League of Women Voters v. DHS*, Civ. Action No. 25-3501," the guidance instructs that while that case is on appeal, "[f]or any person registered to vote for whom the state does not have records of citizenship, the state may resolve this uncertainty by submitting relevant information to USCIS for an immigration records search consistent with 8 U.S.C. § 1373." *Id.* at 2 n.1.

**Response: Undisputed.**

21. In March 2025, when the President issued a wide-ranging executive order ("2025 Order") purporting to, among other things, overhaul voting system guidelines used by the Election Assistance Commission ("EAC") and grant DHS and the so-called Department of Government Efficiency ("DOGE") access to each state's voter registration files. Executive Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025).

**Response: Undisputed** that the President issued Executive Order 14,248, which speaks for itself**.**

22. Section 4(b) of the 2025 Order directed the EAC to issue amended voting system guidelines that would: (1) prohibit ballots that use a barcode or quick-response code in the vote counting process, except to accommodate voters with disabilities; (2) provide a voter-verifiable paper record; and (3) rescind all previous certifications of voting equipment based on prior standards. 2025 Order § 4(b).

**Response: Undisputed** that the President issued Executive Order 14, 248, which speaks for itself.

23. To carry out the mandate of the 2025 Order, the Department of Justice requested complete voter registration lists from at least 48 states and Washington, D.C. It then sued 30 states and Washington D.C. for refusing to comply. As of this filing, all 23 courts that have issued decisions in those cases have dismissed the federal government's complaints. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 24, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

**Response: Undisputed.**

24. If DOJ obtains voter files, it intends to share them with DHS so that the data can be run through the SAVE program—the same program that the Election Administration Conditions now attempt to force upon Plaintiffs. *See*, *e.g.*, *United States v. Schmidt*, 25-cv-01481, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026).

**Response: Undisputed.**

25. DHS's U.S. Citizenship and Immigration Service ("USCIS") has historically operated SAVE, first created in 1986 by the Immigration Reform and Control Act, to provide state governments with an additional method to verify the citizenship and immigration status of individuals applying for government benefits, such as food stamps and Medicaid. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603 § 121, 100 Stat. 3359, 3384–94.

**Response: Undisputed.**

26. Following the issuance of the 2025 Order, DHS deployed a series of updates to transform the SAVE system into a national citizenship database that, according to USCIS, will "help verify U.S. citizenship and prevent aliens from voting in American elections." USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.

**Response: Disputed.** While the SAVE modifications enhanced the ability of states to "verify U.S. citizenship and prevent aliens from voting in American elections," SAVE is not a "national citizenship database" and has been used for voter verification for decades. *USCIS-004 Systematic Alien Verification for Entitlements Program System of Records*, 76 Fed. Reg. 58525, 58526-58527 (Sept. 21, 2011). SAVE provides verification of citizenship and immigration status information on an ad hoc basis and in response to inquiries from state election officials about specific individuals within their jurisdiction. *Id.*

27. On March 31, 2026, the President issued a second executive order related to elections that

went even further: Section 2(a) of the order directed DHS to use information from the SAVE program, SSA records, and other federal databases to create a list of U.S. citizens eligible to vote in each state. Executive Order 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("2026 Order").

**Response: Undisputed** that, on March 31, 2026, the President issued Executive Order 14,399, 91 Fed. Reg. 17125, and Section 2(a) of E.O. 14,399 directs "to the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. 552a), the Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services and in coordination with the Commissioner of SSA" to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." Disputed that E.O. 14,399 "went even further" than prior orders or that E.O. 14,399 was the "second executive order related to elections."

28. All Plaintiffs receive HSGP funds, and all Plaintiffs will lose access to a material portion of their HSGP funds unless and until their state certifies compliance with the Election Administration Conditions. Decl. of Timothy Henderson ("Henderson Decl.") ¶¶ 3-17; Declaration of Erica Lee Carter ("Lee Carter Decl.") ¶¶ 6, 10, 19, 22-25; Declaration of Maria Chavez ("Chavez Decl.") ¶¶ 5–7, 25, 35–37; Declaration of Scott Forster ("Forster Decl.") ¶ 3-4; Decl. of Dashiell Daniels ("Daniels Decl.") ¶¶ 7–15; Declaration of Christopher Long ("Long Decl.") ¶¶ 6, 14, 16, 20.

**Response: Disputed.** FEMA does not direct the award of SHSP or USAI funds to sub-

recipients like Plaintiffs. *See* FY26 HSGP NOFO at 5. Rather, each state awarded one of these grants has the discretion to award the funds to the sub-recipient. *Id*. FEMA also does not mandate the amount of SHSP funding that each sub-recipient will receive. *See id*. at 69-75. For UASI, FEMA directs a certain amount to be provided to a high-risk urban area, which is typically made up of more than one local jurisdiction. *Id*. at 70-73.

29. All Plaintiffs except the City of Columbus also administer or fund elections. Declaration of Kenneth Byrd ("Byrd Decl.") ¶ 3; Decl. of Teneshia Hudspeth ("Hudspeth Decl.") ¶ 6; Declaration of Lisa Wise ("Wise Decl.") ¶ 6; Declaration of Paul Adams ("Adams Decl.") ¶ 7; Declaration of Dyana Limon-Mercado ("Limon-Mercado Decl.") ¶¶ 2–3. These Plaintiffs will incur substantial implementation costs if their state *does* accept the Election Administration Condition. Byrd Decl. ¶ 13; Hudspeth Decl. ¶¶ 15–17, 19–21; Wise Decl. ¶¶ 6, 10-11, 14-15; Adams Decl. ¶¶ 7, 9-11; Limon-Mercado Decl. ¶¶ 16-19.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

30. All Plaintiffs that administer or fund elections will unavoidably suffer financial and other injuries as a result of the Election Administration Conditions, no matter what their state chooses to do.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

31. Plaintiff Metropolitan Government of Nashville and Davidson County ("Nashville") is a rapidly growing metropolitan area with more than 700,000 residents. Henderson Decl. ¶ 3. It hosts millions of visitors each year, including high-profile visitors such as the President and Vice President, and large-scale public events such as CMA Fest, professional and collegiate sporting events, and events tied to the Grand Ole Opry's 100th Anniversary. *Id.* Nashville has weathered both natural and human-caused disasters, including a 2020 Christmas Day bombing that devastated a downtown city block. *Id.* Protecting Nashville requires coordination and assistance among multiple local agencies, including the Nashville Fire Department, Metro Nashville Police Department, and Office of Emergency Management, each of which depends on federal grant funding to keep pace with evolving technology and to train personnel adequately to ensure the safety of both residents and tourists alike. *Id.*

**Response:** These purportedly material facts rely on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

32. Nashville applies for and receives pass-through grants from the Tennessee Emergency Management Agency ("TEMA") under the HSGP's UASI and SHSP programs. *Id.* ¶ 4. In past years, Nashville has received funding for critical equipment and training for its SWAT team, bomb squad, and other components of its fire department, police department, and office of emergency management. *Id.* ¶¶ 7-10. For FY2026, Nashville is again seeking and expects to receive both UASI and SHSP funding and anticipates an allocation of approximately $1,324,902.84. *Id.* ¶¶ 12, 14. Nashville has already identified the specific equipment and training that funding will support. *Id.* ¶¶ 13, 15. If DHS denies, delays, or

reduces the amount of this funding, it will limit Nashville's ability to acquire the equipment and fund the training it has planned to protect its residents and visitors. *Id.* ¶ 17.

**Response: Disputed.** FEMA has not yet made any fiscal year 2026 awards and has not yet notified recipients of the amount of their awards. As a result, simply because Nashville is seeking a certain amount does not guarantee it will receive that amount and it is up to the State of Tennessee to determine the full amount of the Nashville's HSGP subaward. *See* FY26 HSGP NOFO at 5.

33. Nashville also funds the Davidson County Election Commission, which administers elections in the County and pays for poll workers, ballots, and most other election-related expenses (with funds provided by Nashville). *See* Byrd Decl. ¶ 3. The Election Commission conducts free, fair, and secure elections and conducts post-election audits under the standards dictated by Tennessee state law. *Id.* ¶¶ 9, 13.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

34. Complying with the Election Administration Conditions would not enhance Nashville's election security but would impose substantial costs on the Election Commission that would be borne by Nashville. *Id.* ¶ 13.

**Response: Disputed** to the extent this is a statement of opinion rather than fact.

35. Plaintiff Harris County, Texas, is the nation's third-largest county by population, with more than 4.8 million residents and nearly 2.75 million registered voters. Carter Decl. ¶ 6; Hudspeth Decl. ¶ 4. Harris County has participated in the HSGP since 2002 and received approximately $25 million in UASI and SHSP funding from fiscal years 2022

through 2025. Carter Decl. ¶¶ 7, 10(a). Those funds support critical public-safety and counterterrorism programs, including regional emergency radio communications, hazardous-materials and bomb-unit equipment, SWAT units, emergency-management personnel, and accessible emergency alerts. *Id.* ¶¶ 9–10.

**Response: Undisputed.**

36. For FY2026, the 2026 NOFO allocates $23,347,667 for the designated urban area of Houston-The Woodlands-Sugar Land, TX. 2026 NOFO at 73. Harris County applied for up to $8 million of this UASI funding, plus $1.1 million in SHSP funding. Carter Decl. ¶¶ 10(f), 19.

**Response: Undisputed.**

37. Based on its recent share of the Houston-area UASI allocation, the County expects to receive approximately $5.1 million to $7 million in UASI funding alone, meaning that FEMA's 20% holdback would deprive Harris County of approximately $1 million to $1.4 million and prevent it from fully carrying out planned homeland-security projects. *Id.* ¶¶ 23–25.

**Response: Disputed.** Pursuant to the August 10 FY26 Election Security Guidance, the state recipient determines which program account the withheld amounts are drawn from and may concentrate it in one or more programs rather than spreading it evenly, provided that the total amount withheld equals 20% of HSGP award and that all other program requirements continue to be met. August 10 FY26 Election Security Guidance at 2. In allocating the withheld amount, a recipient may not impair its pass-through obligations to local and tribal units of government or place a disproportionate share on a high-risk urban area without that urban area's concurrence and may not withhold

amounts committed to Operation Stonegarden operations addressed in an approved Operations Order. *Id.* Accordingly, it is premature for Harris County to assert how much of its funds will be impacted before they are awarded and it is up to the State of Texas to determine the full amount of Harris County's HSGP subaward. *See* FY26 HSGP NOFO at 5.

38. Harris County also administers one of the largest election systems in the country. The County already follows audit and reconciliation procedures required by Texas law. Hudspeth Decl. ¶ 6. Several of the Election Administration Conditions would require Harris County to substantially alter those procedures, expend millions of dollars and substantial staff resources, and in some instances depend upon action by state officials over whom the County has no control. For example, Harris County currently uses the Hart Verity voting system, in which voters make selections on voting devices that generate a voter-verifiable paper record that the voter then deposits into a scanner for tabulation. *Id.* ¶ 14. Transitioning to exclusively hand-marked paper ballots would cost millions of dollars and require new printers and scanners, additional election workers and training, redesigned ballots, testing and certification of new equipment, changes to vendor contracts, pilot testing, and extensive public education. *Id.* ¶¶ 15–17.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

39. Texas law requires counties to finish counting regular ballots within twenty four hours after polls close. *Id.* ¶ 18.

**Response:** Texas law speaks for itself.

40. Harris County would be unable to meet that deadline using exclusively hand-marked paper ballots that cannot be tabulated with its current systems. *Id.*

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

41. The required 5% manual audit would substantially expand Harris County's existing audit obligations under Texas law. Harris County estimates that conducting an audit of the magnitude required by FEMA would take approximately three to four months, require approximately 300 additional election workers, and cost approximately $3.84 million, while potentially interfering with the County's ability to satisfy the audit procedures imposed by state law. *Id.* ¶¶ 19–21.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

42. Harris County also cannot itself ensure compliance with FEMA's voter-citizenship verification requirement. The County Clerk does not administer the voter rolls, and the Tax Assessor-Collector and Voter Registrar's Office neither has access to SAVE nor submits voter information to USCIS for immigration-record searches. Hudspeth Decl. ¶ 23; Ramirez Decl. ¶¶ 6–8.

**Response: Undisputed** that the State of Texas has access to SAVE for voter

certification but that Harris County does not currently have a direct SAVE account for voter verification. The remainder of this purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

43. Harris County would have to depend on the Texas Secretary of State to perform the required searches, even though the County cannot control whether or when the Secretary does so. Ramirez Decl. ¶ 8.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

44. The Secretary of State has advised Harris County that SAVE matches should be considered to be "weak" matches, meaning that County officials would have to individually investigate any resulting matches and follow Texas's statutory notice, cancellation, and hearing procedures before removing voters from the rolls. *Id.* ¶¶ 9–10; *see, e.g.*, Tex. Elec. Code § 16.033 *et seq*.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

45. Because Harris County has no way to know how many voters such searches might identify, it cannot determine in advance the personnel and resources necessary to

complete those investigations. Ramirez Decl. ¶ 11.

**Response: Undisputed.**

46. Texas requires election workers to be registered voters, but Harris County has no existing process for screening those workers through SAVE. Hudspeth Decl. ¶¶ 24, 26. And Texas law gives presiding election judges and political parties responsibility for selecting certain election clerks, leaving Harris County without authority to exercise the direct control the Election Administration Conditions contemplate unless the Texas Legislature changes state law. *Id.* ¶ 26.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

47. The proposed election worker conditions extend to temporary workers and vendor employees who work on election systems, even though Texas law does not require citizenship verification of those employees and Harris County has neither the existing systems nor personnel necessary to conduct such screening. *Id.* ¶¶ 25, 27.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

48. El Paso County is a multicultural and geographically distinct county. It is home to more than 800,000 residents, more than 82 percent of whom are Hispanic and more than 68 percent of whom speak a language other than English at home. Chavez Decl. ¶ 4. It is the

westernmost county of Texas and part of the largest border community on the Rio Grande. *Id*.

**Response: Undisputed.**

49. El Paso County follows all applicable federal and state laws to protect the security and accuracy of the election process. Wise Decl. ¶ 6.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

50. The Election Conditions imposed by the NOFO would create new costs for El Paso County in several ways.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

51. Currently El Paso County does not just use hand-marked paper ballots, but also uses ballot marking devices for differently abled voters. *Id.* ¶ 9. Transitioning to hand marked paper ballots would "cost several million dollars" and would likely take 12 to 18 months. *Id.* ¶ 10.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

52. In addition to the cost to the county of additional equipment, El Paso County expects that the longer time it takes to print ballots on demand would force the county to hire additional workers and purchase "additional equipment to avoid long delays at polling places." *Id.* ¶ 11. Transitioning to hand marked paper ballots could also present other logistical challenges, such as increasing the number of mismarked ballots that need to be duplicated for review. *Id.*

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

53. The Election Administration Condition related to post-election audits could also increase costs for El Paso County, which currently complies with the reconciliation procedures and post-election manual audit required by Texas state law. Wise Decl. ¶¶ 6, 14. The sample size for the current audit, however, is significantly less than the 5 percent required by the new Election Conditions, and increasing the audit would impose additional costs on the County, both in terms of resources and also in terms of the time a larger audit could take. *Id.* ¶¶ 14–15.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

54. Regarding reconciliation between the number of voters and the number of ballots cast, currently El Paso's reconciliation takes a few hours, including comparison of several

reports such as the electronic poll pad check in of voters with the record of ballots cast. Wise Decl. ¶ 16. Creating a static list of each participating voter would impose additional costs, and imposing new procedures for reconciliation if counts are off by a certain percentage could not just cost the County more, but also cause the County to lose election workers. *Id.*

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

55. Regarding use of the SAVE list, El Paso County does use the SAVE system to verify citizenship of voters but does not use the SAVE system to verify the citizenship of poll workers or employees of voting system vendors. Wise Decl. ¶¶ 17-18.

**Response: Undisputed** that the State of Texas has access to SAVE for voter certification but that the El Paso County does not currently have a direct SAVE account for voter verification.

56. El Paso County would find it difficult to use the SAVE system to verify the citizenship of poll workers or employees of vendors, as it has been labeled as inaccurate by the Texas Secretary of State, and El Paso would need to provide election workers with 30 days to respond to disputed flags from the system, a delay which could put the election department behind schedule. *Id.* ¶ 19.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and

therefore cannot dispute.

57. Even if El Paso County had a system in place to verify the citizenship of employees of vendors, the delays in conducting that verification as vendors add staff closer to a large election could leave the County and the vendor understaffed on Election Day. *Id.*

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

58. If El Paso County were forced to comply with these Election Conditions, and did not receive additional funding to cover such costs, El Paso County would have to "reduce voting locations," and "would likely need to cut outreach programs." Wise Decl. ¶¶ 21, 23.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

59. The Election Administration Conditions would increase El Paso County's costs of training election workers, and force the County to recruit new election workers, as the County has received feedback from election workers that they will stop participating if there is a "significant change in processes." *Id.* ¶ 22.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in

dispute and therefore cannot dispute.

60. Across El Paso County's participation in the HSGP since 2016, El Paso County has received over $13 million in HSGP funding including over $1.2 million in SHSP funding, over half a million in LETPA funding, and over $11 million in OPSG funding. Chavez Decl. ¶¶ 5-7.

**Response: Undisputed.**

61. SHSP and LETPA funds have supported equipment and technology for El Paso County that help law enforcement detect and deter terrorism-related threats, and are vital for lifesaving local law enforcement operations. Chavez Decl. ¶ 27. Funds support much-needed equipment, including items such as radios, protective gear, generators, defibrillators, night vision kits, microphones and earpieces, generators, trailers, ATVs, and rescue harnesses. The loss of SHSP and LETPA funds would weaken the "overall county readiness during emergencies and high risk incidents" as well as the County's "counterterrorism and threat-prevention capabilities." *Id.* ¶¶ 35-36.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

62. If SHSP and/or LETPA funds were delayed or reduced by 20 percent, El Paso County would have to reduce the supplies purchased or cover the costs of such a delay through the General Fund, which could "cause the County to exhaust contingency funds, potentially causing the County to forego other grant opportunities." *Id.* ¶ 37.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and

control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

63. In El Paso, OPSG funds support "overtime staffing, equipment, and joint operations with federal partners, enabling hundreds of additional patrol hours each quarter." Chavez Decl. ¶ 18. OPSG helps El Paso strengthen "local-federal coordination, rapid response capabilities, and enforcement in high-activity border areas." *Id.* A loss or 20 percent reduction in OPSG funds would force the County to "reduce overtime hours for border patrol" and the County's "ability to support border-security operations." *Id.* ¶¶ 38-39.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

64. El Paso County has submitted proposals for $1.287 million in OPSG funds for Fiscal Year 2026, and based on past participation in the program expects this award is likely. Chavez Decl. ¶¶ 28-29. Similarly, El Paso County has submitted applications for $100,431 in SHSP and $73,641 in LETPA funds for Fiscal Year 2026, and the prioritization placed on these applications by the Rio Grande Council of Governments, expects those funds to be awarded. *Id.* ¶¶ 30-33.

**Response: Disputed.** FEMA has not yet made any fiscal year 2026 awards and has not yet notified recipients of the amount of their awards. As a result, simply because El Paso is seeking a certain amount does not guarantee it will receive that amount and it is up to the State of Texas to determine the full amount of El Paso's HSGP subaward. *See* FY26

HSGP NOFO at 5.

65. No matter whether the State of Texas agrees to the Elections Administration Conditions, El Paso County will incur financial injury one way or the other. El Paso County will lose out on HSGP funding if the state does not agree to the conditions and will have to incur the costs described above in implementing the conditions if the state does agree.

**Response: Disputed.** Pursuant the August 10 FY26 Election Security Guidance, the state recipient determines which program account the withheld amounts are drawn from and may concentrate it in one or more programs rather than spreading it evenly, provided that the total amount withheld equals 20% of HSGP award and that all other program requirements continue to be met. *Id*. at 2. In allocating the withheld amount, a recipient may not impair its pass-through obligations to local and tribal units of government or place a disproportionate share on a high-risk urban are without that urban area's concurrence and may not withhold amounts committed to Operation Stonegarden operations addressed in an approved Operations Order. *Id.* Accordingly, it is premature for El Paso to assert how much of its funds will be impacted before they are awarded and it is up to the State of Texas to determine the full amount of El Paso's HSGP subaward. *See* FY26 HSGP NOFO at 5.

66. Dallas County is the second most populous county in Texas and home to more than 2.66 million residents. The County has participated in the HSGP program since 2022, during which time it has been allocated more than $700,000 in UASI grant funding, which it has used for a range of purposes, including hazardous materials planning, cybersecurity, domestic violence extremism workshops, and election security.

**Response: Undisputed.**

67. For Fiscal Year 2026, the 2026 NOFO allocates $15,462,065 to the designated urban area of Dallas-Fort Worth-Arlington, TX. *See* FY26 HSGP NOFO at 73.

**Response: Undisputed.**

68. Dallas has applied for and expects to be allocated $175,000.00 in this UASI funding for FY2026, and to use that funding for election security for sheriff's department overtime. Forster Decl.¶ 3.

**Response: Disputed.** FEMA has not yet made any fiscal year 2026 awards and has not yet notified recipients of the amount of their awards. As a result, simply because Dallas is seeking a certain amount does not guarantee it will receive that amount and it is up to the State of Texas to determine the full amount of Dallas' HSGP subaward. *See* FY26 HSGP NOFO at 5.

69. Dallas County currently uses electronic ballot marking devices designed by Election System & Software ("ES&S"), certified by the Texas Secretary of State. Adams Decl. ¶ 6.

**Response: Undisputed.**

70. In order to adopt a hand-marked paper ballot system to comply with FEMA's Election Administration Conditions, Dallas County would have to procure ballot stock and hundreds of ballot on-demand printers to print individualized ballots that can be hand-marked by voters. *Id.* ¶ 7.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

71. Dallas County has received a quote for on-demand printers: $7.25 million dollars to purchase 1450 such printers. Texas law requires competitive bidding because the contract amount would exceed $1,000,000.00. *Id.* ¶ 9. From the start of competitive bidding to delivery of new printers would take an estimated 6-9 months, after which the Election Department will need to learn how to use the printers and train several thousand election judges, clerks, and other election officials on their use. *Id.* ¶¶ 10-11. It would be infeasible to procure the equipment and trail works on updated procedures before the end of the 2027 election cycle. *Id.* ¶ 12.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

72. Currently the Dallas County Elections Department has no access to USCIS's SAVE system. *Id.* ¶ 14.

    **Response: Undisputed** that the State of Texas has access to SAVE for voter certification but that the Dallas County Elections Department does not currently have a direct SAVE account for voter verification**.**

73. Dallas County will lose out on HSGP funding if the state does not agree to FEMA's Election Administration Conditions, and it will have to incur the costs described above in implementing the conditions if the state does agree.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and

therefore cannot dispute.

74. Plaintiff Travis County, Texas, serves approximately 1.36 million residents and contains substantial critical infrastructure, including hospitals, airports, academic institutions, utilities, communications infrastructure, and emergency-response facilities, as well as major events that bring hundreds of thousands of visitors to the region each year. Daniels Decl. ¶¶ 5–6.

**Response: Undisputed.**

75. Travis County participates in the HSGP through the UASI program, and HSGP funds have directly supported both election security and law-enforcement capabilities. Among other things, prior HSGP awards have funded mobile panic buttons for polling sites, law-enforcement equipment, and security training that prepares election staff to respond to active threats at polling locations. *Id.* ¶¶ 7–10.

**Response: Undisputed.**

76. For FY2026, Travis County has been allocated $260,975 in UASI funding. *Id.* ¶¶ 11–13. FEMA's 20% holdback amounts to $52,195 and would significantly reduce the public-education campaign and prevent the County from purchasing the planned security equipment. *Id.* ¶¶ 14–15.

**Response: Disputed.** FEMA has not yet made any fiscal year 2026 awards and has not yet notified recipients of the amount of their awards. As a result, simply because Travis County is seeking a certain amount does not guarantee it will receive that amount as it is up to the State of Texas to decide the full of amount of Travis County's HSGP subaward. *See* FY26 HSGP NOFO at 5.

77. Travis County also administers elections through its elected County Clerk. Limon-

Mercado Decl. ¶¶ 2–3. Travis County employs extensive election-security practices, including restricted access to election systems, pre-election verification of voting equipment and software, logic-and-accuracy testing, tamper-evident security measures, chain-of-custody documentation, law-enforcement oversight of central counting, and post-election audits. *Id.* ¶¶ 12–13.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

78. Several of FEMA's Election Administration Conditions would require Travis County to make substantial and costly changes to those existing election procedures. Travis County currently uses an Election Systems & Software voting system in which voters make their selections on ballot-marking devices that produce a voter-verifiable paper record containing both a text record of the voter's choices and barcodes used for tabulation. *Id.* ¶ 14. The County acquired those ballot-marking devices in 2018, the equipment is expected to have a useful life of at least ten years and potentially much longer, and the County has no current plans to replace it. *Id.* ¶ 15. Transitioning to exclusively hand-marked paper ballots would cost millions of dollars and require additional equipment and election workers, redesigned ballots, testing and certification, changes to agreements with political parties and other jurisdictions, new training, and extensive public education. *Id.* ¶¶ 16–18.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate

these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

79. FEMA's manual-audit and reconciliation requirements would impose additional burdens on Travis County. Texas law already requires Travis County to conduct post-election hand-count audits under procedures established by state law. *Id.* ¶ 19. FEMA's separate requirement to manually audit at least 5% of precincts and centrally tabulated batches would expand that obligation, requiring additional personnel, time, and resources and potentially interfering with the County's ability to fulfill its existing state-law audit obligations. *Id.* ¶ 19.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

80. Likewise, although Travis County already conducts ballot reconciliation as required by Texas law, FEMA's reconciliation methodology would require the County to devote additional personnel to identifying and investigating discrepancies, including routine discrepancies caused by spoiled or damaged ballots. *Id.* ¶ 21.

    **Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

81. The Travis County Clerk's Office does not independently use SAVE for either voters or

election workers.[2] *Id.* ¶¶ 22–23. Texas law already requires election workers to be U.S. citizens. *Id.* ¶ 20. There is no existing process for running poll workers through the SAVE system. Poll workers are already required to be registered voters under state law.

**Response: Undisputed.**

82. The Election Administration Conditions would require Travis County to incur significant costs in order to create and implement an entirely new system of ensuring that third-party vendors employ only U.S. citizens, not just individuals who are authorized to work in the United States. *Id.* ¶ 25.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

83. Plaintiff City of Columbus is the capital city of the State of Ohio with a population of roughly 938,000 people. Long Decl. ¶¶ 4–5. Columbus is home to the Ohio General Assembly, Ohio Supreme Court, Ohio Governor's mansion, Ohio National Guard, Ohio Emergency Management Agency, The Ohio State University ("OSU"), two international airports, and major manufacturers and industries. *Id.* ¶ 5. The City hosts large public events, including for collegiate and professional sports and the upcoming 2028 Olympic and Paralympic Games. *Id.*

**Response: Undisputed.**

---

[2] The County Clerk's Office is not involved in the voter roll or voter registration process. The Travis County Tax Assessor-Collector and Voter Registrar's Office is responsible for the voter rolls in Travis County. Limon-Mercado Decl. ¶ 22.

84. The City has participated in the HSGP since approximately 2012 and has received at least approximately $1.7 million in UASI and SHSP funds. *Id.* ¶ 6.

**Response: Undisputed.**

85. In recent years, Columbus has received substantial HSGP funds through SHSP and UASI: the City received SHSP program funds for FY2022 ($185,000), FY2023 ($280,026), and FY2024 ($91,842), *id.* ¶ 6, and DHS allocated UASI funding to the Columbus urban area, including for FY2024 ($1,346,340) and FY2025 ($4,062,892), *id.* ¶ 16; *see also* FY2024 NOFO at 16; FY2025 NOFO at 56.

**Response: Undisputed.**

86. These HSGP funds have enabled critical public safety investments in Columbus. For example, the City received $477,318 in FY2024 UASI funds for its Fire Department to purchase a bomb detection robot, and the City has used HSGP funds to purchase personal protective equipment (e.g., hazmat suits and air tanks), radio frequency drone detection sensors, handheld infrared chemical identification systems, mass spectrometer chemical detection systems, and video monitoring equipment for its helicopter fleet. Long Decl. ¶¶ 6, 14. The City has also benefited from HSGP investments, whether directly in the City or for neighboring jurisdictions, made or administered by Franklin County Emergency Management and Homeland Security ("FCEMHS"), which coordinates emergency management and disaster preparedness for Franklin County. *Id.* ¶¶ 7-13.

**Response: Undisputed.**

87. For FY2026, DHS has allocated $3,662,688 in UASI funds to the Columbus designated urban area. *Id.* ¶¶ 16–17; *see* FY26 HSGP NOFO at 72.

**Response: Undisputed.**

88. The City's budget is tight, and a 20 percent or greater withholding of FY2026 UASI funds would deprive the City and region of critical antiterrorism funding allocated to the Columbus area and would negatively impact the services and public safety measures that Columbus could fund. Long Decl. ¶ 20.

**Response: Disputed.** FEMA did not publish the fiscal year 2026 until June 24, 2026 which is when the Election Security requirements were also first released. Columbus would not have known that it was on the UASI list until that date. In addition, the remaining portions of this purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

89. Examples of equipment that the City needs, and which can best be secured using funding like HSGP, include a radio tower near the City's main drinking water source (to provide coverage for the City's Emergency Responders) and anti-drone technology to allow first responders to protect mass gathering events (e.g., football games or other sporting events that will take place in the City). *Id.* ¶ 21.

**Response:** This purportedly material fact relies on information in Plaintiffs' custody and control. Because Defendants did not have an opportunity for discovery to investigate these facts, they lack the ability to determine whether these facts are in dispute and therefore cannot dispute.

Dated: September 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Alexandra L. Yeatts*
ALEXANDRA L. YEATTS (CA Bar No. 358762)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (202) 353-5677
Email: Alexandra.Yeatts@usdoj.gov

*Attorneys for Defendants*