**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-02886 (AHA) |

**Memorandum Opinion**

Texas, Tennessee, and Ohio counties and cities sue the federal government, asserting that the Federal Emergency Management Agency, or "FEMA," adopted an unlawful rule to withhold counterterrorism funds unless they overhaul routine aspects of election administration. The parties filed cross-motions for partial summary judgment as to whether this exceeds FEMA's statutory authority or conflicts with the Constitution. The court grants in part and denies in part each motion. It concludes the plaintiff counties and cities are entitled to vacatur of the conditions but denies their request for a permanent injunction.

## I. Background

After the September 11, 2001 terrorist attacks, Congress passed a law to establish the Department of Homeland Security ("DHS") to "prevent terrorist attacks within the United States," "reduce the vulnerability of the United States to terrorism," and "minimize the damage, and assist in the recovery, from terrorist attacks that do occur within the United States," among other aims. 6 U.S.C. § 111(a), (b)(1)(A)–(C); *see* Homeland Security Act of 2002, Pub. L. No. 107-296, 116

Stat. 2135. Congress made FEMA a subagency within DHS, with the mission to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(a), (b)(1); *see* Homeland Security Act of 2002, § 503, 116 Stat. at 2213 (transferring FEMA to DHS).

In addition to establishing DHS as a department at the federal level, Congress recognized the important role that state, local, and tribal governments play in achieving the federal government's counterterrorism objectives. To that end, Congress created the Homeland Security Grant Program, which requires FEMA to allocate grant funding to state, local, and tribal governments for use "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a); *see* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, §§ 2002–08, 121 Stat. 266, 273–85; ECF No. 36-4 ¶ 3. Congress generally appropriates $1 to $2 billion for the Homeland Security Grant Program each year, including for 2026. ECF No. 36-4 ¶ 3; *see* Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, tit. III, 140 Stat. 773, 789 (appropriating approximately $1 billion for the 2026 fiscal year).

Consistent with Congress's statutory directives, FEMA administers the Homeland Security Grant Program grants through subprograms. *See* 6 U.S.C. § 603(a). The two the subprograms relevant here—the Urban Area Security Initiative and State Homeland Security Grant Program—identify and prioritize counterterrorism funding needs based on the "relative threat, vulnerability, and consequences from acts of terrorism" faced by state, local, and tribal governments across the country and "the anticipated effectiveness of the proposed use of the grant." *Id.* § 608(a)(1)–(2). For the Urban Area Security Initiative, FEMA first "designate[s] high-risk urban areas to receive grants," and then the local and tribal governments in the relevant area apply for grant funds in

conjunction with their states. *Id.* § 604(b)(1); *see id.* § 604(b)–(c). For the State Homeland Security Grant Program, states themselves identify the counterterrorism needs of localities and explain "how the State plans to allocate the grant funds to local governments and Indian tribes" in their grant applications. *Id.* § 605(b)(2)(B). For both subprograms, FEMA awards funds to states themselves, which then pass along funds to local and tribal governments within those states. *Id.* §§ 604(d)(2), 605(c)(1). States must give at least 80% of the money they get to the local and tribal governments of designated high-risk urban areas (for the Urban Area Security Initiative grants) or to local and tribal governments generally (for State Homeland Security Grant Program grants). *Id.* § 604(d)(2)(A) (specifying that to the extent there is remaining money from urban area security grants, states can spend it only on "items, services, or activities that benefit the high-risk urban area"); *see* § 605(c)(1)(A).

In June 2026, FEMA issued a Notice of Funding Opportunity ("NOFO") for the 2026 fiscal year Homeland Security Grant Program, which conditions Urban Area Security Initiative and State Homeland Security Grant Program grants on how states administer their elections. Specifically, the NOFO requires states and their respective high-risk urban areas to carry out certain changes to routine aspects of election administration, including ballot form, auditing and reconciliation rules, and the eligibility of voters and poll workers. In full, the NOFO lists the following conditions:

> Submit a transition plan: Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots.
>
> Post-election manual audit: Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes.
>
> Voter/ballot reconciliation: Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary.

> Voter roll citizenship verification: Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance HSGP counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database.
>
> Election worker citizenship verification: Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under HSGP.

ECF No. 28-10 at 19–20 (footnote omitted). The NOFO then says FEMA will withhold 20% of a state's grant funds "until the recipient submits proof of compliance." *Id.* at 20. For several conditions, FEMA's guidance sets deadlines on states' compliance. *See id.* at 106 (guidance document requiring submission of a plan to transition to hand-marked paper ballots within 120 days of accepting the grant award); *id.* at 108 (requiring implementation of voter-registration-verification condition within 120 days of accepting the grant award). FEMA has not yet issued awards for the 2026 fiscal year, but it will do so by September 30, 2026. ECF No. 37 at 7 n.2.

The plaintiff counties and cities challenge FEMA's adoption of the conditions on statutory and constitutional grounds. *See* ECF No. 26 ¶¶ 172–229. The plaintiffs filed a motion for partial summary judgment on their claims that FEMA exceeded its statutory authority and acted contrary to the Constitution. ECF No. 28. The defendants then cross-moved for partial summary judgment on the same claims. ECF No. 36.[1]

---

[1] The plaintiffs asked for expedited summary judgment briefing given the impending issuance of the grant awards and the concern that it would be impossible to carry out the conditions in time for the upcoming November 2026 elections. ECF No. 21 at 2; Hr'g Tr. at 6 (Sept. 2, 2026); *see*

## II. Discussion

The Administrative Procedure Act ("APA") authorizes judicial review of final agency action and requires the court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B)–(C); *see id.* §§ 702, 704. When a court concludes agency action was unlawful, the "normal remedy" is to vacate the relevant agency action and any implementing instruments. *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 179 (D.C. Cir. 2022). Here, the defendants do not dispute that FEMA's NOFO, including its conditions on election administration, is "final agency action." *Bennett v. Spear*, 520 U.S. 154, 156 (1997) (defining final agency action as "the consummation of the agency's decisionmaking process" from which "legal consequences will flow"); *see Hennepin County v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *18 (D.D.C. Aug. 16, 2026) ("[T]he NOFOs qualify as final agency action in their own right."); *see also Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) ("[T]he APA's final agency action requirement is not jurisdictional."). They make two other threshold arguments: first, that the

---

*also, e.g.*, ECF No. 28-9 ¶ 18 (County Clerk for Harris County stating the county "would not be able to" comply with state law counting deadlines "using exclusively hand-marked paper ballots that cannot be tabulated using current systems"); ECF No. 28-3 ¶ 12 (Elections Administrator of Dallas County stating "it would be infeasible to procure the necessary equipment, and train election poll workers on the updated procedures before the end of the 2027 election cycle"); ECF No. 28-12 ¶ 20 (Travis County Clerk stating the audit condition would "potentially interfer[e] with the County's ability to" comply with state audit law). The defendants responded that the parties and court could "breathe a sigh of relief" and there is "not as much urgency as maybe it appears" because, although awards would be issued by September 30, 2026, jurisdictions had 60 days to accept the award and come into compliance. Hr'g Tr. at 16–17. The defendants further downplayed time sensitivity, on the basis that FEMA can extend the award acceptance deadline and "has done so historically" for litigation to "play out before anyone was forced to commit to accepting the awards." *Id.* at 18; *see also id.* at 24 (taking the position that jurisdictions have "three years to meet" the conditions). The defendants agreed, however, that no administrative record or discovery would be needed for the plaintiffs' proposed partial motion for summary judgment and agreed to brief partial summary judgment on an expedited schedule. *Id.* at 32–33; ECF No. 22 at 1–2. The court therefore adopted a schedule based on the parties' proposals. Hr'g Tr. at 34–41.

plaintiffs' claims must proceed in the Court of Federal Claims according to the Tucker Act and, second, that the plaintiffs cannot obtain relief without joining the states as required and indispensable parties. The court considers those arguments before turning to whether FEMA has exceeded its statutory authority or acted contrary to the Constitution.

### A. The Tucker Act Does Not Require The Plaintiffs To Sue In The Court of Federal Claims

The defendants raise the possibility that the plaintiffs' suit is, in essence, a contract action that must be brought in the Court of Federal Claims under the Tucker Act. That argument is not persuasive here (and, as discussed below, the defendants appear to acknowledge as much).

The Tucker Act says the Court of Federal Claims has exclusive jurisdiction over claims against the United States (other than tort claims) for more than $10,000 that are "founded . . . upon any express or implied contract with the United States," as well as a few other types of claims. 28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2). So, if that describes the plaintiffs' claims, they cannot assert them as APA claims in this court. *See* 5 U.S.C. § 704 (recognizing that APA review does not displace "other limitations on judicial review" or another statute that "expressly or impliedly forbids the relief which is sought"); *see also id.* § 701(a)(1). If, on the other hand, the plaintiffs' claims do not fall within the Tucker Act, they are entitled to review under the APA. *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) (recognizing that "to determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act" (quoting *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996))). The Tucker Act applies when an action is "at its essence a contract claim." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). And that's determined by examining "the source of the rights upon which the plaintiff bases its claims" and the "type of relief sought (or appropriate)." *Perry*

*Cap. LLC*, 864 F.3d at 619 (quoting *Megapulse, Inc.*, 672 F.2d at 968). The D.C. Circuit has recognized "it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions," yet cautioned not to interpret the Tucker Act to be "so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse, Inc.*, 672 F.2d at 968.

The defendants appear to acknowledge they don't have a viable argument here, at least on the plaintiffs' claims as they exist today. They never themselves firmly say that the Tucker Act covers the plaintiffs' claims. Instead, the defendants say the plaintiffs would have to go to the Court of Federal Claims "[t]o the extent Plaintiffs seek relief in the form of an order requiring the Government to modify the terms of HSGP grant agreements between FEMA and the states *once they exist*." ECF No. 37 at 7 (emphasis added). That's puzzling here because the plaintiffs do not seek any order modifying grant agreements—indeed, it is undisputed that no grants have been awarded, let alone accepted, under the challenged NOFO. *See* ECF No. 36-4 ¶¶ 32, 64, 68, 76 (stating that "FEMA has not yet made any fiscal year 2026 awards and has not yet notified recipients of the amount of their awards").

Assuming the defendants did contend that the plaintiffs' current claims have to go to the Court of Federal Claims under the Tucker Act despite the absence of any grant agreements, it would not be persuasive. The "source[s] of the rights" the plaintiffs assert here are the APA and Constitution, and not any contracts. Indeed, their claim is that the terms of any future contract based on the agency NOFO here would conflict with—not be the source of—their rights. And it is also obvious that the plaintiffs don't have to bring their claims to the Court of Federal Claims because, well, they can't bring their claims to the Court of Federal Claims given there's no contract. *See* 28 U.S.C. § 1491(a)(1) (limiting that court's jurisdiction to claims founded "upon

any express or implied contract with the United States"). As the defendants themselves suggest, the plaintiffs would be able to seek relief in the Court of Federal Claims, "if at all," only after "a grant agreement between FEMA and a state, executed after the state accepts FEMA's conditioned award offer." ECF No. 37 at 7 n.2. "There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle*, 446 F.3d at 177.

The "relief sought" is not contractual either. *Megapulse, Inc.*, 672 F.2d at 968. This is not a case where the plaintiffs want "to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Rather, they seek vacatur of an agency policy—certain conditions adopted in FEMA's NOFO. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring in the partial grant of the application for stay) (distinguishing between claims seeking "vacatur of internal agency guidance," for which APA review is available, and claims seeking the reversal of "grant terminations," for which the Tucker Act likely applies). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *Id.* (Barrett, J., concurring in the partial grant of the application for stay) (quoting 28 U.S.C. § 1491(a)(1)). And, as the D.C. Circuit has long recognized, "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate." *Megapulse, Inc.*, 672 F.2d at 971; *see R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 67 (D.R.I. 2025) ("Like many

other courts that have considered similar arguments, the Court finds that the Tucker Act does not cover challenges to grant funding conditions.”).[2]

### B. The Plaintiffs Did Not Have To Join The States As Required And Indispensable Parties

The defendants argue the plaintiffs’ claims must be dismissed because they did not join all the states into this suit as parties. *See* ECF No. 37 at 9. According to the defendants, any state that “may enter into conditioned HSGP agreements with FEMA” is a required and indispensable party under Federal Rule of Civil Procedure 19. ECF No. 37 at 9. This is not a close argument either.

Rule 19 “establishes a two-step procedure for determining whether an action must be dismissed because of the absence of a party needed for a just adjudication.” *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 1496 (D.C. Cir. 1997). First, the court must determine whether the absent party is required, “according to factors enumerated in Rule 19(a).” *Id.* Then, if “a party is required but cannot be joined,” the court must turn to the second step, examining the factors in Rule 19(b) to “determine ‘whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed,’” the absent person being regarded as “indispensable.” *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1070–71 (D.C. Cir. 2023) (quoting Fed. R. Civ. P. 19(b)); *see also Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kan. v.*

---

[2] The plaintiffs argue the Tucker Act would not apply even if grant agreements between the federal government and states existed, given the nature of the plaintiffs’ claims and relief sought. And given that the plaintiff counties and cities would not be parties to those agreements, they may not necessarily be in privity with the government. *See* ECF No. 37 at 11; *Cabrera v. U.S. Dep’t of Lab.*, 792 F. Supp. 3d 91, 100–01 (D.D.C. 2025) (concluding the Tucker Act did not apply because “the plaintiffs are not party to any contract with DOL and cannot assert rights arising out of DOL’s operator contracts,” and therefore their “asserted rights exist independently of any contract [with] DOL”); *Dallas County v. Kennedy*, No. 25-cv-4242, 2026 WL 2123225, at *9 (D.D.C. July 23, 2026) (observing that a “growing chorus of courts has ruled that a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling” (collecting cases)). But the court need not resolve these questions given how far afield the plaintiffs’ current claims are from any contract claim.

*Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995). "The rule calls for a pragmatic decision based on practical considerations in the context of particular litigation." *Kickapoo Tribe*, 43 F.3d at 1495. Here, the defendants haven't shown the states are required or indispensable.

An absent party is "required" if, as relevant here, it "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Here, the defendants appear to argue that the states have an interest in the subject of this action because they may be awarded and accept a relevant FEMA grant and, if so, vacatur of the NOFO conditions that the plaintiffs challenge would impact the terms of the future grant agreement. But that argument proves far too much and could be used to say that no APA claim may proceed unless every party affected by the challenged policy is joined. The defendants do not address that obvious line drawing problem—in fact, they demonstrate it, arguing that the plaintiffs were required to join all 50 states into this suit to bring their claims. On top of that, the defendants do not identify any way in which the plaintiffs' suit would "impair or impede" a state's ability to protect its interest. To the contrary, the plaintiffs seek to vacate affirmative obligations that would be imposed upon states. The court also notes that no state has intervened in this litigation to protect any interests that might be impaired. *See Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 266 (6th Cir. 2009) (en banc) ("[E]ven if the States have a particular interest in this dispute [for Rule 19 purposes], they had the opportunity to intervene to protect that interest but declined to participate.").

And even if the states were required parties that could not feasibly be joined, the court finds the states are not indispensable parties requiring dismissal of this case. Rather, weighing the factors that Rule 19(b) sets forth in making a pragmatic decision for this litigation as to whether the states

are indispensable, the court the court finds litigation can proceed "in equity and good conscience" with the existing parties. Fed. R. Civ. P. 19(b). For the reasons stated, there is no reason to believe "a judgment rendered in the [states'] absence might prejudice [them] or the existing parties." *Id.* Rather, the only effect of the relief sought by the plaintiffs would be to free the states from affirmative obligations imposed by the challenged NOFO conditions. Any state that wishes to adopt those conditions on its own remains free to do so within the constraints of the law, irrespective of this action. *See W. Flagler Assocs., Ltd.*, 71 F.4th at 1071 (explaining that "courts should ask: Would the absentee be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor?" (quotation marks omitted)); *see also* Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1608 (3d ed. Apr. 2026 update) ("[C]ourts must look to the practical likelihood of prejudice and subsequent litigation, rather than the theoretical possibility that they may occur.").[3]

### C. FEMA Exceeded Its Statutory Authority By Conditioning The Counterterrorism Grant Funds On Changes To Routine Election Administration

The parties move for summary judgment on the plaintiffs' first count, brought under the APA, which asserts that FEMA exceeded its statutory authority when it adopted a rule to withhold counterterrorism funds unless states and localities change routine aspects of election administration, including ballot form, auditing and reconciliation rules, and the eligibility of voters and poll workers. *See* 5 U.S.C. § 706(2)(C). As mentioned above, the defendants do not dispute that the NOFO represents "final agency" action subject to APA review. *See* ECF No. 37 at 23. Nor did they object to proceeding directly to partial summary judgment without an administrative

---

[3] Rule 19(a) requires a plaintiff to join required absent parties when feasible, whether or not the party is indispensable. The defendants do not argue that joinder of the states is feasible. *See* ECF No. 37 at 11 n.3.

record. *See* ECF No. 23; Hr'g Tr. at 32–33; *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (concluding an administrative record was unnecessary when the plaintiff's "argument that the challenged provisions violate the [relevant statute] can be resolved with nothing more than the statute and its legislative history"). The court concludes the plaintiffs are entitled to summary judgment on their statutory claim.

The Supreme Court has recognized that a federal agency has "no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And when agencies are "charged with administering congressional statutes," their "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). So for an agency to act lawfully in adopting a rule, it must be able to identify "some delegation of the requisite legislative authority by Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979).

The court's analysis of whether FEMA exceeded the authority Congress gave it centers on the text of the statute Congress used to create the grant program. Here, FEMA has exceeded the authority granted by the text in a few ways. First, the provision creating the Homeland Security Grant Program authorizes FEMA to "award grants" under the subprograms "to State, local, and tribal governments." 6 U.S.C. § 603(a). And in the subprogram sections, Congress similarly authorizes FEMA to "provide grants to assist" states and high-risk urban areas in achieving stated counterterrorism aims. The statute does *not* authorize FEMA to withhold counterterrorism grants until states and high-risk urban areas achieve policy objectives on their own dime. *Id.* § 604(a); *see id.* § 605(a). In other words, the statute gives FEMA the authority to fund projects proposed by states and high-risk urban areas; it does not give FEMA authority to use the possibility of grants to induce states or high-risk urban areas to carry out the federal government's preferred projects

at their own expense. *See id.* § 604(b)(1), (c)(2)(A) (stating FEMA "shall designate high-risk urban areas to *receive grants under this section*" and setting forth procedures to give and oversee the "*distribution of funding* among the local and tribal governments in the high-risk urban area") (emphases added); *id.* § 605(b)(2) (setting forth a process for FEMA to provide grants based on "the purpose for which the State *seeks grant funds* and the reasons why the State *needs the grant* to meet the target capabilities of that State," how the State "plans to *allocate the grant funds* to local governments and Indian tribes," and other procedures specific to allocating funds to states and local governments) (emphases added); *id.* § 608(a)(2) (directing FEMA in "*allocating funds* among States and high-risk urban areas" to consider "the anticipated effectiveness of *the proposed use of the grant by the State or high-risk urban area* in increasing the ability of that State or high-risk urban area") (emphases added).

Yet extracting the federal government's preferred reforms at the state or high-risk urban area's expense is exactly what FEMA did here. It is undisputed that FEMA's rule requires the plaintiff counties and cities, or their states, to self-fund the various election administration reforms that the NOFO requires to receive full payment of the counterterrorism grants at issue. *See* ECF No. 28-10 at 20 (explaining that compliance with the conditions is not simply a condition on how distributed funds must be spent); *id.* at 105 (same); *cf. id.* at 19 (NOFO referencing in passing the possibility of an unspecified future "funding request" to comply with one of the five conditions). Indeed, the plaintiffs have introduced credible evidence that such costs would be substantial. *See, e.g.*, ECF No. 28-3 ¶ 9 ($7.25 million in printing equipment costs for Dallas County to comply with the ballot form condition); ECF No. 28-12 ¶ 25 ("significant costs" for Travis County to comply with poll worker eligibility condition); ECF No. 28-4 ¶ 13 (additional staff, equipment, and expenses required for Nashville to comply with the conditions). And FEMA's NOFO

specifically states that a substantial portion of the grant funds will be withheld unless and until those conditions are satisfied. ECF No. 28-10 at 20, 73 (describing the "20% holdback" requirement, affecting over $200 million in grant funds). While the statute repeatedly references FEMA's authority to further stated counterterrorism aims by "award[ing]," "provid[ing]," "distribut[ing]," and "allocating" funds "to assist" in those ends, the defendants do not point to *any* text that purports to give FEMA the authority to extract unfunded reforms from states in exchange for grants. 6 U.S.C. §§ 603(a), 604(a), 604(d)(1), 605(a), 608(a). Indeed, even in circumstances where FEMA provides grants to fund state ends, the statute assigns states and high-risk urban areas—not FEMA— the role of identifying "the purpose" and "needs" on which the funds will be spent and assigns FEMA the role of selecting and providing funding. *See id.* § 605(b)(2)(A)–(C); *see also id.* § 604(c)(2)(A) (a high-risk urban area must include in their grant application a "plan describing the proposed division of responsibilities and distribution of funding"); *id.* § 608(a)(2); ECF No. 28-10 at 40 (FEMA guidance directing applicants to describe "existing capability levels," "gaps the investment intends to address," and "expected outcomes and improvements resulting from the proposed projects"); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (explaining that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

Upon receiving applications, the statutory scheme assigns FEMA the role of prioritizing among projects proposed by states and high-risk urban areas. *See* 6 U.S.C § 608 (titled "Prioritization"); *see also Dubin v. United States*, 599 U.S. 110, 121 (2023) (explaining that "the heading of a section" is a "tool[] available for the resolution of a doubt about the meaning of a statute" (quotations marks omitted)). And it dictates how FEMA "allocate[s] funds among States and high-risk urban areas"—it does not state bases for FEMA to condition grants on states first

doing the things it wants. 6 U.S.C. § 608(a). By authorizing FEMA to prioritize among different uses of grants proposed by states and high-risk urban areas, Congress in no way authorized FEMA to withhold grant funds to achieve the federal government's policy ends at state and local expense.

Second, and independently, Congress did not authorize the grant program to be used for the sort of election administration reforms FEMA demands here—changes that, whether sound or not as a matter of policy, are not advanced to prepare for or respond to "acts of terrorism." The statute governing the grant programs at issue authorizes FEMA to administer the program to assist states and high-risk urban areas "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). And it further directs FEMA to allocate funds based on "relative threat, vulnerability, and consequences from acts of terrorism." *Id.* § 608(a)(1). The conditions relating to election administration issues—such as the form of ballots, auditing and reconciliation rules, and the eligibility of voters and poll workers—fall well outside of preparing for or responding to "acts of terrorism." *See id*. That Congress did not intend for the program to drive routine election administration decisions is supported by examples of act-of-terror-related threats given in the statute, which require FEMA to prioritize grants after considering whether the grant would address threats that are "biological," "chemical," "cyber," "incendiary," "nuclear," or "radiological," or that involve "explosives" or "suicide bombers." *Id.* § 608(b)(1)–(8) (cleaned up).

The defendants do not appear to argue—or, if they do, explain how—the specific election administration conditions listed in the NOFO connect to the types of physical or cyber threats to critical infrastructure listed in the statute. *See* ECF No. 37 at 13–15. They instead frame their conditions as aiming to "strengthen the integrity of U.S. elections." ECF No. 37 at 5 And they say FEMA has "considerable discretion" in using the grants to tackle "documented evolving threats"

to "election infrastructure," *id.* at 13, through the election administration changes here because Congress said that, in considering "relative threat, vulnerability, and consequences from acts of terrorism," FEMA should consider not only the enumerated kinds of threats but also "[s]uch other types of threat determined relevant" by FEMA, 6 U.S.C. § 608(b)(9). According to the defendants, that more general authority to rely on threats "determined relevant" provides the breadth of authority needed to adopt the election administration conditions. But that's not a plausible (let alone the best) interpretation of the text. To begin with, it is well established that statutory text must be read in light of the text around it; indeed, the Supreme Court has specifically recognized that "the last in a list of terms"—like the language the defendants rely on here—must be interpreted in light of the terms that come before. *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (explaining that "a word is known by the company it keeps"). So the delegation to consider "other types of threat" must be read in light of those other types of threats: "biological," "chemical," "cyber," "explosives," "incendiary," "nuclear," "radiological," and "suicide bombers." § 608(b)(1)–(8) (cleaned up). Therefore, the text the defendants rely on "embrace[s] only objects similar in nature to those objects enumerated by the preceding specific words" and does not occasion the type of broad, undefined expansion that the defendants posit to the court. *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003). And because courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress," it makes little sense to interpret "other types of threats" to mean any type of threat FEMA deems relevant, no matter how different in kind those threats are from the enumerated examples. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quotation marks omitted).

To be sure, the statute would plainly authorize FEMA fund grants that protect against or respond to terrorist attacks on critical election infrastructure. The text authorizes FEMA to award and distribute grants to states and high-risk urban areas for them to address threats to "critical infrastructure sectors" and to prepare for or respond to acts of terrorism, including physical or cyber terrorist attacks targeting critical infrastructure related to elections. 6 U.S.C. § 608(a)(1)(D). Indeed, DHS has previously designated election systems as "critical infrastructure," ECF No. 37-7 at 2, and recognized that "electoral processes remain an attractive target for many adversaries." ECF No. 37-6 at 28. And the NOFO at issue requires grants awarded and distributed to be spent, in part, on investments into physical and cyber election security, as determined by the state or high-risk urban area's needs. ECF No. 28-10 at 19–20 (requiring 2026 grant recipients to "dedicate at least 3%" of their fiscal year 2026 Urban Area Security Initiative and State Homeland Security Grant Program grant "award[s] to eligible election security investments" that "support[] physical and/or cyber election security"); *see also, e.g.*, FEMA, *The U.S. Department of Homeland Security (DHS) Notice of Funding Opportunity (NOFO) Fiscal Year 2024 Homeland Security Grant Program* 27–28 (Apr. 16, 2024) (past NOFO requiring grant recipients to use funds to make "at least one . . . investment . . . to enhance physical election security and/or cyber election security"). And FEMA even provided example projects as guidance for how the grants can be spent in ways that track the statute, including "physical/site security measures (e.g., locks, shatter-proof glass, alarms, access controls)" as well as "cybersecurity risk assessments, training, and planning," "Distributed Denial of Service (DDoS) protection," and "migrating online services to the '.gov' internet domain." ECF No. 28-10 at 24 (cleaned up). But FEMA's conditions here—which are imposed on states and localities at their own expense, rather than funded by grants, and which address routine election administration decisions rather than the types of terrorist act threats

contemplated by the statute—go beyond what Congress authorized. For example, the defendants say the NOFO condition requiring states to adopt FEMA's proposed citizenship-verification procedures in maintaining lists of registered voters "ensures that only U.S. citizens are voting in U.S. elections." ECF No. 37 at 15. But it never explains how that condition, or any of the others, is tied to the goal of shoring up vulnerabilities to terrorist attacks.

In reaching its conclusion—that the text of the statute governing these grant programs does not authorize FEMA to use grants as a means to get states and localities to pay for changes in routine election administration—the court does not pass judgment on the soundness or importance of any of the election administration decisions in the NOFO or otherwise made by states and localities. The plaintiffs cast the NOFO conditions as part of a broader policy effort by the federal government to prod states and localities into changing how they conduct elections. *See* ECF No. 28-1 at 10–14. Meanwhile, the defendants and the NOFO itself cast the conditions as part of an effort to "strengthen the integrity of U.S. elections." ECF No. 37 at 5 (defendants); ECF No. 28-10 at 19 (NOFO); *see also* ECF No. 28-10 at 107 (FEMA guidance describing the manual-audit condition as having a purpose to "support public confidence" in elections). The defendants largely do not defend any of FEMA's election administration conditions on their own terms, generally addressing them collectively throughout their briefing under the label "Election Security Conditions." *See generally* ECF No. 37. The court's analysis does not wade into the policy debate about how to administer elections with integrity; its analysis is limited only to whether Congress, in the particular grant program here, authorized FEMA to withhold funds based on those types of reforms.

Third, if there were any doubt about whether the grant program allows FEMA to withhold grants to extract policy ends from states or whether certain general election practices fall within

what Congress authorized for the grant programs here, the major questions doctrine would compel the same result. The Supreme Court has instructed that under that doctrine, the "economic and political significance" of any claimed authority "provides a reason to hesitate before concluding that Congress meant to confer such authority." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 246 (2026) (alterations and quotation marks omitted). In that circumstance, the court cannot "assume that Congress entrusted that task to [the] agency without a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). The conditions here require states and localities to reform numerous aspects of their election administration, from who they hire, how they maintain their lists of registered voters, and how they record votes, to the procedures they have in place afterward. Whether FEMA can compel states to adopt those far-reaching reforms by withholding hundreds of millions in federal grant money until they comply has substantial economic significance, necessarily requiring either significant investment into new practices and people or a significant loss in federal funds, and has substantial political significance, literally implicating how elections are conducted. *See West Virginia v. EPA*, 597 U.S. 697, 714 (2022) (applying the major questions doctrine to an EPA rule that "would entail billions of dollars in compliance costs"). The court therefore cannot assume Congress delegated that authority to FEMA without "a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). The court does not find any such clear statement in the statutes here.

And, fourth, even if there were any ambiguity as to whether the statute authorizes the NOFO conditions, the defendants' interpretation of the statute would raise serious doubts as to its constitutionality. *See Michel v. Anderson*, 14 F.3d 623, 629–30 (D.C. Cir. 1994) ("[W]e have an obligation to construe statutes to avoid serious constitutional questions."). The Supreme Court has said that although Congress has broad power to set the terms on which it disburses funds under the

Spending Clause, that power is limited to conditions that are "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992); *see also id.* at 167 (spending conditions must "bear some relationship to the purpose of the federal spending"). For the reasons described, the conditions here go well beyond any measure that can reasonably be characterized as related to "preventing, preparing for, protecting against, and responding to acts of terrorism," the purpose of the funding in question. 6 U.S.C. §§ 604(a), 605(a). Indeed, FEMA itself describes the elections conditions as serving a different purpose, namely to "strengthen the integrity" of, and "support public confidence" in, U.S. elections. ECF No. 28-10 at 19, 107. Again, the court does not question that this may be a laudable goal, but it is not a counterterrorism goal. The NOFO conditions, under which FEMA can withhold hundreds of millions in grant funding unless states change routine aspects of election administration, including the form of ballots, auditing and reconciliation rules, and the eligibility of voters and poll workers, are not reasonably related to the explicit statutory purpose of the funding. To the extent there is any ambiguity in the statute, then, the court must "construe" it to avoid these "serious constitutional questions." *Michel*, 14 F.3d at 630.[4]

---

[4] The defendants say the Spending Clause would not be implicated because it limits Congress, not the Executive. That argument is self-defeating. Limits on the spending power constrain Congress alone because the spending power itself is Congress's alone. *See U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012). If the elections conditions were an exercise of executive power alone, then they run afoul of separation of powers given that only "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). If the conditions instead represent a delegation of congressional power, then the Spending Clause constrains the scope of that delegation. *See id.* (describing the power to "attach conditions on the receipt of federal funds" as an "[i]ncident" of Congress's Spending Clause power).

### D. The Court Dismisses The Plaintiffs' Remaining Claims And Vacates The Election Administration Conditions

Having concluded that the plaintiffs are entitled to summary judgment on their APA claim that the election administration conditions in FEMA's NOFO exceeded the agency's authority, the court pauses to carefully consider the impact on the plaintiffs' other claims and the proper scope of relief.

The D.C. Circuit has recognized that "[v]acatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting 5 U.S.C. § 706(2)). Consistent with that understanding, the court concludes vacatur of the election administration conditions, as well as of FEMA's August 10, 2026, implementing guidance memorandum specifying how states are to comply with those conditions, is the appropriate remedy here. *See Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) (recognizing that courts should set aside "the part of a rule found to be invalid—for that is the only 'agency action' that exceeds statutory authority"). The court notes that neither party argues the appropriate remedy is to vacate the NOFO in full or that the election conditions cannot be severed from the rest of the NOFO. The court makes clear that its partial vacatur does not apply to any other aspect of the NOFO, including other election-related components, such as the requirement to spend at least 3% of grant funds on investments into physical and cyber election security, a requirement the plaintiffs do not challenge. *See* ECF No. 28-10 at 19–20.

In light of that remedy, the court dismisses without prejudice the plaintiffs' remaining APA claims and freestanding constitutional claims. The plaintiffs concede that is the appropriate course as to the arbitrary and capricious claim they bring under the APA in their complaint, but ask the court to "[r]eserve" and "permit supplemental briefing on whether a permanent injunction is also

warranted" on top of vacatur, based on their constitutional claims. ECF No. 28-1 at 41–42. But the plaintiffs have not pled or shown any basis to conclude that vacatur of the NOFO conditions would not be sufficient to afford them full redress. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66, (2010) ("If a less drastic remedy (such as partial or complete vacatur of [the agency's] decision) [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted."); *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 264 (D.D.C. 2014) ("Where injunctive relief would likely have no impact, a court is free to stay its hand."). The court therefore denies the plaintiffs' motion for summary judgment as to and dismisses the plaintiffs' constitutional claims.

Moreover, as the defendants argue, the plaintiffs' ultra vires claim fails because APA review is available. Ultra vires review is unavailable when, as here, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (explaining that to state an ultra vires claim, there must be "no alternative procedure for review of the statutory claim"). The court therefore grants summary judgment for the defendants on this claim and denies it for the plaintiffs.

The defendants otherwise object to vacatur on the grounds that the APA does not authorize vacatur and that the court is limited to issuing only party-specific relief here. Neither of those arguments finds any support in the D.C. Circuit or the Supreme Court's precedents. The APA authorizes vacatur. *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). And vacatur is not restricted to the parties before the court. "[W]hen a reviewing court determines that agency regulations are

unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *see Montefiore Med. Ctr. v. Kennedy*, No. 24-cv-1810, 2026 WL 2547056, at *8 (D.D.C. Aug. 28, 2026) ("Binding precedent therefore contemplates that vacating unlawful agency action affects nonparties."); *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (limiting relief based on the authority conferred by the Judiciary Act of 1789 but leaving open "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"); *id.* at 873 (Kavanaugh, J., concurring) (explaining that, even after *CASA*, district courts may grant "the functional equivalent of a universal injunction" by "preliminarily setting aside . . . an agency rule under the APA"). The defendants do not identify any courts that have limited relief under the APA in the way they propose.

## III. Conclusion

For these reasons, the court grants the plaintiffs' motion for partial summary judgment as to count one and denies it as to counts two, three, four, six, and seven; grants the defendants' cross-motion as to count seven and denies it as to counts one, two, three, four, and six; and dismisses counts two, three, four, five, and six without prejudice. It is hereby ordered:

- The election administration conditions and 20% holdback requirement on pages 15–16 of the Department of Homeland Security's Notice of Funding Opportunity (NOFO): Fiscal Year 2026 Homeland Security Grant Program, ECF No. 28-10 at 19–20; and FEMA's August 10, 2026, implementing guidance memorandum, ECF No. 28-10 at 104–09, are vacated.

A separate order accompanies this memorandum opinion.

AMIR H. ALI
United States District Judge

Date: September 28, 2026