# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| * * * * * * * * * * * * * * * * ) | |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., Plaintiffs, | Civil Action No. 26-02886 |
| vs. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., Defendants. | Washington, D.C. September 2, 2026 2:50 p.m. |
| * * * * * * * * * * * * * * * * ) | |

TRANSCRIPT OF SCHEDULING CONFERENCE
CONDUCTED VIA ZOOM
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

DANIEL F. JACOBSON, ESQ.
JACOBSON LAWYERS GROUP, PLLC
5100 Wisconsin Avenue, Northwest
Suite 301
Washington, D.C. 20016

LAUREN MILLER KARALUNAS, ESQ.
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway
Suite 1750
New York, New York 10271

JACEK PRUSKI, ESQ.
PROTECT DEMOCRACY
2020 Pennsylvania Avenue, Northwest
Suite 163
Washington, D.C. 20006

APPEARANCES, CONT'D:

FOR THE PLAINTIFFS: GRAHAM PROVOST, ESQ.
PUBLIC RIGHTS PROJECT
490 43rd Street
Suite 115
Oakland, California 94609

EDWARD SWIDRISKI, ESQ.
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress Street
Houston, Texas 77002

FOR THE DEFENDANTS: ALEXANDRA LEE YEATTS, ESQ.
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L Street, Northwest
Washington, D.C. 20005

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6509
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY: This is Civil Action 26-2886, *Metropolitan Government of Nashville and Davidson County, Tennessee, et al., versus the United States Department of Homeland Security, et al.*

May I have counsel please identify yourselves for the record, beginning with Plaintiffs' counsel.

MR. JACOBSON: Yes. Good afternoon, your Honor. Daniel Jacobson for the Plaintiffs.

THE COURT: Good afternoon.

MR. JACOBSON: I'm joined here by co-counsel, Lauren Miller Karalunas from the Brennan Center, Jacek Pruski from Protect Democracy, Graham Provost from Public Rights Project and Edward Swidriski -- forgive me if I pronounce that wrong -- from Harris County, Texas.

THE COURT: Good afternoon to all of you.

MS. YEATTS: Hi, your Honor. This is Alexandra Yeatts on behalf of DOJ and Defendants.

THE COURT: Good afternoon to you as well, Ms. Yeatts.

Okay. I received the Plaintiffs' motion for partial summary judgment last night. Obviously, this is not going to be a hearing on the merits of that motion. I don't have full briefing.

I understand the parties dispute the appropriate schedule to get us to that point of full briefing, and I

think both parties have essentially asked for an order from me with a schedule.

I've got the motion for expedited briefing from the Plaintiffs. As I understand it, the Plaintiffs say that the urgency arises from conditions that FEMA is placing on awards that would be issued September 30th, and therefore I think they frame it as taking effect on October 1st.

And then I've also got a motion from the Defendants to set a briefing schedule. And I understand that they're proposing to have the motion proceed under the standard time allowed under the rules, which would be two weeks.

So I'll plan to set a schedule. I've got a couple of questions for -- maybe it might end up being a little bit more than a couple questions for each side.

Who's going to be speaking on behalf of the Plaintiffs? Is it you, Mr. Jacobson?

MR. JACOBSON: Yes, your Honor.

THE COURT: I've read the back-and-forth on the scheduling question. Can you explain to me from Plaintiffs' perspective exactly how the urgency here works? What --

MR. JACOBSON: Yes, your Honor.

THE COURT: Maybe one way to put it is, what happens as a practical matter if we hit September 30th?

MR. JACOBSON: Yes, your Honor. And I should say,

September 30th is not necessarily when the awards will be issued. It could be sooner. The relevant NOFO here on the opportunity announcement said no later than September 30th.

So as soon as the awards are issued and the state agrees to the awards, then these election conditions -- well, sorry. Let me rephrase it differently.

As soon as an award issues and even really now, the election conditions exist. And those election conditions require, as we set forth in our summary judgment motion -- and I know you haven't read it all yet -- a set of five different conditions that kind of touch on every aspect of the election process, from voter registration to how voters vote to then, you know, audits and ballot reconciliation post-election and including -- the final condition relates to election workers and a requirement that counties in particular confirm the U.S. citizenship of all election workers. And that includes not just poll workers, but also vendors and employees of vendors who, you know, touch voting equipment or the machinery in any way here.

And FEMA, which is the -- which administers this program, put out guidance on August 10th that in our view makes clear that at least -- basically, all the conditions except the voter registration running through the SAVE database for the voter poll conditions all kick in right away.

And so what that means is that counties -- unless counties take immediate action to start checking all of their election workers, you know, somehow -- I think they set forth in their declarations how impossible this would be through their, you know, checking for U.S. citizenship, for their people who are going to be touching any elections systems for the upcoming election, that after the election doing this post-election audit for which FEMA has not prescribed these very detailed requirements, ballot reconciliation, that these are all going to be requirements. And they -- they will not -- counties and other jurisdictions in the state will have 20 percent of their Homeland Security money held back unless and until they comply with all those conditions.

I know that was a mouthful, your Honor. But essentially, it will impose --

THE COURT: Let me just clarify.

So you said this August 10th guidance says that -- I think the words you used are that it would kick in right away. Do you mean right away like as of August 10th or do you mean right away as of October 1st?

MR. JACOBSON: Yeah. So the way it kicks in essentially is just through a holdback, which is -- the holdback is right away.

As soon as the award --

THE COURT: I don't understand what you mean by "holdback." Use plain English.

MR. JACOBSON: Yeah. They're going to hold back 20 percent of the grant funds, meaning not dole them out to the state and -- as well as to our clients, the counties and municipalities. They would hold back 20 percent of those funds until the states and the counties have submitted sufficient documentation to prove that they are in compliance with these five conditions.

So the immediate kick-in is that they are requiring compliance with these conditions right away, including for the upcoming election. They will not receive --

THE COURT: Okay. You're still not answering my question. "Right away." Are we talking about now or right away as of October 1st? When do they have to start doing these things?

MR. JACOBSON: As soon as the grant is awarded and accepted.

THE COURT: So not now, but as of October 1st? In other words, they're not looking at compliance as of today; they're not looking at compliance as of -- or as of August 10th. They're looking at compliance as of October 1st?

MR. JACOBSON: Well, let me -- I don't mean to be

evasive, your Honor, but it's really just -- they have to be in a position where they're going to be able to say they comply. So whether they start that process now or whether they start that process on October 1st, they're going to need to be in a position where they can say --

THE COURT: Your point is -- fair point. So they need to be in compliance as of October 1st. But that may require work before then. Is that the clarification you were just offering?

MR. JACOBSON: I mean, our view is it would have required work starting, like, years ago to be in compliance for now. But yes.

THE COURT: Hold on. I'm just trying to ask a simple question, which is --

MR. JACOBSON: Sure.

THE COURT: -- like, there's some sort of requirement to come into compliance. Let me use that word. When does that start? Does it start August 10th or does it start when a grant is awarded, which would be latest September 30th, and accepted?

MR. JACOBSON: The latter, your Honor.

THE COURT: All right. And then the way that it is implemented would be that the grant is awarded, but the funds would not be given until they come into compliance? Is that the idea?

MR. JACOBSON: That's what the both NOFO and then, as we submitted, the October -- sorry -- the August 10th FEMA guidance says, yes. I can just read you one sentence, because I think it makes it clear.

It says: FEMA will continue to withhold these funds until the recipient submits proof of compliance with these requirements and the department verifies the proof.

THE COURT: Okay. Then you said, I think, that the state -- I think you used the word the state accepts the award. Tell me exactly how that works, because you don't represent the state; you represent municipalities.

MR. JACOBSON: That's correct, your Honor.

So this is a very complicated structured program. It's one program, the Homeland Security grant program, but within it there are sort of three subprograms.

THE COURT: And let me just be clear. I mean, you may need to give me some background education on what you're about to do. Just to make the purpose of my question clearer, you know, you're arguing urgency as it relates to your clients, who are municipalities. And my question is, fill in the blank for me as exactly -- you know, practically what this looks like for your clients.

MR. JACOBSON: Yeah.

THE COURT: Go ahead.

MR. JACOBSON: So the state submits one combined

application for all these programs. It includes money that our clients have applied for under, like, the county- and municipality-specific program.

The government -- sorry -- FEMA then awards one grant to the states that covers these subprograms. The state will accept that and, in our view, turn around and tell the counties, You are now bound by all of these conditions that you have now accepted. We are ordering you to implement them.

THE COURT: And then -- okay. I'm with you until now.

And how practically -- what would the impact be if one county in the state is not in compliance? Does that mean the state doesn't get the money? Or the state does get the money, but they can't give it to the county or municipality?

MR. JACOBSON: So that is left a little bit vague in the FEMA guidance.

What is clear is that some money will be withheld from both the state and the county that's not in compliance. How they will do that on, like, a proportional basis is left very much, at least from our view, unclear from the guidance.

THE COURT: So unclear whether FEMA would say, "We're just withholding 20 percent from the state" or "We're

withholding some amount and, you know, that means you shouldn't give this money to Nashville"?

MR. JACOBSON: I think it is unclear. I think our -- one read of the FEMA guidance is that sort of these designated urban areas that are the actual sort of grantee in practice are -- the money is withheld from them if they don't comply.

But I don't want to get too far into the weeds, because it is unclear and we're speculating a bit in terms of how FEMA will work this.

THE COURT: All right. Let me ask you this. Then I'm going to have some questions for Ms. Yeatts, too.

There's a case pending as I understand it in the District of Rhode Island that's brought by the states. How does this case relate to that? And how should I think about that in terms of -- I mean, you know, I'll obviously judge this case that's before me; but I want to understand the relation between the two cases.

MR. JACOBSON: Yes, your Honor. That case is brought by the -- I think the best way to describe it is the blue state AGs, the states' Democratic attorney generals. It is limited to just those, I think, 26 or 27 states, depending on how you count.

None of our clients are in states that are a plaintiff to that lawsuit. So there's no overlap.

And that -- the plaintiffs in that case, my understanding, have not moved for any preliminary relief. And the difference is that, you know, in those states, the states themselves, because they are the ones who decide whether to accept these conditions, they can just say, "We're not going to accept these conditions for now, and so it won't affect our election practices."

Our clients don't have that luxury because they can't control what their state does in terms of accepting the conditions.

THE COURT: But then fill the blank in for me here. Why can't they just say, Well, we're not going to accept those conditions? And if our state loses the money, they lose the money in the same way I assume the blue -- what you described as the blue states could do?

MR. JACOBSON: Because our understanding is it's the state's decision whether to accept the conditions, not the county's. And so if the state accepts the conditions, it will then impose the conditions upon the counties as a matter of, you know, state orders.

But, you know, either way -- our view is, either way, no matter what the state chooses on whether to accept the conditions, our clients will be injured. Either they're going to have money withheld from them or they're going to be forced to comply with all these conditions.

THE COURT: Got it.

Are there other cases pending other than the one I mentioned?

MR. JACOBSON: Not to our knowledge, your Honor.

THE COURT: And then more kind of in the weeds or maybe focused on the schedule here, how about just a fairness argument in terms of briefing scheduling? You know, you took some time to get your motion on file, and then you were giving them seven -- I'm sorry -- giving them ten and then giving yourself another seven on the back end. And maybe most of all, it's harsh on me, who's actually just getting all of this in the first instance.

But if we adopt a schedule like that, can't you get your reply done quicker?

MR. JACOBSON: I think we proposed four or five days for our reply. At least that was our intent, so apologies if we didn't put that in. I think our idea was to shorten both the op and the reply.

THE COURT: Oh, you're right. It is five days. You're right.

MR. JACOBSON: At the end of the day, your Honor, sort of the most important thing for us is getting a decision by the 30th. How we get there in terms of the schedule, of course -- well, I'm flexible to whatever works best for the Court.

THE COURT: Let me hear from Ms. Yeatts on this. Ms. Yeatts, if you want to start by responding to anything you just heard, you can do that.

MS. YEATTS: Sure. I want to make sure I don't forget anything.

But just at the outset, for clarity, you asked about the overlap with the District of Rhode Island case. You asked if there's a third litigation.

I want to be clear with what my understanding is. The suit is limited to the challenging of the election conditions, the election security conditions attached to the HSGP grants issued by FEMA.

The District of Rhode Island case has three issues, one of which is that same issue. And as has already been made clear by my co-counsel, it's brought by states.

Separately, that case challenges the standard terms and conditions that DHS put out this year for FEMA grants and other DHS grants.

There's a related case out of the Northern District of Illinois that also challenges those standard terms and conditions, so presumably not relevant here, but that is kind of the interweb of the active litigation.

THE COURT: Yes. That's -- thank you for clarifying that. So in other words, the case in Rhode Island is broader and includes this, but it includes other

things.

Is that -- you just mentioned that the District of Illinois case -- or the Northern District of Illinois case challenges the standard terms. Is it also accurate to say that it covers the conditions here and more? Or is it only different conditions?

MS. YEATTS: So I can double-check for you, your Honor, but my -- so it only covers the fiscal year '26 standard DHS terms and conditions, not explicitly challenging the election security conditions at issue in this case, in Issue 1 in the District of Rhode Island.

THE COURT: Thank you for that context. That's helpful.

MS. YEATTS: So maybe I shouldn't have brought it up at all. But we --

THE COURT: No, no. That is helpful to know.

MS. YEATTS: Okay. And then also as a point of clarity as to those two cases, neither are -- have brought emergency motions, as I believe also was previously stated. And my understanding is the Government's MSJ will actually give the opening motion for summary judgment in Illinois, and it will be due on the 15th --

THE COURT: Okay.

MS. YEATTS: -- which is the same day we proposed for our motion, by coincidence.

So I'm trying to recall all of the questions that you asked my co-counsel. But -- go ahead.

THE COURT: Well, I guess --

MS. YEATTS: Oh --

THE COURT: -- maybe you can speak to some of the questions I was asking about the practicalities here --

MS. YEATTS: Yes.

THE COURT: -- on the ground. And one way I framed it -- although you could have more flexibility, like I gave Mr. Jacobson in describing it to me. But one way to put it is, like, what happens on October 1st?

MS. YEATTS: Yes, your Honor. So I think this is the most important thing to clarify today so that we can all kind of breathe a sigh of relief that there's not as much urgency as maybe it appears.

So as Mr. Jacobson outlined, it is requisite that both FEMA issue the award and that the jurisdiction accept the awards and the attached conditions.

But it's explicitly stated on Page 1 of the fiscal year 2026 HSGP NOFO, the document at issue here, that any recipient jurisdiction, so anyone issued an award, has 60 days to accept the award and the attached conditions.

What this really means is that, even if awards are issued tomorrow -- and I'm confident that they will not be -- but they could be issued up until September 30th. And

once they are, there are 60 days before a jurisdiction is bound by the conditions because there are 60 days before a jurisdiction must sign on to the award and the attached conditions, if that makes sense.

THE COURT: Right. Although, you know, it's not like it's the Plaintiffs who get to decide whether to sign it; it's the states. So what happens -- that's a helpful clarification. So if the states wait 60 days to sign it, presumably there wouldn't be any conditions imposed.

But just hypothetically say, you know, a state gets it on October 1st and signs it on October 1st. What happens then?

MS. YEATTS: It's a little bit tricky. I think this honestly goes to why we need 14 days to brief this.

But there is sort of a greater context point that -- so I don't have an answer. I'm not 100 percent certain on how the subset of funds that is received by states under HSGP would filter down or how the states would commit to conditions and that would then filter down to some jurisdictions.

However, HSGP has multiple subcomponents, and one goes directly to local jurisdictions. They need to be high-risk -- urban high-risk areas. So I'm not sure, because this case was just assigned to me, whether these Plaintiff jurisdictions are qualifying for HSGP awards that

come directly to them under that subset of HSGP funding. But I'm assuming that that's not the case and that these jurisdictions -- these Plaintiff jurisdictions are solely in the bucket of states sign for funds; states filter them down. And I don't know the implication of if a state accepts money.

I do know that in previous litigation, another point, FEMA has the authority to extend the award acceptance deadline. And that really doesn't resolve the problem that you just raised. I think none of us are quite clear on the implications of a state accepting conditioned funds and then how that trickles down.

But generally speaking, FEMA has the authority to extend the award acceptance deadline. It has done so historically to allow for litigation like this that challenged HSGP conditions to play out before anyone was forced to commit to accepting the awards.

MR. JACOBSON: Your Honor --

MS. YEATTS: Maybe that --

Go ahead. Yeah. I think --

THE COURT: Well --

MS. YEATTS: -- you know more about your local jurisdictions.

MR. JACOBSON: I just wanted to clarify that, your Honor.

THE COURT: Go ahead, in case it's helpful.

MR. JACOBSON: Our Plaintiffs do include those jurisdictions that get what are called UASI funds. But here is where it gets tricky. Even though the awards are earmarked for them, the money goes through the state. And that's where it gets confusing. And it's the state that accepts the award and the money and then passes it through.

So for all of the money, my understanding is the state will be the one that accepts the award and accepts the conditions.

THE COURT: I'm not quite picking up on the distinction here. So, Mr. Jacobson, why don't you tell me the significance or lack of significance of that, and then I'll have Ms. Yeatts tell me again. I'm not sure I'm getting the distinction on the fly here between the two categories of how states do this or how municipalities get it.

MR. JACOBSON: Well, the broader point is just that for all of the money at issue, it is up to the states to accept the conditions and that the states are then the ones that would then impose those conditions on the counties. It's not as if some bucket of this money, these counties will have autonomy to, like, decide whether to accept the conditions or not. That's my only point.

THE COURT: I see.

Ms. Yeatts, would you add anything to that?

MS. YEATTS: I'm not certain about exactly how the funnel-down works when we're talking about Subcategory 1 versus Subcategory 2. And it may well be the case that in both instances, the states control. I'm unsure about that.

THE COURT: Right. And then you mentioned the possibility that FEMA could extend the acceptance deadline. That -- I'm going to give you something to direct me to. That seems like it would be a relevant and helpful thing if this were a state that -- and not a municipality that was challenging these conditions and in a situation where they have to decide whether to certify or not, because they're the ones who accept or don't accept.

And so you can imagine litigation saying, Well, you know, just put off the acceptance date. Let's resolve this. Get some more time.

But I don't think that's the circumstance we're in here. So is there something I'm missing as to how that could be helpful in this litigation?

MS. YEATTS: No. You're correct, your Honor, if what Plaintiffs are representing and are correctly understanding is true. And I'm uncertain as to whether or not it is -- I don't question that -- my belief that they know more. They've been looking into this for longer than I have. So this case just came across my desk.

But if what they're representing as states signing off on behalf of localities is true, then I take your Honor's point.

THE COURT: If I understand correctly -- first of all, I appreciate your candor. I know you've been assigned this case only recently. I'm trying to sort through the actual practical consequences.

It may well be that Plaintiffs know their case better. But maybe it's also true that if you go back and talk to your client and your client sees it differently, that in fact they're in the same situation, for example, as those states who are litigating in Rhode Island or they have some other right that they don't know about.

I think for it to affect the urgency, they probably need something from you on behalf of your client indicating to them that they have this other option. And then, you know, obviously it should be brought to my attention. But it could certainly impact the asserted urgency of the Plaintiffs. But I think until we know one way or the other on that, it's hard to rely on that.

MS. YEATTS: Yeah. We're more than happy to clarify with them, of course, and to provide clarity to you and to opposing counsel.

I will say I spoke with them yesterday, and this was not something that came up. They were viewing this

award extension option as helpful here. So I would need to clarify with them.

Granted, historically, they have been litigating cases about this award from Plaintiff states.

THE COURT: Well, maybe I could ask you to talk to your client, report that to Plaintiffs. If it impacts -- if either party thinks it impacts the urgency here, you can file something and let me know. But without that clarity, I don't think I can rely on it here.

So come back to the question of, you know, assume one of the Plaintiff states or all of the Plaintiff municipalities' states that they are in accept the funds on October 1st. They don't wait that 60 days. What's your understanding of what happens?

MS. YEATTS: So my understanding -- and I also want to be clear that we're looking at the same guidance document, because I'm looking at IV No. 596-A. It's dated August 12th. But my co-counsel said August 10th, and that may very well be the same document.

But my understanding is that there is -- immediately states -- and this is a question your Honor asked that I think still needs clarity -- states will be with -- they will receive -- or jurisdictions, let's say jurisdictions -- will receive an award.

That award will be given to jurisdictions minus 20

percent in this instance as to election security conditions, minus 20 percent of the award until the jurisdiction complies with several outlined election security requirements, at which point they will submit to FEMA that they've implemented projects to meet these listed requirements. And then that 20 percent of their HSGP award that was being withheld will be released to them.

And I think also pertinent, I think, for clarity, these awards, they're for three years of performance. So this is 20 percent of a three-year-long period- of-performance award, if that helps put into context the amount of money that would be held back and the amount of time over which jurisdictions spend this massive amount of money.

MR. JACOBSON: Your Honor, I don't mean to --

THE COURT: Well, hold on. Let me just digest that.

Ms. Yeatts, typically, is the award -- I assume we're talking about a state that is viewed by FEMA as fully compliant. Is the award given in full right away or is it given over time anyways?

MS. YEATTS: It's not given over time. But there are -- my understanding is there are other conditions that have this -- a similar -- I don't want to call it a holdback, but there are things that need to be done to meet some of the other targeted projects that come with these

funds, the goals that come with these funds, where a jurisdiction has to submit to FEMA, "We are engaged in this process or this effort that meets that requirement." And then FEMA releases that amount of funds.

THE COURT: So there might be another kind of compliance that's required to get the full amount. But if you're considered to be kind of fully compliant and you're doing all the things that are requited, you would typically have --

MS. YEATTS: Yes. It's a one-time -- sorry. It's a reimbursement. So it would be -- I believe, at least my understanding from last time around, was it's a reimbursement. So it would come to you as you spend the money over the course of the three years forward-looking.

THE COURT: Okay. So as it's drafted, if somebody comes into compliance late, they still get the reimbursement, but they get it once they're shown to be in compliance. Is that right?

MS. YEATTS: Right. And there's no such thing as -- my understanding, your Honor, is there's no such thing as coming into compliance late, because you have three years to meet -- you know, there might be dates attached to some of these conditions. But generally speaking, you submit to FEMA, "We're going to engage in or we have engaged in this activity." FEMA reviews that proposed activity or that

completed activity and submits back to the jurisdiction, you know, "Approved," and funds are released under that subset of this award.

THE COURT: Right. And again, I'm asking this from understanding the urgency of getting a decision out. Right?

So maybe this is more clear; maybe it's not. But I don't have full briefing on the merits right now, so I don't know how the case would be decided. But what I'm trying to figure out is how much what we're discussing impacts when the case is decided and to evaluate the Plaintiffs' argument of urgency.

So I think what you're telling me -- and you'll correct me if I'm wrong -- and so again, I don't know how this is going to come out. So take the version in which the FEMA rule is lawful under the APA, which is the basis for the partial motion for summary judgment. You would say, Well, look, the rule's lawful; and if Plaintiffs want the money, once they come into compliance, they would get it.

Right? Is that accurate, even if it's after October?

MS. YEATTS: If they've accepted the award by the award acceptance deadline, which is 60 days from the date the award issues, then my understanding is meeting some of these conditions and requirements, unless a requirement, a

condition, is explicitly dated as, you know, by a certain date, within X date of accepting the award. But otherwise, my understanding --

THE COURT: So in other words, in this case, if the state timely accepts the award -- and I assume it's the state, but you'll correct me if I'm wrong. The state comes back and says, "All of our municipalities are now in compliance." It's October 15th, say. And the administration agrees. They would get the funds? Is that your understanding?

MS. YEATTS: Yes, your Honor. I mean, my current understanding is it could be November 15th.

THE COURT: Right.

MS. YEATTS: Like, it doesn't --

THE COURT: Exactly.

MS. YEATTS: I think that the pertinent issue is the date the award has to be accepted; and of course, we've landed on whether or not that's the state or on behalf of the municipality or not is relevant.

THE COURT: Right. That's helpful. I was just picking October 15th because it's some date after October 1st.

And you're right: The point was that it's, you know, anytime afterwards.

And so again, I'm trying to evaluate the time

sensitivity of getting a decision out. So if the decision were to come out the other way after October 1st, in other words, a state has accepted the funds but has a municipality that is not in compliance and so the 20 percent is withheld; and then the rule, FEMA's conditions, are invalidated -- I mean, maybe your point -- I don't want to put words in your mouth. But maybe your point is the outcome is the same because FEMA's conditions would be unlawful and invalidated whether -- you know, maybe what you're saying is, "I don't have to brief this. I shouldn't have to brief this in ten days because, even if you invalidate the rule on October 15th in that instance, the conditions would be invalidated and they get the money." Is that your position?

MS. YEATTS: I mean, the practical impact that I understand is if sometime in October or November this Court rules invalidating the election security conditions and the impact of noncompliance or not yet complying and confirming compliance with FEMA with the election security conditions is that 20 percent of your award is withheld from you.

Then invalidation of the rule or of the -- we call it a rule -- but of the conditions would simply mean that 20 percent that's been being withheld for some jurisdictions, maybe not for others, would be released.

THE COURT: Okay. And that's a helpful clarification.

I imagine Mr. Jacobson -- I mean, I'm not going to put words in his mouth; I'll let him tell me -- would say, "Okay. That's all fine and well. But the problem is, once the state agrees, we're going to be forced to implement the conditions." And so there might be something that's outside of the kind of -- an external factor that causes urgency that the federal government doesn't -- at least as to that actor, doesn't have control of. But let me let Mr. Jacobson respond to that.

Why isn't that an indication that there's not urgency here?

MR. JACOBSON: Several reasons, your Honor.

But I did want to just clarify something -- later on -- about what document is the operative one. I know that there's confusion here. And it's important to clarify that.

But two reasons: One, what you just said, this is not within my clients' control. It is undoubtedly for some of the money that the states that accept and the states that are then charged under the FEMA guidance with certifying compliance. It is like they need to essentially get their counties in line, and then they certify compliance back to FEMA in order to get that 20 percent unlocked.

The second is, you know, just saying, Well, if you get the 20 percent later, what's the big deal? It's important to take a step back and talk about what this money

is for. This is counterterrorism money. Like, if you read our clients' declaration, this is money to buy security equipment, staff up for security threats, including election security, threats to polls themselves.

And so it's not harmless to just say, Well, maybe this will get delayed three years. It imposes quite a bit of harm on our clients, the county whose job it is to keep their systems safe.

I did want to just clarify for the record -- and I think maybe this doesn't matter for now. And I don't begrudge Ms. Yeatts at all, because I realize what she said about this just coming across her desk. The bulletin number that she references is not the right one. That actually concerns FY '25 money, which we're not suing about. Ours is the August 10th bulletin. So I just wanted that to be clear on the record. The August 10th one, which was an exhibit to our motion, sets out, like, a very detailed and prescriptive guidance from FEMA about the holdback and what the conditions require.

I'm sorry. One more thing, your Honor, if I may, on the time urgency: Even if the states accept the award two months later, 60 days later, 40 days later, some of these requirements are post-election requirements, including, you know, conducting an audit of ballots, reconciliation. And there's every reason to believe that

they're going to still impose these requirements even if the state accepts on November 10th as opposed to, you know, October 30th or September 30th.

And then the last thing I would say, your Honor, taking a step back, I think the Court can take -- it's not judicial notice, but cognizance of the context here. And this is not something that FEMA's just going to say, "Yeah, we'll just kick it down the road." The director -- I'm sorry -- the Secretary of Homeland Security Mullin has cited these specific conditions very publicly as one of the main things they are doing to promote, quote, "election integrity" for the upcoming midterm elections.

The State of Texas has now intervened in the mail ballot voting case as a defendant, you know, the one that's been up and down the Supreme Court, to, you know, defend the administration's prerogatives. You know, it's not exactly speculative here what's going to happen in terms of the State of Texas, for example, accepting these conditions that are imposed on them.

THE COURT: And your representation is, you know, come August -- come October 2nd, if this rule is not enjoined, you know, the states are going to impose upon your clients, your municipalities, those election conditions? I'm really just focused on, like, what happens -- you've asked for a decision by a certain day. I'm focused on

understanding, is that actually a date certain for something to happen?

MR. JACOBSON: There's --

THE COURT: It's just a scheduling question. It's not like -- we're not here talking about, you know, from a burden to show irreparable harm. I'm just trying to assess schedule here. But I do want to -- before I set a schedule, I want to understand that the urgency is a real one. And it may well be that the Government needs to get back to me with something before I could be persuaded that it's not, again, kind of precisely because we're just talking about scheduling here.

But I want to hear your answer. Is that your position, essentially?

MR. JACOBSON: Yes. Our clients have every reason to believe that, come the beginning of October, they're going to be compelled to comply with these conditions. And they lay out sort of what that will entail. But that is why we have asked for a decision by when we've asked for it.

THE COURT: Is it at least some subset of those -- like, implementing those conditions decided at the state level as opposed to the county level and then the municipality level?

MR. JACOBSON: Our understanding, at least from the face of the documents, is that all of it is a state

decision about whether to implement. It will just be the counties on the ground that are going to have to do the implementing. But the decision to accept the conditions is --

THE COURT: Well, I'm not talking about the decision to accept. I think everyone seems to agree that the decision to accept is the states', the decision to implement. Right? You drew a distinction between certain states and other states based on whether they actually have to go about doing what the conditions require. And I'm asking you, you know, can your municipalities just say: Well, good for you; you accepted this; we're not doing it?

MR. JACOBSON: I don't want to answer that question right now specifically.

But just to let you know how we think this will play out in practice, each state would accept the conditions. Then you will get an edict either from the governor of Texas or Tennessee or the secretary of state that goes down to the counties that says, You are hereby ordered to do the following things.

THE COURT: Okay. Ms. Yeatts, just to make sure I understand your position, you know, I didn't see the argument in your motion being that the schedule for briefing proposed is inappropriate because there's a need for some sort of discovery or an administrative record that the

Government wants to develop here, which makes sense, I think, given the nature of the claim that is the subject of the motion, which is as I understand it just a contrary-to-law administrative procedure claim. So I guess that makes sense here. You'll correct me if I'm wrong. But that's my understanding. And that you're instead making an argument that is really just about having time to brief the case.

And, you know, hopefully it's clear. I want to make sure that gets consideration. And I'm considering it right now. But I just want to understand that. That's the nature of your response, that you should get the time under the rules. Right?

MS. YEATTS: Well, yes. And, your Honor, I think it's multifaceted. I think, first of all, for example, what was just referenced was an exhibit attached to one of 15 declarations or 13 declarations. This one in particular is 109 pages, and this was filed last night. So there's a lot of information to take in from every jurisdiction that needs to be considered.

And so yes for briefing. But of course, before briefing, for conversing with the client and gaining clarity, I think today evidences that this is complicated and there are a lot of questions to be answered before we can start drafting argument.

So yes. That 14 days is appropriate because consulting with the client, carving out arguments, et cetera, is necessary.

And as -- you know, as to your -- I think that another point that we made in the opposition is that this wasn't brought in an emergency posture. And we welcome -- you know, we welcomed Plaintiffs to do so. But this was brought as an MSJ. An amended complaint was filed yesterday.

THE COURT: I saw that argument, Ms. Yeatts. I get a couple things. I get that the rules typically allow two weeks. You know, at the same time, courts, you know, change those default deadlines. I mean, that deadline is applicable, for example, to all the motions, not just this type of motion. And so those deadlines change kind of as a matter of course based on what makes sense.

Here, you do have a situation where it seems like there's a time sensitivity and a degree of importance that's been raised about the implications of passing the deadline that I think -- you know, fair to say, again, I appreciate your candor and I understand that you are new to the case. But you haven't fully dispelled, I think, fairly from your perspective -- you haven't been able to fully dispel that significance and urgency.

And part of the urgency here is from the date set

by your clients, which does not always feel great from a lawyer's perspective. It's not your fault, obviously. But your clients have this deadline set. As I understand it, kind of the main guidance here was not from that long ago; it was August. So there's kind of this window between August and September 30th that's just really significant. So I understand that point.

You know, as it relates to Rule 65 and moving for preliminary relief, you know, again, we're talking here about scheduling of briefing deadlines. Right? And so if it's the difference between ten and 14 days, it's not only in the context of a Rule 65 brief where one would reduce the deadline. I've had Rule 65 PI motions where the deadline's been shorter; I've had ones where it's been longer; I've had the same for these -- you know, it's a contextual question.

So I get the point that they didn't move for preliminary relief. But we are here only talking, I think, about, you know, how fast to brief the case. It's not like they're here saying, You've got to brief this in three days. They're proposing ten.

And part of the question I have for you, I guess, is, you know, given that what we're really talking about here is not a kind of procedural problem except insofar as making sure that within the time that is applicable here until the deadline -- making sure that, you know, we try to

allocate the time between the parties and between the Court reasonably, given that that's the only question we're talking about here, what is exactly your proposal? I know that you wanted the two weeks. But when are you proposing the reply would be due? And, you know, how long are you giving me to get a decision out?

MS. YEATTS: Sure, your Honor.

THE COURT: Assuming that I, you know, am going to get this done before September 30th.

MS. YEATTS: Right. I stress again that I do want to make sure that I get back to you and to everyone to clarify whether or not the sense of urgency is real. You know, so there's that.

But assuming that it is, assuming that states accept conditions on behalf of their local entities, the Government proposes that we have 14 days from yesterday. And we're totally fine with Plaintiffs taking five days to write their reply as they proposed.

I'm not sure if you were asking something other than that. But that is our -- are you asking for me to compromise or are you asking --

THE COURT: I'm only smiling because you're basically saying the time that goes to the parties comes out of my time to write a decision.

MS. YEATTS: Oh, your Honor, I meant to clarify as

well: We -- the Government is also -- I mean, we would be happy for you to decide on the papers. I know that doesn't relieve everything. But to the extent that, you know, we clarify that, we won't be insisting upon argument. I know that that's been helpful to other courts in the past in terms of this timeline.

THE COURT: So the Government's proposal, then, is the opposition due September 16th?

MS. YEATTS: I think 15th, your Honor.

THE COURT: 15th?

MS. YEATTS: I could be wrong.

THE COURT: September 15th.

And then Plaintiffs reminded me that they only asked for five days, not seven days, which would take you to the 19th, which is a Saturday.

So what if we do this: I'm looking at maybe thinking that -- it's not quite the 15th, but if I give the Government until the 14th here and then I give the Plaintiffs until the 18th, it still crunches me. It would be helpful to me, actually, if the Government could get their -- I'm sorry -- if the Plaintiffs could get their briefing in by the 17th. So the 14th and the 17th.

Mr. Jacobson, can you comment on that schedule? So you're basically giving the Government until the other end of the weekend from what you proposed to give them, a

few more days to get closer to what they're proposing. And then I'm shaving off -- it would be a couple of days from the reply.

MR. JACOBSON: I'm just checking something about the -- there's a religious holiday right around there. I'm not trying to be evasive. I just want to check the date of that and how that would align with our team. But in general, we'll deal with that.

THE COURT: Well, I want to be sensitive to that among all of the considerations.

And I'll say it this way: I mean, you're asking currently for -- it's a tight period. I think it's reasonable for Government counsel -- obviously, you know, part of this is informed by your clients. But it's reasonable for them to have -- you know, to ask for more time at a minimum.

If she gets until the 14th, I'll give you guys until the 17th to get something on file and reply. If you want to come back for reply -- I don't think we have room to shift the principal briefs. But if you want to come back for a reply and ask for one more day until the 18th, I'll let you do that. But, you know, you're taking it out of my time and you're asking me to get an opinion out. So I would have that weighing in the balance if you're transferring a day from the Court to the parties.

And so --

MR. JACOBSON: We will.

THE COURT: I will also say that, Ms. Yeatts, I appreciate your candor that maybe you have some more questions to ask your clients that may impact the urgency here. I'm interested in those. I do think it's going to be worth letting me know about those. But it would be worth conferring on any of those in advance and filing them, you know, as a joint report.

It may well be -- and I don't think Plaintiffs should rule this out -- it may well be that the Government, the Defendants, are able to give some sort of representation that removes the urgency here. And if so, I think presumably the Plaintiff municipalities would be satisfied by that and happy with that, and maybe it kicks the concern about changes to election procedures to at least after the current election.

That may not be the case. I understand it. But you all should talk about that so I can get both of your positions on the impact of anything that Ms. Yeatts learns in consultation with his clients.

But, you know, absent something that warrants modifying the schedule, we're going to go with the opposition brief. So I guess I'd put it this way: Well, let me -- before I do this, any other submissions anyone

really, really wants to make related to scheduling?

MR. JACOBSON: I'm just --

THE COURT: Mr. Jacobson, go ahead.

MR. JACOBSON: We'll get it in by the 17th, your Honor.

THE COURT: Ms. Yeatts, anything else?

MS. YEATTS: No, your Honor, other than you just hit on something that is an outstanding question that I have: Whether or not given 60 days from award acceptance, even if we're just talking about states, the conditions then need to be met, whether or not that would ever happen before the November election is something that I'm trying to understand and have been wondering about the impact on this election versus a future election, given the 60-day timeline, et cetera, et cetera. I think that's an important question, is my only addition here.

THE COURT: I agree.

And I do think -- you know, I'm not going to speak for Plaintiffs. I'll speak to my interpretation of their submissions, is that the urgency arises from, Hey, there's going to be this stuff that we have to do and it's going to impact an election -- how an election is carried out in their particular municipalities. They understandably have an interest in that.

And so if you can come back and tell them, Hey,

look, that's not going to be the case, I think that would be -- my guess is that would be welcome news. And even if it's not, I think it warrants coming back to me and telling me about it; and I'd want to know why it doesn't impact, you know, the parties' schedule and my schedule here.

So I'll let you confer with the Plaintiffs and get back to me on that. Okay, Ms. Yeatts?

MS. YEATTS: Yes, your Honor.

THE COURT: Okay. Then I'm going to -- I guess technically it would be granting in part both motions here. I think it's ECF 21 and 22. I'll be granting in part and denying in part each of them because I'm adopting a briefing schedule as the Government is asking for.

I'm expediting as the Plaintiffs are asking for, but I'm not adopting the exact proposals. So there's the "in part."

I'm going to order the Government to file its opposition on September 14th.

I will order a reply on September 17th.

And I believe that resolves everything for today, so we can adjourn.

And I do appreciate the submissions, especially on short order, hopping on a call so we can plan this out in a way that makes sense.

Thank you.

MR. JACOBSON: Thank you, your Honor.

MS. YEATTS: Thank you.

(Proceedings concluded at 3:42 p.m.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 23rd day of October, 2026.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269