**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-02886 (AHA) |

**Order Denying Motion For Stay Pending Appeal**

Nearly a month ago, the court granted summary judgment to Texas, Tennessee, and Ohio counties and cities that sued the federal government, vacating a Federal Emergency Management Agency ("FEMA") rule that would have withheld counterterrorism funds unless the localities overhauled routine aspects of election administration. *See Metro. Gov't of Nashville & Davidson Cnty. v. DHS*, No. 26-cv-02886, 2026 WL 2905123, at *1 (D.D.C. Sept. 28, 2026). The defendants have noticed an appeal to the D.C. Circuit and now ask this court for a stay pending that appeal on grounds that are confounding in light of the court's reasoning and the defendants' own litigation decisions: The defendants say they are likely to succeed in their appeal but have no response to the court's principal (and independent) reason for concluding that FEMA exceeded its statutory authority; they assert a conclusory harm that is difficult to square with their earlier representations that states and localities could accept the funds but wait months or even years to implement the changes; and they don't acknowledge, let alone balance, their asserted harm with the credible evidence of harm to localities from being denied federal counterterrorism funds if they decide not

to divert millions from their own budgets to overhaul election procedure. And the defendants don't explain why they waited nearly a month to seek a stay.

"A stay pending appeal is an extraordinary remedy." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quotation marks omitted). In determining whether to grant a stay pending appeal, the court considers: (1) whether the defendants have made a strong showing that they will likely succeed on the merits of their appeal; (2) whether the defendants will suffer irreparable harm absent a stay; (3) whether a stay will substantially injure the opposing parties; and (4) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). On the record here, the factors all point against granting a stay. Indeed, it would be extraordinary to grant the defendants' requested stay when they still haven't developed any theory (let alone a persuasive one) under which FEMA has the authority to condition funds on states and localities using their own budgets to implement the federal government's preferred projects, when they represented that states and localities would have years to comply with the conditions at issue, and when the defendants have acted without urgency.

## I. The Defendants Have Not Shown A Likelihood Of Success

The court concluded that FEMA exceeded its statutory authority by adopting the election administration conditions for two independent reasons. It held, first, that although the governing statute authorizes FEMA to provide grant funding to state, local, and tribal governments to achieve stated counterterrorism aims, the statute's text "does *not* authorize FEMA to withhold counterterrorism grants until states and high-risk urban areas achieve policy objectives on their own dime." *Metro. Gov't of Nashville*, 2026 WL 2905123, at *6. The court reasoned: "While the statute repeatedly references FEMA's authority to further stated counterterrorism aims by 'awarding,' 'providing,' 'distributing,' and 'allocating' funds 'to assist' in those ends, the defendants do not point to *any* text that purports to give FEMA the authority to extract unfunded

reforms from states in exchange for grants." *Id.* (alterations omitted) (quoting 6 U.S.C. §§ 603(a), 604(a), 604(d)(1), 605(a), 608(a)).

The defendants' stay motion does not even attempt to argue—let alone make a strong showing—that the statute authorizes FEMA not just "to fund projects proposed by states and high-risk urban areas," but also "to use the possibility of grants to induce states or high-risk urban areas to carry out the federal government's preferred projects at their own expense." *Id*. Indeed, the defendants' only response to what the court articulated as its first, independent basis for its decision is buried in a single conclusory paragraph at the end of their likelihood of success argument, which does not quote any statutory text and merely asserts that "the five Election Security Conditions promote[] the security and integrity of election infrastructure." ECF No. 45 at 7. That response is entirely beside the point. Even assuming FEMA was pursuing the statute's stated purposes, "Congress in no way authorized FEMA to withhold grant funds to achieve the federal government's policy ends at state and local expense," *Metro. Gov't of Nashville*, 2026 WL 2905123, at *7—and the defendants' stay motion does not dispute that FEMA's conditions did just that.

The court secondly and independently concluded FEMA exceeded its statutory authority because "Congress did not authorize the grant program to be used for the sort of election administration reforms FEMA demands here—changes that, whether sound or not as a matter of policy, are not advanced to prepare for or respond to 'acts of terrorism.'" *Id*. The court observed "the statute would plainly authorize FEMA [to] fund grants that protect against or respond to terrorist attacks on critical election infrastructure," including "physical or cyber terrorist attacks targeting critical infrastructure related to elections." *Id*. at *8; *see also id*. at *7 (analyzing the types of threats listed in the statute's text). The court also observed that the defendants did "not appear

to argue—or, if they [did], explain how—the specific election administration conditions listed in the [notice of funding opportunity] connect to the types of physical or cyber threats to critical infrastructure listed in the statute," and instead relied on a generalized interest and discretion in "strengthen[ing] the integrity of U.S. elections" and tackling threats to "election infrastructure." *Id*. at *7. In their stay motion, the defendants do not dispute that they never previously argued or explained how each condition connects to the specific physical or cyber threats listed in the statute. Nor do the defendants offer that missing explanation now. Instead, they simply say each condition is "self-evidently" within FEMA's authority, with one conclusory assertion about how each condition is "intended to protect against election infrastructure vulnerabilities." ECF No. 45 at 5.

That response is too superficial to assist, let alone control, the statutory analysis—indeed, neither the defendants' representation that FEMA is "self-evidently" acting within its authority nor their brief assertions about the individual conditions are accompanied by a single reference to the statute's text. *Id*. As the court explained, here, the text authorizes the agency to allocate funds to protect against and respond to "acts of terrorism." *Metro. Gov't of Nashville*, 2026 WL 2905123, at *7 (discussing the language in 6 U.S.C. §§ 604(a), 605(a), 608(a)(1)). So even accepting the defendants' new gloss, the statute does not authorize FEMA, an emergency management agency, to address anything broadly "intended to protect against election infrastructure vulnerabilities," even things with no clear nexus to acts of terrorism. ECF No. 45 at 5. Indeed, the defendants (still) offer no limiting principle for FEMA's authority under the statute—on their view, FEMA can condition counterterrorism funding on election administration decisions long at the core of state and local discretion as long as the agency can assert a concern about elections being "manipulated" or "tampered with," *id.*, despite the statute's express focus on "acts of terrorism." 6 U.S.C. §§ 604(a), 605(a), 608(a)(1). That argument remains far too underdeveloped to be persuasive. And,

as the court also explained, it conflicts with the Supreme Court's guidance that such major questions require a clear statement and puts the statute's constitutionality in doubt. *Metro. Gov't of Nashville*, 2026 WL 2905123, at *8–9.

As the court explained, "whether FEMA exceeded the authority Congress gave it centers on the text of the statute Congress used to create the grant program." *Id.* at *6. The court cannot agree that the defendants are likely to succeed on appeal when they advance no reading of the statute that authorizes FEMA to withhold grants unless localities self-fund federal objectives and offer only a superficial reading that the statute authorizes these objectives at all.

## II. The Defendants Identify No Specific Irreparable Harm

The defendants' tardy stay motion offers two cursory paragraphs on the remaining three stay factors. The motion asserts that the defendants will be irreparably harmed based on the general notion that the federal government suffers irreparable injury "any time it is prevented by a court from effectuating statutes," as well as an assertion that, "absent a stay," the funding at issue "will be disbursed to state grantees without attached conditions carefully designed to promote election security, thereby delaying critical efforts to improve the integrity of the Nation's election infrastructure." ECF No. 45 at 8–9 (formatting modified). The court finds these arguments are not credible on the record here.

First, the assertion of irreparable harm from a delay in the implementation of the conditions is belied by several specific representations the defendants have made throughout these proceedings. As the defendants themselves have emphasized, states need not accept the awards and accompanying conditions at all. *See* ECF No. 37 at 21 (emphasizing that "a potential recipient may choose to forgo [grant funds] entirely, thereby eliminating any requirement to implement the conditions"). In other words, the defendants had no guarantee that the conditions would be implemented by any state or locality. And, as to jurisdictions that choose to accept awards, the

defendants emphasized that the issues in this case do not pose "as much urgency as maybe it appears" because, even assuming FEMA's conditions were lawful, the grantee would have "60 days to accept the award" and therefore no state or locality would have to take any action before the November 2026 election. Hr'g Tr. at 16 (Sept. 2, 2026); *see* ECF No. 31 at 2. The defendants went further, assuring that FEMA could further extend the award acceptance deadline and "has done so historically" for litigation to "play out before anyone was forced to commit to accepting the awards." Hr'g Tr. at 18. Indeed, the defendants represented that even if a jurisdiction were to accept an award with the conditions, there would be "no such thing as coming into compliance late" because states and localities could take "three years to meet" them. *Id*. at 23–24. Having repeatedly emphasized that there was no expectation the conditions would be implemented at all (for jurisdictions that do not apply for funding or accept awards) or on any particular timeframe (for jurisdictions that do accept awards), the defendants cannot now credibly assert that any delay in implementation poses harm that is "beyond remediation" and "so imminent that there is a clear and present need for equitable relief to prevent" it. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (formatting modified).

Second, the harm defendants assert here also conflicts with what the defendants have been saying in other cases and their actions since this court's vacatur order. The defendants say in their motion that, "absent a stay," funding "will be disbursed to state grantees without attached conditions." ECF No. 45 at 8. But in a parallel case brought by states to challenge the same election administration conditions, the same defendants have represented that they can simply enforce the election administration conditions if the conditions are later held to be lawful and that they can do so even after the grant awards have been accepted by states. *See Illinois v. FEMA*, No. 26-cv-485 (D.R.I.), ECF No. 56 at 20 n.10 (defendants representing that, if states accept awards, FEMA

"intends to enforce the rescinded Election Security Conditions if . . . a court later determines on appeal that it is within [FEMA's] lawful authority to do so"). Indeed, FEMA issued a guidance document after this court's decision telling grant awardees that although it has reissued grants, it intends for "the election administration conditions and 20% holdback [to] immediately become effective" in the event the "order is vacated or extinguished." ECF No. 48-1 at 4; *see, e.g.*, *Illinois*, No. 26-cv-485 (D.R.I.), ECF No. 56-17 at 42 (reissued grant award including the same language). So it is rather misleading for the defendants to say that, without a stay, awards will be "disbursed to state grantees without attached conditions," ECF No. 45 at 8—the defendants are disbursing awards with a term stating the conditions will be enforced if they succeed on appeal.

Third, and itself a sufficient reason to deny a stay, the defendants' assertion of irreparable harm is belied by their own non-urgency in pursuing the extraordinary relief they now seek. The defendants waited nearly a month to seek a stay pending appeal. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (concluding a 44-day delay in seeking relief was "inexcusable" when the movant was aware of the purported harm during that period); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." (collecting cases)). They offer no explanation for that delay, and the court finds the defendants' stay request is inconsistent with basic notions of diligence in pursuing available relief.[1]

[1] The stay motion is not clear on this point, but to the extent the defendants claim harm based in any part on the November 2026 federal midterm elections, their delay in seeking a stay would seem to manufacture urgency and an opportunity to raise these issues to an appellate court in a more abbreviated, emergency posture. *See, e.g.*, ECF No. 45 at 1 (telling this court that, after weeks of delay in moving for a stay, the defendants would wait only two business days for a ruling); *see also USPS v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sept. 14, 2026) (Kavanaugh, J., concurring in the denial of the application for stay) (reasoning that, even with a "fair prospect" of success on the merits, applying a challenged rule "in the 2026 elections would be arbitrary and

### III. The Balance Of The Equities And The Public Interest Favor Denying A Stay

Although the defendants purport to address the "remaining stay factors" in their final two paragraphs, they make no effort to balance the equities. That's a problem on the record before the court because, in contrast to the defendants' cursory assertion of harm, the localities have offered competent and credible evidence that withholding counterterrorism funds and imposing the election administration conditions would come at a steep cost to their operations, cause significant disruption to state and local election administration, place their obligations under the eventual grant agreements in conflict with their obligations under state law, and saddle them with significant (and unfunded) costs to revamp their systems for running elections. *See Metro. Gov't of Nashville*, 2026 WL 2905123, at *2 n.1, 6 (finding the plaintiffs had offered "credible evidence" of substantial costs).

Finally, although the defendants' motion simply takes for granted that the public interest is best advanced by maximizing federal government authority pending appeal, under this country's federalist system, states and localities represent the public interest too. *See, e.g.*, *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) ("The public interest plainly lies in not allowing DHS to circumvent those federalism concerns."). There is no doubt that election administration is a matter of great public importance. *Metro. Gov't of Nashville*, 2026 WL 2905123, at *9 (explaining "the court does not question" that strengthening the integrity of U.S. elections is "a laudable goal"). But it is also well established that, in our federalist system, states and localities play a critical role in regulating and administering elections. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14–15 (2013) (describing "the States' role in regulating congressional elections" as "weighty and worthy of respect"); *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 677 (2026)

capricious . . . because state and local election officials do not have sufficient time to reasonably implement the rule before the elections").

(explaining that, by default, "responsibility for the mechanics of congressional elections belongs to States" (quotation marks omitted)). In contrast to the federal government's vague assertions of harm and repeated representations that the election conditions have no urgency, the plaintiff counties and cities here have asserted concrete harm to the orderly administration of elections if funding is withheld based on conditions that would require them to overhaul their elections. *See, e.g.*, ECF No. 28-15 ¶¶ 21–23 (Elections Administrator for El Paso County attesting that, without "additional funding to cover the increased costs of complying with the [election administration] conditions, the County would need to reduce voting locations," "cut outreach programs," and would likely "lose poll workers"); ECF No. 28-12 ¶ 20 (Travis County Clerk attesting that the audit condition would "potentially interfer[e] with the County's ability to" comply with state audit law).

## IV. Conclusion

For these reasons, the court denies the defendants' motion for a stay pending appeal, ECF No. 45.

AMIR H. ALI
United States District Judge

Date: October 26, 2026